MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF GEORGIA
2                        SAVANNAH DIVISION

3

4

5
     MICHAEL JACOB CASTLE-FOSTER,
6
          Plaintiff,
7

8

9

10
     vs.                              CIVIL ACTION NUMBER
11                                     4:19-CV-139 RSB

12

13

14
     CINTAS CORPORATION NO. 2 d/b/a CINTAS
15   CORPORATION, and, CINTAS CORPORATE SERVICES,
     INC.,
16        Defendants.

17   --------------------------/

18          The videotaped deposition via video

19   conference of LANE VANINGEN, a witness in the

20   above-entitled cause, taken pursuant to Notice

21   and agreement, before Cathy M. Knoettner,

22   Certified Court Reporter and Notary Public, and

23   Charles Nussbaum, Audio-Video Technician, on the

24   1st day of September, 2020, commencing at or

25   about the hour of 11:04 a.m.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
          800-791-1100      www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                                   2

```
 1    APPEARANCES OF COUNSEL:

 2       FOR THE PLAINTIFF:

 3                 VIA VIDEO CONFERENCE

 4            C. CLAY DAVIS, ESQUIRE
              HOWARD E. SPIVA, ESQUIRE
 5            MARY K. HASHEMI, ESQUIRE
              Spiva Law Group, P.C.
 6            1137 Mohawk Street
              Savannah, Georgia  31419
 7            912-920-2000
              davis@spivalaw.com
 8            howard@spivalaw.com
              mary@spivalaw.com
 9
         FOR THE DEFENDANTS:
10
                 VIA VIDEO CONFERENCE
11
              WILLIAM S. MANN, ESQUIRE
12            Hall Booth Smith, P.C
              3528 Darien Highway
13            Suite 300
              Brunswick, Georgia  31525
14            912-554-0093
              wmann@hallboothsmith.com
15            bboone@hallboothsmith.com
              bbryson@hallboothsmith.com
16

17       ALSO PRESENT VIA VIDEO CONFERENCE:
              Peter Ruden
18

19                      -   -   -

20

21

22

23

24

25
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                                    3

1

2                          I N D E X

3

4                                                      PAGE

5

6    EXHIBIT INDEX ----------------------------- 4

7
     OPENING REMARKS AND STIPULATIONS ----------- 6
8

9

10

11

12

13

14

15   DIRECT EXAMINATION:
        By Mr. Davis ---------------------------- 6
16

17

18

19

20

21

22

23

24   CERTIFICATE ------------------------------- 182
     DISCLOSURE -------------------------------- 183
25   ERRATA SHEETS ------------------------- 184-186



COASTAL COURT REPORTING & VIDEO SERVICES
          800-791-1100       www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                              4

1           D O C U M E N T A R Y     E V I D E N C E

2     NUMBER                    DESCRIPTION                    PAGE

3
      EX-1     Remote Video Deposition Notice of
4              Lane VanIngen, dated 8-25-20

5     EX-2     Amended Remote Video Deposition
               Notice of Lane VanIngen,
6              dated 8-28-20

7     EX-3     Lane VanIngen Retainer/Fee Schedule
               with attached e-mail string
8
      EX-4     Letter to Lane VanIngen from Beth
9              Boone, dated 7-30-20

10    EX-5     Expert Report of Dmitri A. Sofianos,
               M.D.
11
      EX-6     Expert Witness Report of Lane VanIngen
12
      EX-7     Expert Witness Report of Lew Grill
13
      EX-8     Vehicle Policy
14
      EX-9     Authorized Driver Safety Policy
15             (U.S. Operations)

16    EX-10    Company Van Use

17    EX-11    Procedures for Reporting and
               Investigating Vehicle Liability,
18             Property Damage, General Liability
               and Workers' Compensation Claims
19
      EX-12    Georgia Department of Public
20             Safety Transportation Rulebook,
               Chapter 1, Motor Carrier Safety
21             Regulations

22

23

24

25



COASTAL COURT REPORTING & VIDEO SERVICES
              800-791-1100      www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                                     5

1          D O C U M E N T A R Y   E V I D E N C E

2      (CONTINUED)

3      NUMBER                DESCRIPTION                    PAGE

4
       EX-13  Colored photograph
5
       EX-14  Driver Vehicle Inspection Report,
6             April 2018

7      EX-15  SMS, Safety Measurement System
              document
8
       EX-16  Company Snapshot Cintas Corporation
9             No. 2

10

11

12

13          REPORTER'S NOTE:  ALL EXHIBITS WERE
             PREMARKED BY PLAINTIFF'S COUNSEL.
14

15

16

17

18

19

20

21

22

23

24

25



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          6

```
 1                    (Disclosure was made pursuant to
 2                    O.C.G.A. annotated 9-11-28
 3                    (c) and (d) and 15-14-37
 4                    (a), (b) and (c).)
 5                    (Whereupon, the videocorder was
 6                    turned on at approximately
 7                    11:04 a.m. and videotaping
 8                    commenced.)
 9                    LANE SCOT VANINGEN,
10    having been produced and first duly sworn as a
11    witness, testified as follows:
12                    DIRECT EXAMINATION
13    BY MR. DAVIS:
14        Q    Sir, would you state your full name,
15    please.
16        A    Yes, it's Lane Scot VanIngen.  Scot is
17    spelled with a single T.
18        Q    And do you have your driver's license
19    or some other form of government ID available
20    with you today?
21        A    I know I have my pistol permit; will
22    that suffice?  (Indicates.)
23        Q    Thank you very much, sir.
24        A    You're welcome.
25                    MR. DAVIS:  Let the record show
```



1    this is the deposition of

2    defense-retained expert Lane VanIngen

3    which is being taken by the plaintiff

4    in the case of Michael Jacob

5    Castle-Foster versus Cintas Corporation

6    No. 2 and Cintas Corporate Services,

7    Incorporated, Civil Action Number

8    4:19-CV-139 RSB CLR pursuant to notice

9    and agreement of counsel.  This

10   deposition today is being taken

11   remotely by Zoom pursuant to the

12   current COVID-19 pandemic, agreement of

13   counsel and direction of the Court.

14   This deposition is being taken for the

15   purposes of discovery,

16   cross-examination and all other

17   purposes permitted under the Federal

18   Rules of Civil Procedure and applicable

19   federal law.

20        Mr. VanIngen, you have a right to

21   read and sign your deposition if you

22   choose to do so whether -- you know,

23   Will, do you want him to read and sign

24   or does he wish to read and sign?

25        MR. MANN:  Yes, I do; I typically



1   request to read and sign.

2            MR. DAVIS:  Very good.  Thank you,

3   sir.

4            (Whereupon, the witness expressly

5            reserved the right to read and sign

6            the deposition transcript.)

7            MR. DAVIS:  I propose that all

8   objections except to the form of the

9   question and responsiveness of the

10  answer are reserved until trial,

11  pretrial conference or first use of the

12  deposition.  Is that acceptable, Will?

13           MR. MANN:  Yes, that's acceptable.

14           MR. DAVIS:  All right.

15           MR. MANN:  And, Clay, before we

16  get going, let's just put on the record

17  who all is present for the parties.

18  I'm Will Mann here for the defendants.

19           MR. DAVIS:  Okay.  Well, I'm Clay

20  Davis.  I'm in the conference room

21  right now with Peter Ruden who's

22  assisting me with the deposition today,

23  and Howard Spiva is in his office, and

24  Mary Hashemi is in her office.

25           MR. MANN:  Very good.  Thank you.



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          9

1    BY MR. DAVIS:

2         Q    Mr. VanIngen, my name is Clay Davis; we

3    were just introduced.  I represent Jacob

4    Castle-Foster in this lawsuit that has been

5    filed against Cintas Corporation.  I'm going to

6    ask you some questions concerning your expert

7    report and the expert opinions that I understand

8    you hold in this case, which of course arises

9    from the automobile collision that took place in

10   Effingham County on April 6, 2018 at the

11   intersection of Old Augusta Road and

12   Rincon-Stillwell Road.

13        If you don't hear or understand any of

14   my questions, please ask me to restate or

15   rephrase my question.  I'll be more than happy

16   to do so.  Likewise, you know, due to Zoom or

17   the audio feed, if you can't understand me, just

18   let me know.  If you give an answer to a

19   question that I've asked, I'm going to assume

20   that you heard and understood my question and

21   you're giving me a true and accurate response.

22   Please verbally answer all questions by saying

23   yes or no if it calls for yes or no so the court

24   reporter can get down your response correctly.

25   And, you know, obviously I've read the fact that

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    10

1    you've been an expert witness in a number of
2    cases so I'm assuming you've given numerous
3    depositions; correct?
4        A    That is correct, yes.
5        Q    Okay.  And, you know, one of the ground
6    rules is we try not to talk over one another and
7    that's more so today because how we're doing the
8    deposition so --
9        A    Yes, sir, I understand.
10       Q    If I interrupt you, I don't mean to;
11   let me know and I'll be quiet and let you
12   finish, okay?
13       A    I will try to return that favor.
14       Q    All right, thank you.  Sir, let me show
15   you -- first of all, did you receive the
16   exhibits by e-mail that we sent earlier this
17   morning?
18       A    I saw them come in.  They were
19   forwarded to me by Mr. Mann, I believe.  I have
20   not really had a chance to look at them but I
21   did receive them.
22       Q    Okay.  Do you want to take the time now
23   to print them off so you will have them in front
24   of you or do you have the ability to see them
25   through some other means?



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100          www.coastalcourt.com

1      A      I assume that you might share them with
2   me but I could, I guess, swap and open them up
3   if I needed to electronically.
4      Q      Okay.  Well, I will share them with
5   you, but if get into any problems -- because
6   some of the documents are a little more lengthy.
7   If we need to, we might take a break so you can
8   print off that respective document if you need
9   to, okay?
10     A      That sounds good, yes, sir.
11     Q      Let me show you -- and I'm just getting
12  up to speed on this whole sharing business
13  myself and I have Mr. Ruden here to help me if I
14  mess it up, but I'm going to start by showing
15  you Plaintiff's Exhibit Number 1.  Give me just
16  a minute, sir.  Can you now see Exhibit Number
17  1?
18     A      I can, yes, sir.
19     Q      Hold on just a minute.  And you see
20  it's marked Exhibit 1.  Have you seen this
21  document before today?
22     A      I have.
23     Q      When did you first see this document?
24     A      Sometime in the last day or two, I
25  would say.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    12

1      Q    Okay.  And do you see -- I think you'll

2   probably know that we sent an amended notice as

3   Exhibit 2 because this particular document had

4   the wrong day of the week for today's

5   deposition.  We have it down as Friday,

6   September 1, 2020, and we caught that and

7   corrected it to read Tuesday, September 1, 2020

8   do you mean.  Doo you think you've seen both of

9   those documents, sir?

10     A    To be perfectly honest, I didn't catch

11  the date differential but I knew we were doing

12  this today so I'm good with that either way.  I

13  may have seen both.

14     Q    All right.  You'll see in the last

15  paragraph it says, "Pursuant to the Federal

16  Rules of Civil Procedure, the deponent is

17  commanded to produce the docyments listed in

18  Schedule A, annexed hereto, to counsel for the

19  plaintiff on or before 3:00 p.m., on August 28,

20  2020 via e-mail or electronic file sharing."; do

21  you see that?

22     A    I do.

23     Q    And if you go down a little bit further

24  you will see Schedule A.  Do you know if you

25  provided these documents to defense counsel?



 1      A     Well, I typically don't handle that
 2   myself; my staff does but it's my understanding
 3   it was.
 4      Q     Okay.  So it's your understanding that
 5   all the documents listed on Schedule A was
 6   provided to defense counsel at some time before
 7   today; is that correct?
 8      A     That's my expectation, yes, sir.
 9      Q     Do you know when it was provided to
10   defense counsel?
11      A     I don't know that I know that
12   specifically, no.
13      Q     Okay.  Well, sir, going through today,
14   I may come back and forth to these documents to
15   show you different matters that are on them.
16   Let me -- just a second.  Like I say, I'm still
17   getting up to the speed on the system so I do
18   apologize.
19            I'll also show you Exhibit 2 and give
20   me just a second to get that up for you.  And
21   you see there's Exhibit 2.  And as you'll
22   notice, the day of the week has been corrected
23   there, also.
24            All right.  Sir, I'm going to show you
25   what's been marked as Plaintiff's Exhibit 3;



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1    give me just a minute.  Now, I'm going to go

2    through these documents for a second.  Do you

3    recognize this document?  I'll tell you, I'll

4    represent the document is 28 pages long and it

5    was provided to me yesterday, I believe

6    yesterday afternoon, and it's marked Exhibit 3.

7    Do you see that, sir?

8        A    I see the first page of it, yes.  And I

9    see that it is 28 pages long, as you said.

10       Q    Yes, sir.  Now, it says at the top

11   "Rate Schedule - Litigation Consultation and

12   Support"; do you see that?  Does this appear to

13   be one of the standard documents for your

14   business, sir?

15       A    It does, yes.

16       Q    I'll go to the second page, also.  If I

17   need to slow down at all, let me know.

18            Does that three-page document appear to

19   be one of the documents produced by your office,

20   sir?

21       A    I would assume so, yes.

22       Q    Okay.  And what is this document called

23   exactly?

24       A    It's, what we call, our retainer

25   document for litigation matters.



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

1      Q     And I guess you produced the same form

2    document in every case you work on, sir?

3      A     Well, we update that document from time

4    to time.  You know, the rates change and

5    everything.  But, yes, this is the rate schedule

6    that was in place at the time that we were

7    retained in this case.

8      Q     And at that time the deposition and

9    trial fee was $345 an hour with a $1500 daily

10   minimum; is that correct?

11     A     That's what it was at that time, yes,

12   sir.

13     Q     And it's my understanding that it's

14   gone up now to $2,000; is that correct?

15     A     Yes, the daily minimum is $2,000;

16   that's July the 1st.  And the hourly rate went

17   from 345 to 395.

18     Q     Okay.  And, once again, that's in all

19   of your cases; correct?

20     A     It is, yes, sir.

21     Q     Okay.  Now, let me get down to page

22   four; hold on just a minute, sir.  Page four of

23   this document appears to be a letter dated July

24   24th from a Ms. Beth Boone to you; do you see

25   that?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    16

1       A     I do.

2       Q     Yeah.  And in this letter, what was the

3    purpose of this letter, as you understand it?

4       A     It accompanied probably the electronic

5    conveyance of some documents that were sent to

6    me from Ms. Boone or her office for my ongoing

7    review in the case.

8       Q     Okay.  I take it these were not all the

9    documents you received from Ms. Boone throughout

10   the course of your work on this case; is that

11   correct?

12      A     I would say that's probably fair, yes,

13   sir.

14      Q     Now, this letter was dated July 24th.

15   Let's see, your retainer agreement with Ms.

16   Boone was June 11, 2020; do you see that?

17      A     I do, yes.

18      Q     Okay.  Do you know if this date when

19   you got these documents -- oh gosh, hold on --

20   on July 24th, was that the first time you had

21   received documents from Ms. Boone?

22      A     I don't believe so.  No, I think the

23   first documents we probably received maybe other

24   than a copy of the complaint for vetting

25   purposes, conflict purposes would have probably



1    been the fee schedule that you just asked, the

2    first three pages of this document; but then

3    shortly thereafter it's pretty common to see a

4    number of other documents for our review even in

5    advance of the conveyance of an opposing

6    expert's deposition or materials or whatever.

7         Q    Let me go down another page; hold on

8    just a minute.  Here we have an invoice dated

9    August 7, 2020.  Have you seen this invoice

10   before today?

11        A    Yes, my staff put it together as a

12   reference material for today's deposition.

13        Q    Okay.  And you agree that as far as the

14   date being August 7, 2020, that the total amount

15   you had billed in this case was $19,321.85?

16        A    That appears to be correct, yes, sir.

17        Q    Do you know if that amount has gone up

18   since that date, August 7th?

19        A    We haven't billed anything since then

20   so I don't think -- you know, the overall amount

21   billed or this invoice specifically went up.  I

22   assume that there is or will be more time to

23   invoice here in the next couple days since we

24   tend to invoice at the end of each month, the

25   first several days of the following month.



1    We're into now with it being September 1.

2        Q    And if you provided an expert report in

3    this case on August 14, 2020, do you feel as

4    though -- that your bill probably went up

5    between August 7th and August 14?

6        A    I don't know.  We haven't technically

7    billed yet.  There's more time to bill since

8    then, yeah, I can agree with that.  I expect

9    that would be the case.

10       Q    Do you have any way of knowing how much

11   you're due at this time for all work done on the

12   case up until now?

13       A    I don't know that off the top of my

14   head.  We do keep a spreadsheet; that's the

15   basis for the invoicing.  So I do have that

16   available and it would show the different

17   entries, you know, whether they be my entries or

18   those for either Ina or Judy in my office, so.

19   I not sure I could do the math in my head, but I

20   do have the underlying document that would

21   represent the additional work that hasn't been

22   billed.

23       Q    Okay.  Do you have that document with

24   you today?

25       A    I do have a copy of it but that's of a



1    couple days ago, again, when my staff gave me

2    the file for today's deposition.

3        Q    Let me show you the next document if I

4    can find it.  The next document appears to be --

5    well, let me ask you this:  What is this

6    document?  Do you recognize it?

7        A    Yes, it was what I was just

8    referencing.  I call it our case worksheet here.

9    It identifies the work that we've done in a case

10   as of a certain day.

11       Q    Let me go back to the top of it.  Now,

12   this document shows -- it looks like it goes all

13   the way through August 7, 2020; do you see see

14   that at the bottom?

15       A    I do.

16       Q    And you believe that you have

17   possession of a document that goes beyond this;

18   is that correct?

19       A    It's a living document so it gets

20   updated, you know, day to day and, yes, I mean,

21   I've got a version that was complete, I don't

22   know, sometime in the last week, maybe, with any

23   additional time, and last night I was updating

24   it even further as I was preparing for today.

25   So it's a live document.  This is a



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    20

1    representation of it at a certain time that my

2    staff chose, I guess.

3        Q    When we take a break, could you e-mail

4    a copy of that document to Mr. Mann in its

5    current form so he can perhaps share it with me

6    during the deposition today?

7        A    Yeah, I can have my staff do that.

8        Q    Thank you.

9        A    Okay, got it.

10       Q    Thank you.  Okay.  Behind that

11   document -- this is the same 28-page document

12   that's Exhibit 3 -- there is a series of

13   e-mails.  Do you know if you you provided -- if

14   you or your office provided Ms. Boone with all

15   of the e-mail communications between your office

16   and Ms. Boone's office?

17       A    I expect that's been done, yes, sir.

18       Q    Just a minute.  Let me go to page 15 of

19   this document; give me just a minute.  Now, do

20   you see this document?  It's an e-mail to you

21   from Bianca Bryson of Ms. Boone's office; do you

22   see that?

23       A    I do.

24       Q    It says, "Please see the attached

25   correspondence from attorney Beth Boone.  The



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          21

1    documents referenced have been sent to you

2    through a secure access which you should receive

3    in a separate e-mail.  For your convenience, I

4    have also included a link to the same."  Do you

5    know if this is the same -- if this letter she's

6    referring to is the same -- let me go back to

7    it.

8        A    Yeah, I think it's the same document

9    that you were referencing earlier.

10       Q    Same letter of July 24th?

11       A    I would expect that to be the case,

12   yes, sir.

13       Q    Okay, thank you.   Now, you're up in

14   Minneapolis?

15       A    I'm about as far away from there as I

16   could be.  I'm in Orange Beach, Alabama.

17       Q    Orange Beach, Alabama, okay.  I don't

18   know why I had Minneapolis on my mind.

19       A    I'm glad I'm not there but thank you.

20       Q    All right.  Do you have connections in

21   Minneapolis or --

22       A    I've got clients in Minneapolis, but I

23   don't have any connections other than that, no.

24       Q    Okay.  Well, I very well may have you

25   confused with a different expert in this case.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    22

1   Please accept my apologies for that.  How long
2   have you lived in Alabama?
3       A    A pretty long time; a couple decades at
4   this point in time.
5       Q    Okay.  Now, this next document I'm
6   going to ask you about is page 16 of the same
7   document, and it's to you from Bianca again, and
8   it mentions an attachment called LewGrill PDFT,
9   and it says, "Please find attached the
10  deposition transcript of plaintiff's expert Lew
11  Grill.  The court reporter has not finalized the
12  exhibits to Mr. Grill's deposition yet.  We will
13  send you those upon receipt."
14           So obviously you've read Mr. Grill's
15  deposition?
16      A    At some point subsequent to this, yes,
17  sir.
18      Q    Okay, let's go to the next document.
19  It's dated Friday, July 31st; do you see that?
20      A    I do.
21      Q    It's a little longer e-mail.  It's from
22  you, I believe, to Beth.  And it says in the
23  second line "we've consumed adequate documents
24  and testimony in this case to render the
25  opinions that I ecxpect to be able to render".



1    It says "with the exception of reading the Lew

2    Grill deposition which has recently been

3    received"; do you see that?

4         A    Yes.

5         Q    So do you think by July 31st, other

6    than Mr. Grill's deposition, you had reviewed

7    all the documents you needed to review to render

8    an opinion in this case?

9              MR. MANN:  I'll object to the

10        form.

11             THE WITNESS:  That seems to have

12        been my opinion at that time, yes sir.

13   BY MR. DAVIS:

14        Q    Okay.  Other than Lou Grill's

15   deposition, do you know if you read any other

16   documents after July 31st that were necessary

17   for you to render your opinions in this case?

18        A    Not that were necessary to issue the

19   report and the content that was in the report at

20   the time, no.  I do have recognition of having

21   received a couple other, you know, expert

22   reports such like that.  So I think I've

23   received -- I've had some other things trickle

24   in, but whether they were necessary to support

25   the opinion that I offered in my written report,



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                        24

1    I doubt it.

2        Q    Okay.  Well, you go on to say at the of

3    in the paragraph, I'm comfortable with issuing

4    my opinions to date based on what I have already

5    received.

6             Do you know if you issued any opinions

7    between July 31st and the date that you issued

8    your report -- I believe it was on August 14th?

9        A    No, I think the report itself was the

10   only instance where I, you know, arrived at or

11   articulated the opinions.

12       Q    Thank you, sir.  Now, I'm going to take

13   you down to page 21.  I had a couple of

14   questions about some documents.  Do you see the

15   e-mail dated August 7, 2020 from Judy Owen to

16   Bianca?

17       A    I do, yes.

18       Q    Who is Judy C. Owen?

19       A    She's one of my assistants here at my

20   expert witness practice.

21       Q    Okay.  It says, "I have attached copies

22   of our casework spreadsheet"; do you see that?

23       A    I do.

24       Q    What's a casework spreadsheet?

25       A    That's that billing document that you



1   referenced earlier within this 28-page

2   accumulative document.

3        Q    Okay.  The one we just looked at that

4   went through August 7th; correct?

5        A    Yes.  And this is August 7th, so.  I

6   note that I'm not copied on this message, but it

7   makes sense that that document is what was

8   shared.

9        Q    Okay.  And that's the same document you

10  said was a living document and you were going to

11  provide it to your attorney -- the attorney for

12  the defendant a little later; correct?

13       A    That's correct.

14       Q    Okay.  The TCE invoice 560, is that the

15  same invoice we were just referring to?  I do

16  note that the invoice on page six is invoice

17  number 560.

18       A    Correct.  And that's the only invoice

19  that we've issued in this case so far.  That's

20  the same invoice document, apparently, that Judy

21  conveyed to Bianca on August 7th.

22       Q    Now, it also mentions another document,

23  Lane's Rule 26 spreadsheet; what is that?

24       A    It's my testimony history document,

25  another live document, you know, that we



1    continue to update as there's need to update it.

2        Q    Okay.  So is that document contained in

3    your Rule 26 report that you eventually

4    produced?

5        A    It should be, yes, sir.

6        Q    Okay.  Let's go on down to 24.  Now,

7    here we have another document that says it's an

8    invoice, 19,321.85.  That's the same amount that

9    was on the other invoice; correct?

10       A    Yes.  And this actually references that

11   same invoice number, number 560; correct.

12       Q    Very good.  Now, I understand from the

13   next page it says exactly what you told me

14   earlier, that y'all bill on a monthly basis, "so

15   in September we will send you a bill for the

16   month of August".  Do you know when that bill

17   will be ready?

18       A    I can tell you that Ina, in my office,

19   has already sent out an e-mail blurb to me

20   making sure that everybody has their time in,

21   but that usually comes out about end of month,

22   and honestly I did not do anything in that

23   regard because I was preparing for today.  But

24   it typically happens in the first five to seven

25   days of a calendar month, I would say, when the



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    27

1    invoices are actually prepared and issued.
2         Q    How many people in your office have
3    worked on this case?
4         A    I see three of them so far; me, Judy
5    and Ina, but myself as the only expert.
6         Q    Okay.  You said Judy and who?
7         A    Ina.
8         Q    Ina.  Oh, Ina -- is it Chicu?
9         A    It's actually pronounced Chicu.
10        Q    Chicu, okay.  What does Ina do?
11        A    The same thing Judy does, you know,
12   they pretty much handle the same type of work
13   product.  The difference, I guess, between Ina
14   and Judy is that Ina has some accounting
15   responsibilities here in-house where Judy
16   generally doesn't.
17        Q    Okay, I'm going to stop the share, get
18   out of that document.  Can you see again me
19   again?
20        A    Yes, sir.
21        Q    I'm going to go now to pur next
22   exhibit, Exhibit 4.  Give me just a minute to
23   get that up.  Can you see Plaintiff's Exhibit 4?
24        A    I can, yes.
25        Q    Do you know if you've ever seen this



1    document before?

2        A    I have recently, yes, sir.

3        Q    Okay.  Do you know when you first saw

4    this document?

5        A    Not specifically, no.

6        Q    Okay.  What do you understand this

7    letter deals with, this letter dated July 30th

8    to you from -- wait a minute, I believe it's

9    from Beth; let me make sure.  Yeah, from Ms.

10   Boone.  And I can take it back to the top.  I

11   don't mean to move it around too fast; hold on.

12   Okay.  If you need me to move it, just let me

13   know.

14       A    No, I think it was simply a written

15   follow-up to my expectation that a federal

16   report was doing in this case and that I would

17   be expected to provide one before the scheduling

18   order required, apparently, August 14th.

19       Q    How many times have you done federal

20   reports in your career?

21       A    Hundreds and hundreds, I'm certain.

22       Q    Okay.  Do you know if you've ever done

23   one for the Southern District of Georgia before

24   this report?

25       A    I expect that I have, yes.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    29

1       Q    Now, was Ms. Boone giving you any
2    advice or instructions for completing the report
3    in this letter?
4              MR. MANN:  Object to the form.
5              THE WITNESS:  I don't remember
6         even reading this letter, to be
7         perfectly honest, before I worked and
8         kind of assembled my report.  But not
9         specific as it would be related to
10        content, for sure; just making sure I
11        understood what the federal
12        requirements were in case I wasn't
13        familiar with them.
14   BY MR. DAVIS:
15      Q    And you believe that you were familiar
16   already with the federal requirements based on
17   the number of reports you've done in the past?
18      A    We write every report in-house to the
19   federal standard for all of our experts
20   regardless of whether the jurisdiction requires
21   it.  It's just easier for us to approach it that
22   way.
23      Q    How many experts do y'all have?
24      A    I've got a lot of experts.  Not all of
25   them provide expert testimony, but I would say



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    30

1    probably nine or ten people that I would

2    classify as experts as of today.

3         Q    Okay.  And these nine or ten people,

4    what are they experts in?

5         A    The majority of them are FMCSA experts.

6    I do have two OSHA experts, two former OSHA

7    employees that also serve within my consulting

8    practices.  So we have a combination of both

9    types of expertise and skill set.

10        Q    Okay.  Other than yourself, who are the

11   experts in your office who do Federal Motor

12   Carrier Safety regulation work or administration

13   work?

14        A    There's not very many of them in my

15   office.  Most of them tend to be out in the

16   field.  I think the only one that -- I'm not

17   sure that I have one that is in my office

18   technically.  They're disbursed around the

19   country.

20        Q    Okay.  Well, is this your company or is

21   it someone else's company?

22        A    What company are we talking about?

23        Q    What company do you work for?

24        A    I guess I work for all the ones that I

25   own in some way or another, but I own multiples,



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    31

1    not just Transportation Compliance Experts.

2        Q    Are you working for TSS today?

3        A    I own it today and have responsibility

4    for it today but, no, I'm really here

5    represented on behalf of Transportation

6    Compliance Experts today.  That's where our

7    expert witness work is.

8        Q    Transportation Compliance Experts, I

9    beg your pardon?

10       A

11            Yes, that's our expert witness entity.

12       Q    Do you know why your expert report is

13   written on the letterhead of TSS?

14       A    It's not.  It has a TSS emblem on it,

15   but it is in the name of Transportation

16   Compliance Experts, I believe.

17       Q    Okay.  First of all, what is TSS; let's

18   talk about that.

19       A    TSS is Transportation Safety Services.

20   It's a company that I've owned and have run

21   since 2002, and it is really where primarily all

22   my industry consultation has occurred, though we

23   have spun some things out into freestanding

24   entities, like the compliance expert entity over

25   a period of years.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    32

1        Q      Well, what does TSS do?

2        A      Generally speaking, we offer regulatory

3   advice, outsourcing options, and such, to the

4   trucking industry, whether private fleets or

5   hired fleets, such.  But generally we are a DOT

6   consulting firm that offers compliance or

7   outsourcing options to the trucking industry as

8   a whole.

9        Q      Has that company ever done any work for

10  Cintas?

11       A      Not that I'm aware of, no, sir.

12       Q      Okay.  Now, your other company that we

13  were just talking about, Transportation

14  Compliance Experts, explain what that is.

15       A      It is the entity within which all of

16  our expert witness testimony is provided.  So I

17  guess the distinction is that I've got a number

18  of experts, not all of my experts are involved

19  in expert witness retentions.  So some of the

20  experts are over on the other side of the house

21  within Transportation Safety Services, some of

22  them are exclusively within the compliance

23  experts entity.

24       Q      Okay.  The ones that are exclusively in

25  Transportation Compliance Experts, what are



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    33

1     their names?

2         A    And you're saying that I classify as

3     experts?

4         Q    Well, that hold themselves out as

5     experts in any matters.

6         A    When you say "matters", is that

7     litigation matters; is that consultation to the

8     industry separate from litigation matters?  I

9     want to make sure I answer your question

10    appropriately.

11        Q    Let's go with both to make it easy.

12        A    Okay.  Well, I've got two OSHA experts,

13    Steve Yeend, Y-E-E-N-D, and Steve Day.  They're

14    a mixture of employee and contractor, but they

15    are my subject matter experts in OSHA issues.

16    Both of them are former federal OSHA employees.

17             On the DOT or FMCSA side of the house

18    we've got people that we use either as employees

19    or contractors.  Currently those people include

20    Danny Shelton who's a HAZMAT contractor in

21    Texas, Dave Griffen who's an FMCSA employee in

22    Tennessee, Dennis Burke who's an FMCSA

23    contractor in Cape Dorado, Missouri, John Holder

24    who is a DOT contractor in Michigan, Rick Parris

25    that is a DOT contractor here in Alabama,



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

1    Leander Pickens who is a DOT employee of mine

2    here in Alabama.  I've already mentioned Dave

3    Griffin in Tennessee.  I have someone -- I've

4    got another OSHA contractor, though he's not

5    doing as much for us; his name is Rick Hunter.

6    He's based here in Alabama.  I have employee

7    Scott Stratton who is based here in Alabama.  I

8    have -- I'm missing one and I don't know why I'm

9    missing him.  I've got another one in Tennessee

10   and I don't know why I'm not coming up with his

11   name -- it will hit me here in a second -- but

12   he's a contractor as well.  So I think that's

13   all the people that categorically I would

14   classify or describe as an expert, whether

15   they're involved in the litigation expert

16   business, maybe not, but that is currently my

17   group of experts?

18       Q    Now, of that group of people how many

19   of those folks give testimony as retained

20   experts in cases that deal with the Federal

21   Motor Carrier Safety Regulations?

22       A    That would be Dennis Burke, the guy in

23   it Missouri; John Holder, the guy in Michigan;

24   Dave Griffin in Tennessee; myself; Steve Day;

25   Steve Yeend; and Rick Hunter.



1      Q    Okay.  Before this case had you ever
2  encountered Mr. Lew Grill before?
3      A    Yes, sir, a number of times.
4      Q    Okay.  And where have you encountered
5  Mr. Grill?
6      A    I don't know I've encountered like
7  physically in any location, but I've been asked
8  to evaluate opinions of his in a number of other
9  cases over the last decade, or so, that I've
10 been doing expert witness work.
11     Q    Have you ever appeared in court where
12 Mr. Grill testified in court?
13     A    Not simultaneously for sure, at least
14 not that I remember, but it's quite possible
15 that we were both in the same courtroom for the
16 same case that was being tried but maybe at a
17 different chronological point.
18     Q    As far as you know, have you ever met
19 him?
20     A    I don't remember having met him.  I
21 guess it's possible that I have.  I don't have a
22 recollection of it if that ever occurred, I can
23 say that much.
24     Q    Okay.  And, I'm sorry, I got a little
25 away from the outline, which I sometimes do.



1    Let me kind of get back to where we were at.

2    Let's see, you notice there is an enclosure

3    mentioned on this letter we were talking about

4    earlier from Ms. Boone?

5        A    I don't.

6        Q    At the bottom it says BB, and under

7    that is Encl; do you see that?

8        A    I do see that, now that you point it

9    out, yes.

10       Q    Okay.  Do you see where it says about

11   in the middle of the paragraph on this last

12   page, it says, "For your convenience I have

13   included a comprehensive list of all documents

14   produced in this litigation and all sworn

15   testimony to date.  If you see any document or

16   deposition that you want to review to solidify

17   any opinions, please do not hesitate to let me

18   know and we will forward immediately for your

19   review."; do you see that?

20       A    I do see that, yes.

21       Q    Okay.  Do you know if you asked for any

22   documents based on this letter?

23       A    I didn't even remember that this letter

24   existed until it was provided for me to review,

25   so I don't have that recollection, no, sir.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    37

1        Q    All right, thank you.  Give me just a

2    second to get another document up.  This is

3    Exhibit 5.  Do you see Exhibit 5, it says that

4    it's -- at the top it says "Donald Ivey Stalvey,

5    Jr. and Candace Stalvey, Plaintiffs", and what

6    it appears to be -- it says it's an expert

7    report of somebody named Dmitri A. Sofianos; do

8    you see that?

9        A    Yes.

10       Q    Okay.  Do you know if you've ever -- it

11   looks to me like it's some sort of a model

12   expert report.  Do you know if you've ever

13   reviewed this document that's been marked as

14   Exhibit 5?

15       A    It seems to me that I recognize that

16   she sent an example if I needed help arranging

17   an expert report that would be suitable for

18   federal court.  Whether I spent any time even

19   looking at it once I recognized it was probably

20   a model -- I've written plenty of federal

21   reports before.  I don't think I gave it a whole

22   lot of consideration.

23       Q    Okay, thank you.  It was just in with

24   the documents and that's why I was asking you

25   about it.  Very good.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          38

1               Okay.  I'm going to pull up your expert

2     report; give me just a second, Mr. VanIngen.

3     This will be, I believe, Exhibit 6.

4         A    Am I able to supplement a previous

5     response I gave you when I told you I couldn't

6     remember my other employee -- or my other

7     contractor up in Tennessee?

8         Q    Absolutely; go right ahead.

9         A    His name is Gerry Keifer.  I'm not sure

10    why I couldn't recall that off the top of my

11    head, but it's Keifer, K-E-I-F-E-R.  It's Gerald

12    but we call him Gerry.

13        Q    Okay.  Can I ask how old you are?

14        A    How old I am?

15        Q    Yes, sir.

16        A    I think I'm 53.

17        Q    Okay.  Well, I'm 56 and I notice

18    sometimes it takes me a little time to remember

19    names sometimes so don't concern yourself with

20    that.  You're a couple years younger than me,

21    though.

22        A    There's a lot of things to keep track

23    of in life the older you get.

24        Q    Absolutely.  Now, can you see the

25    document I pulled up; it says the Expert Witness



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    39

1    Report of Lane VanIngen?

2        A    I can, yes, sir.

3        Q    Okay.  Now, it's been marked as Exhibit

4    6.  The first document is just a pleading Ms.

5    Boone completed when she filed it, obviously.

6    Now, hold on just a minute.  Now, the next page

7    there's a document -- I guess this is a cover

8    letter.  Do you see this page; it's dated August

9    14, 2020?

10       A    Yeah, this is kind of a cover letter to

11   counsel -- that's what we he call it, at least,

12   on this side -- and it's the first document

13   consecutively in an expert report package that

14   my staff here assembles for me when we issue a

15   report like this.

16       Q    Now, the report that I have -- like I

17   said, there was that pleading from Ms. Boone and

18   there's this page that is marked at the bottom

19   as VanIngen Exhibit A-001; do see that?

20       A    I do, yes, sir.

21       Q    And then it goes, I guess, all the way

22   to 26 -- I'm sorry, 23.  I'm just going to take

23   you through it just to show you the page

24   numbers.  I know I'm moving fast.  I just want

25   to show you all the page numbers here.  We'll go



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    40

1    back through it slower in a few minutes.

2        A    I have a copy of that here in my file

3    that I can manually go through as well if I need

4    to.

5        Q    Why don't you pull it out.  This is my

6    question -- and I'll get all the way to the

7    bottom then.  I want to make sure that what I'm

8    looking at here is the last page which is

9    Exhibit A-23.

10       A    That appears to be the last page, yes.

11       Q    Okay.  Can you tell me where you signed

12   your report at?

13       A    On the cover letter page, the first

14   one, VanIngen Exhibit A-001 is where I sign it.

15       Q    Okay.  Now, number two is Report of

16   Opinion; correct?

17       A    Yes.

18       Q    But is it your testimony then that the

19   signature on page one is the signature for the

20   following, I guess, 22 pages?

21       A    That is the first page of the expert

22   report package that we assemble, yes, sir.

23       Q    And that's where you sign it pursuant

24   to Rule 26; correct?

25       A    That's customarily what we do, yes,



1   sir.

2       Q     Now, go back up to the top of it.  I've

3   got a few questions and we'll just go through

4   it.  If you have a copy in front of you, that's

5   fine.  If not, we can look at this one,

6   whichever you prefer.  You agree it's dated

7   August 14, 2020; correct?

8       A     Yes.

9       Q     And you come down a little further in

10  that first paragraph, do you see where it says

11  "also, my opinion"?

12      A     I do.

13      Q     Okay.  It says -- I'm going to read it

14  to you.  It says, "Also, my opinion includes

15  conclusions drawn from review of the documents

16  provided to me to date and my understanding of

17  the motor carrier industry.  I reserve the right

18  to amend or expand my opinion in this matter

19  based on further testimony that I am provided or

20  credible documents that are entered into

21  evidence."; do you see that?

22      A     Yes, sir.

23      Q     What do you mean by "credible

24  documents"?  What's a credible document?

25      A     Well, I guess any document is



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    42

1    potentially credible, but I don't know that I
2    really look towards the permitting whether one
3    is more credible than the next, to be perfectly
4    honest.   That's just the terminology that we've
5    chosen to use across our expert team.
6        Q    Well, would Cintas Corporation's
7    company policies be credible documents?
8        A    They can be, yes.
9        Q    Okay.  I want to take you over -- we'll
10   get to your conclusions last so let me go
11   through some other things in the document first.
12   I want to take you over to page 13, Materials
13   Reviewed in Case, and it's, I think, almost --
14   it's two pages, page and a half; do you see
15   that?
16       A    I do, yes, sir.
17       Q     And these are all the materials you
18   reviewed in this case in forming your opinions;
19   correct?
20       A    It should be, at least through the date
21   that this report was issued, yes.
22       Q     And this report was issued on the
23   14th; correct?
24       A    Of August, yes, correct.
25       Q     And is it your understanding that your



1    report, expert reports were due in this case on

2    August 14th; correct?

3        A    That was my understanding; correct.

4        Q    Okay.  And this was your opinion on --

5    this report reflects your opinions on August

6    14th; correct?

7        A    That's correct, yes.

8        Q    And when you issued this report on

9    August 14th, these are all the materials you had

10   reviewed; correct?

11       A    Specifically to this case, I would say

12   that's correct.  I may be aware of some other

13   things just generally that I didn't specifically

14   reference but --

15       Q    Okay.  Well, what things would you --

16   I'm sorry, I cut you off, sir.

17       A    That's correct.  Sometimes I will not

18   specifically make reference to something that I

19   feel like I can speak to off the top of my head,

20   but we try to be pretty inclusive when my staff

21   prepares these materials for this.

22       Q    Well, were there anything in this case

23   you relied on that you felt a reference under

24   "materials reviewed in case"?

25            MR. MANN:  Object to the form.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    44

1              THE WITNESS:  Not that I can
2        identify, no.
3    BY MR. DAVIS:
4        Q    All right.  Do you think these are all
5    of the documents you reviewed?
6        A    They should be.  Like I said, there's a
7    listing of them and my office is directed to
8    list every single thing that we have maintained
9    in the file.
10       Q    All right.  Do you know if you reviewed
11   any expert reports from any of defense experts?
12       A    I don't have a recollection of having
13   done so and especially before the issuance of
14   this report.
15       Q    Okay.  Do you know if you've ever seen
16   a report written by an engineer by the name of
17   Dunn, D-U-N-N; I believe it's Ashley Dunn?
18       A    That name rings a bell but I can't say
19   that's because of this litigation necessarily.
20       Q    At least it's not in this list of
21   materials that you reviewed in this case;
22   correct?
23       A    That is correct.
24       Q    And there's another expert's name,
25   defense expert's name -- I'm afraid I'm going to



 1    mess it up.  I want to say it's Bronowski; does
 2    that sound familiar?
 3        A    A lot of these names sound familiar but
 4    not necessarily because of this litigation.  If
 5    it's not here on my materials review list, then
 6    I did not review it and that it wasn't part of
 7    my file as of the date that this report was
 8    finished.
 9        Q    Okay.  But obviously you read Lew
10    Grill's report; correct?  It's on here.
11        A    Yes, sir, correct
12        Q    And you read John Bethea's report;
13    correct?
14        A    I have, though it's not really within
15    my wheelhouse as an expert.  He has a different
16    subject matter of expertise than I do.
17        Q    Okay.  And you read Chris Stewart's
18    report; correct?
19        A    I have, yes, sir.
20        Q    Do you have any opinions -- have you
21    formed any opinions in this case concerning
22    whether or not Mr. Robinson ran a stop sign?
23        A    No, it's kind of beyond what I do as an
24    expert.  Obviously, I know what the officer --
25    what his opinions were because they're



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          46

1    demonstrated on a report and in testimony that
2    he gave, and I've seen depositions for some of
3    these accident reconstructionists so I know
4    their thoughts but, to me, it's good background
5    information.  I don't know that it really has a
6    direct relevance to the opinions I'm offering.
7        Q    Okay.  Is it your understanding,
8    though, that there is evidence in this case that
9    Mr. Robinson ran a stop sign?
10            MR. MANN:  Object to the form.
11            THE WITNESS:  Yeah, I wasn't
12       questioning the fact that he didn't
13       come to a complete stop.  That's an
14       accepted fact in this case, though not
15       one relevant necessarily to my opinion.
16   BY MR. DAVIS:
17       Q    Okay.  The next page is your resume or
18   your CV.  Now, just out of curiosity, you know,
19   at the top of this document, also, there's TSS
20   letterhead for Transportation Safety Services,
21   but there's also under your name, Lane VanIngen,
22   President, it says Transportation Compliance
23   Experts, Inc.  Why does this document have, I
24   guess, both of these companies on it?
25       A    We've just chosen to have brand



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    47

1    recognition follow to all the companies that I

2    own.  So it doesn't matter -- we use the same,

3    you know, letterhead and symbol for TSS whether

4    it is a consulting entity correspondence,

5    whether it's a TSS Properties correspondence,

6    whether it's a Transportation Compliance Experts

7    correspondence or whether it's a Consortium &

8    Testing Services correspondence.  I've just

9    chosen that for name recognition purposes.

10       Q     Do you hold a CDL?

11       A     I do not hold a CDL, no, sir.

12       Q     Have you ever held a CDL?

13       A     I've never held CDL, though I helped

14   the State implement the CDL program.  Never held

15   one.

16       Q     Okay.  In any of these courses, do you

17   teach courses on CDL?  I'm sorry, that was a bad

18   question.  In any of the companies you own, do

19   any of these companies or through any of these

20   companies, do you teach courses concerning CDLs?

21       A     We have provided some entry level

22   driver training for drivers that are new CDL

23   holders or are going to be, but I would say

24   beyond that and specifically as you've asked the

25   question, no.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1      Q      Do you own a trucking company?

2      A      TSS Properties has an intrastate DOT

3  number.  It is a real estate investment company

4  and it had a vehicle that people could use to

5  relocate their stuff for storage.  Other than

6  that, no, I never have.

7      Q      Are you a Smith System trainer?

8      A      I am not a trainer like a certified

9  trainer.  I understand Smith System.  We have

10  the training in our libraries, you know, for our

11  consultants to use and a lot of our clients use

12  the Smith System, but I am not a certified

13  trainer in it, no.

14      Q      What is Smith System?

15      A      It is probably the most widely

16  recognized driver training curriculum approach

17  in the transportation industry whether it's

18  truly the trucking industry or whether it's a

19  motor fleet application.  It's the most

20  widespread or at least historically has been the

21  most widespread technology within the industry,

22  I would say.

23      Q      And you would agree that throughout the

24  fleet vehicle industry; correct?

25      A      Yeah, I mean, I think it's a lot more



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100          www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    49

1    heavily utilized for true DOT regulated
2    vehicles, but it's not uncommon for a company
3    that has a mixture of DOT and non-DOT-regulated
4    vehicles to use it as a standard training
5    platform.  Whether it's used for companies that
6    are only a fleet and have no DOT subjectivity, I
7    would say much less so, though it does happen
8    from time to time.
9        Q    Are you aware of taxicab fleets using
10   the Smith System?
11       A    I don't consult to a company that I
12   would put within the category of taxicabs,
13   though we do have passenger-transporting
14   clients, so I would say no, but it wouldn't
15   surprise me if there were some that did use it.
16       Q    So is it fair to say you're not aware
17   of all the different fleets that may use the
18   Smith System?
19           MR. MANN:  Object to the form.
20           THE WITNESS:  Sure.  There are
21       hundreds of thousands of motor
22       carriers.  I've seen lot of what the
23       industry has to offer and what the
24       industry does over the last 30, or so,
25       years, but I don't think I can speak to



1          what every company does or what their
2          training curriculum of choice is.
3     BY MR. DAVIS:
4          Q     Is the Smith System approximately 65
5     years old?
6          A     I don't know that I know the answer to
7     that question.  I can tell you I'm sure it's
8     been around for a while, and it's the most
9     commonly used and especially for commercial
10    vehicle fleets.
11         Q     Okay.  And you're aware that the Smith
12    System is being used by vehicles that are not
13    commercial motor vehicles under the Federal
14    Motor Carrier Safety Regulations; correct?
15         A     I have seen it and this case is a
16    pretty good example.  The commonplace I see it
17    are fleets that have some non-DOT vehicles but
18    then also within that fleet who have DOT and CDL
19    compliance.  That's the most commonplace for it
20    to be represented, in my opinion.
21         Q     How often do you work with clients that
22    are not regulated by the Federal Motor Carrier
23    Safety Regulations?
24         A     To any extent or that includes
25    non-regulated vehicles but are otherwise



1    regulated?

2         Q    To any extent.

3         A    We are regularly consulting to

4    companies, but almost all of them are going to

5    have some regulated vehicles.  I don't know that

6    I can say every one of them that we service is

7    that way, but I expect the overwhelming majority

8    are since we're a commercial vehicle consultant.

9         Q    So then you don't have a great deal of

10   knowledge concerning industries that use the

11   Smith System with regard to their motor vehicle

12   fleet if those industries don't have vehicles

13   that are regulated by the Federal Motor Carrier

14   Safety Regulations?

15             MR. MANN:  Object to the form.

16             THE WITNESS:  I think there's some

17        truth in what you said because the

18        majority of my exposures are to fleets

19        that have smaller vehicles but then

20        also have the larger ones.  So I don't

21        know that it's exclusively that way but

22        my experience in the industry is

23        definitely primarily towards fleets

24        that have commercial vehicles within

25        them.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          52

1   BY MR. DAVIS:

2       Q    So the Smith System might be utilized

3   throughout the industry more than you know of;

4   correct?

5       A    I don't know every company that uses

6   them across the board whether they're commercial

7   vehicles or not.  My exposures have been

8   primarily to fleets that operate to some extent

9   a commercial vehicle under the DOT, yes.

10      Q    But you would agree that the Smith

11  System is an accepted industry standard;

12  correct?

13      A    I don't know that I would call it the

14  industry standard.  It's a common approach for

15  sure, and I'm not really fighting you on those

16  descriptions.

17      Q    Well, you seem to be fighting me on

18  whether or not the Smith System is an industry

19  standard.

20           MR. MANN:  Object to form.

21           THE WITNESS:  I don't have enough

22       of a basis in noncommercial fleets to

23       make that opinion so, I mean, you're

24       kind of asking things with two

25       perspectives.



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                        53

1    BY MR. DAVIS:
2         Q    Okay.  But then you would agree, then,
3    you don't have enough requisite knowledge to say
4    whether or not the Smith System is an industry
5    standard; correct?
6              MR. MANN:  Form.
7              THE WITNESS:  I'm not sure that I
8         would unilaterally term it an industry
9         standard.  I would say it's probably
10        the most used curriculum within the
11        industry that I see.  That's all I can
12        say.
13   BY MR. DAVIS:
14        Q    Okay.  But you're not in a position
15   then to say whether it is or is not an industry
16   standard; correct?
17             MR. MANN:  Object to form.
18             THE WITNESS:  That's correct, but
19        I don't even think that I would say it
20        was an industry standard within the
21        commercial vehicle category so I
22        just -- I doubt that I would ever say
23        it in any other context.
24   BY MR. DAVIS:
25        Q    Let's talk a little bit about your



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                     54

1    background, sir.  You graduated -- did you
2    graduate from Bob Jones College?
3         A    Bob Jones University, yes.
4         Q    Could you hear me, sir, I'm sorry?
5         A    Yes, Bob Jones University.
6         Q    I'm sorry, Bob Jones University.  And
7    was your degree in accounting?
8         A    Yes, sir.
9         Q    And did you graduate with that before
10   Bob Jones was an accredited university?
11        A    I am not sure that Bob Jones has ever
12   become an accredited university, to be honest
13   with you.  It wasn't at that time, I don't
14   believe.
15        Q    Okay.  Have you ever worked as an
16   accountant?
17        A    I have not.
18        Q    Did you get a degree from Bob Jones?
19        A    Yes, a Bachelor of Science in
20   accounting.
21        Q    Okay.  Do you have any other college
22   degrees that you hold?
23        A    I do not, no, sir.
24        Q    Do you have any, I guess -- tell me
25   about the training you have in the Federal Motor



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    55

1    Carrier Safety Regulations.

2         A    Well, I'm a former FMCSA guide.

3    Everything I learned, really, that's the basis

4    for my opinions today, and the consultation I

5    had within the industry was given to me either

6    in formalized training by FMCSA or its

7    predecessor, the Federal Highway Administration,

8    and I guess it's borne out just with my

9    experience in the industry since that time.

10             A number of those training events are

11   listed within my CV package that is still being

12   displayed in front of me on the screen.

13        Q    Okay.  Now, it says here you're the

14   president/owner of Transportation Safety

15   Services since 2002; correct?

16        A    That's correct, yes, sir.

17        Q    What is TSS Consortium & Testing

18   Services?

19        A    It is an entity that handles solely

20   drug, alcohol testing, employee-fitness-for-duty

21   evaluations for some of the fleets that we

22   service.  So that was actually a function that,

23   as you might be expect initially, was within my

24   main consulting entity, Transportation Safety

25   Services, but it had different employees that



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    56

1    serviced it.  It had different risks, different
2    needs financially, and everything out, and it
3    made sense for us to kind of roll that into its
4    own standalone entity, which we did in 2014.  So
5    it essentially services several hundred of our
6    clients on a day-to-day basis, coordinating drug
7    and alcohol testing programs, whether they're a
8    CDL employee or not; arranging DOT physicals.
9    They're under fitness-for-duty, you know,
10   evaluations, whether they're DOT or OSHA in
11   nature.
12        Q    Isn't it industry standard that
13   following a collision that a driver driving a
14   fleet vehicle should be drug or alcohol tested?
15             MR. MANN:  Object to the form.
16             THE WITNESS:  It's becoming more
17        and more common, especially for a
18        larger fleet as compared to a smaller
19        fleet.  I don't know that I would say
20        it's the standard.  It's definitely
21        more common for larger employers to do
22        that along the lines of their own
23        internal procedures and protocols as
24        well.
25   BY MR. DAVIS:



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    57

1       Q      So, now, you were employed -- when you

2   were a special agent with the Federal Motor

3   Carrier Safety Administration, that was from

4   1989 to 2002; is that correct

5       A      Technically I don't think FMCSA existed

6   until sometime in the late '90s.  Technically

7   before that period of time, I worked for the

8   Federal Highway Administration's office of motor

9   carriers, but it's a difference without a

10  distinction, if you know what I'm saying.

11      Q      Do you agree that the Smith System has

12  been around longer than the Federal Motor

13  Carrier Safety Administration?

14      A      That would not surprise me if that was

15  the case, but as my earlier response indicated,

16  I'm not sure I knew it was 65 years or older,

17  whatever you suggested.  No, I have no reason to

18  doubt what you said.

19      Q      By the way, do you know what the Smith

20  System -- what the five keys for the Smith

21  System are?

22      A      I mean, I know it's an acronym that's

23  All Good Kids Love Milk so, you know, A is aim

24  high in steering and on down, but could I recite

25  them here, no, I couldn't.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    58

1       Q     Okay.  Now, these career development

2    training courses, are they up to date?

3       A     It should be, yes.  And as referenced

4    earlier, the majority -- they're in

5    chronological order so the majority of them were

6    the formalized FMCSA training courses that DOT

7    provided.  It wasn't on-the-job training; it was

8    actual in-classroom training, but the further

9    you go down the list -- and especially since

10   2002, since I've been on my own, they tend to be

11   training provided by other sources.  But that's

12   not training I'm providing to somebody; it's

13   something I actually received.

14      Q     Okay.  Now, as far as Transportation

15   Compliance Experts, that's who you are working

16   for today; correct?

17      A     Yes, all of the expert witness business

18   is done within the Compliance Experts business

19   at this point.

20      Q     As far as that company, how do y'all

21   get business?

22      A     I would say it's literally all word of

23   mouth.  There are times where our interactions

24   with a consulting client or a drug testing

25   client or even an OSHA client leads to somebody



1  recognizing us as a good source for expert

2  witness potentially so we do get some feeding, I

3  guess you would say, from one company to the

4  next across, you know, when one vendor sees us

5  and says, hey, I think these people do a good

6  job.  Many times it will move from a company

7  that I haven't had exposure from the consulting

8  side of the practice but now we're retained as

9  an expert witness.  So it goes both ways feeding

10  each other between the entities, but it tends to

11  all be word-of-mouth business, very little other

12  than word of mouth.

13      Q    Do you ever speak before any

14  associations of defense lawyers?

15      A    It's been a good while since I've done

16  that.  I guess occasionally infrequently would

17  be my term, infrequently I would speak as part

18  of a panel on an industry issue but not in a

19  solo presentation, at least as I recall them.

20      Q    Have you ever spoken before any groups

21  of plaintiff's lawyers?

22      A    I expect that there are plaintiff

23  lawyers within some of the associations or

24  meetings that I've been to, but I assume -- I

25  don't recognize having been invited to one that



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    60

1    was at least by name primarily plaintiff, no.

2         Q    Okay.  Do you recognize any of them

3    that seem to be primarily defense lawyers?

4         A    Well, I assume, you know, if I am

5    present to help in a group presentation for the

6    Trucking Industry Defense Association, TIDA,

7    that that is primarily defense attorneys, though

8    I'm sure many of them are also handling

9    cross-claims and everything else.  So I'm

10   assuming my few exposures to that have been more

11   likely defendant than plaintiff, but I don't

12   know that that really has anything to do with

13   what I was doing presenting there, to be

14   perfectly honest.

15        Q    What was that acronym again?

16        A    I mentioned TIDA, T-I-D-A, which is the

17   Trucking Industry Defense Association.

18        Q    Okay.  Let me ask you this:  I mean,

19   what percentage of your income -- I don't want

20   to know an amount, but what percentage of your

21   income do you think you derive from

22   Transportation Compliance Experts, Incorporated?

23        A    At this point in time, I'd say it's

24   between 30 and 40 percent of my overall income.

25        Q    Okay.  Now, sir, if you go to the last



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    61

1    page of this CV, it says memberships and

2    licenses and there's the Alabama Trucking

3    Association and the Commercial Vehicle Safety

4    Alliance; do you see that?

5        A    I do, yes, sir.

6        Q    What is the Commercial Vehicle Safety

7    Alliance?

8        A    It is an alliance within the industry

9    that really sets some standards that the Federal

10   Motor Carrier Safety Administration and the

11   state DOT agencies follow or have adopted.  So

12   they're kind of the baseline of determining

13   commercial-vehicle-out-of-service violations and

14   a number of other things, but it's an industry

15   association that is relied on pretty heavily by

16   the actual government regulators themselves.

17       Q    Is it a trade group or something like

18   that?

19       A    I would reference it as more than a

20   trade -- as a trade group of sorts but, you

21   know, I'm not as actively involved in CVSA as

22   others of my associates are or have been, so I'm

23   probably not in as good of a position to

24   describe it as they would be.

25       Q    What is the Alabama Trucking



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    62

1   Association?

2       A    It is an association of Alabama-based,

3   at least primarily, trucking companies, true

4   companies that are at least subject to DOT

5   regulations, maybe also as it relates to their

6   fleets or as warehousers or other things, but it

7   is a state-based industry association.

8       Q    Does Alabama have its own intrastate

9   trucking regulations?

10      A    It does; it has adopted some of the

11  Federal Motor Carrier Safety Regulations but has

12  chosen not to regulate all the vehicles that the

13  federal people do.  They basically only have

14  chosen intrastate to regulate CDL vehicles and

15  nothing else.  That changed in the last five or

16  ten years, I'd say.

17      Q    Are you fairly familiar with Alabama's

18  intrastate trucking regulations?

19      A    Both historically and currently I would

20  say yes.

21      Q    Are you a member of any trucking

22  associations in Georgia?

23      A    Not currently, no, sir.

24      Q    Are you familiar at all with Georgia's

25  intrastate trucking regulations?



1     A     I've got clients in Georgia that have

2   intrastate operations and, yes, I have an

3   understanding of, I guess, some of the specific

4   exemptions that Georgia has decided to apply,

5   intrastate commerce and other things that are

6   different, but I don't tend to go off the top of

7   my head because states vary from one to the next

8   and they change the rules from one point to the

9   next as well.

10    Q     From what you have seen, does Georgia

11  regulate intrastate commerce more than Alabama?

12    A     Probably to a greater extent because

13  they have chosen to regulate just categorically

14  vehicles between 10- and 26,000 pounds in a way

15  that applies a lot of the Federal Motor Carrier

16  rules to them.  They also are one of the states

17  that has chosen to regulate other classes of

18  passenger transporters in a way that probably is

19  greater than Alabama has.  So there are some

20  uniquenesses to the Georgia's implementation of

21  the otherwise federal rules, I would say,

22  compared to Alabama, yes.

23    Q     I lost you after you said

24  implementation.  For some reason it stopped

25  right after you said implementation.


COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    64

1      A    I'm not sure that I can totally do that
2   again, if you know what I'm saying, probably for
3   the same reason I couldn't remember Gerry
4   Keifer's name earlier.
5      Q    Okay.
6           THE WITNESS:  Are we at a place
7      maybe where we could take maybe a five-
8      or ten-minute break?
9           MR. DAVIS:  Absolutely.  Any time
10     you need to take a break, that's good,
11     we'll take one.
12          THE WITNESS:  Well, I hate to do
13     it in the middle of a question which is
14     kind of where we were.
15          MR. DAVIS:  We're okay.  We're
16     okay.  Will, how long do you want to
17     take?
18          MR. MANN:  What did you say, five
19     or ten minutes?
20          MR. DAVIS:  Okay.
21              (Whereupon, the videocorder was
22              turned off and a short break
23              ensued.)
24              (Whereupon, the video portion of
25              this deposition resumed.)

 COASTAL COURT REPORTING & VIDEO SERVICES
                    800-791-1100       www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    65

1          MR. DAVIS:  What was the last
2     question I asked, Madam Court Reporter?
3              (Whereupon, the record was read
4              back as requested.)
5   BY MR. DAVIS:
6     Q    Let me go back to Exhibit 6; hold on
7   just a minute.  Let's go down a little bit
8   further; we're going to get to your previous
9   testimony.  And you've got this in front of you;
10  correct, sir?
11    A    I have a version that was produced with
12  my expert report here and I believe even on this
13  end I have one that was updated last week with
14  my most current testimony as well.
15    Q    Well, let me ask you, how were you
16  retained by Hall Booth in this case?
17    A    What do you mean how was I retained?
18    Q    How did they know to seek you out?
19         MR. MANN:  Object to the form.
20         THE WITNESS:  I'm not sure that I
21     know that.
22  BY MR. DAVIS:
23    Q    Have you ever worked with Hall Booth
24  before?
25    A    I know the name of the firm so I do

1   feel like either myself or some other experts

2   have probably been used here or there.  So I

3   recognize the name.  I don't know that I had

4   ever worked for counsel that retained me in this

5   case before this case.

6       Q    Okay.  Have you had any interactions

7   with any lawyers on this case besides Mr. Mann

8   and Ms. Boone?

9       A    I think my original contact was with a

10  Pam Coleman, also within the same office, but

11  pretty much since that initial contact most all

12  my communications have been with Beth Boone, at

13  least that I recall

14      Q    Have you worked on any previous cases

15  with Ms. Coleman?

16      A    No.  I was only given an exposure to

17  her in this case and it was the first that I

18  recall, at least.

19      Q    Well, take a look at the next few pages

20  of the document which I think is the remainder

21  of the 26 report.  And if I'm reading this

22  correctly, it looks like the last case on here

23  where you gave testimony was in Malone versus

24  Elsbury?  That's on page 23.

25      A    Yes.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    67

1      Q    Have you testified at all in any cases
2  since that day?
3      A    Yes, several times?
4      Q    How many?
5      A    I don't think it's more than five but
6  it's there are several more that have occurred
7  since this has been issued, I would say.
8      Q    Okay.  Have you testified for the
9  plaintiff in any of those, approximately, five
10  cases?
11      A    I don't believe I've testified for a
12  plaintiff.  I think they've either been a motor
13  carrier defendant or another industry defendant
14  who is not the motor carrier, but I think both
15  of those scenarios since marked as document
16  number 19 was produced.
17      Q    Yes, okay.  Now, I went through --
18  based on the documents we have been given, I
19  went through and counted -- if my math is
20  correct, I counted 103 cases on here and that
21  you only testified for the plaintiff in 8 of
22  those cases; does that sound about right?
23      A    Yeah, the testimony tends to bear out
24  about ten percent historically for a plaintiff
25  compared to a defendant of some sort.  That's



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                              68

1    pretty much the way it's always been, I'd say.

2         Q    Do you know why that is?

3         A    I don't know why it is.  My expectation

4    is that when they're evaluated and they're in

5    pretty good compliance, that they feel like

6    there's safety in that adequate level of

7    compliance and I'm an expert that will bear that

8    out.  More of my plaintiff work does tend to be

9    early on in a case, sometimes even pre-suit, so

10   I'll say, you know, probably two out of ten

11   cases that come to our table are plaintiff cases

12   and I help develop the underlying basis for a

13   complaint or to hone that in a little bit

14   further, but I don't know that that always pans

15   out into testimony that I end up giving as a

16   retained expert in that same case.

17        Q    Would you agree that the vehicle

18   involved in the collision that we're here about

19   in this case is not a tractor-trailer?

20        A    It does not fit how I would define a

21   tractor-trailer, yes.

22        Q    You agree that it's a Ford van;

23   correct?

24        A    It's a Ford Econoline, 2015, as I

25   understand it, yes.



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                                69

1       Q    Okay.  Of the cases you've given, have
2   you ever testified in a case that involved a
3   motor vehicle that was not a tractor-trailer?
4       A    Many times, yes.  It's becoming more
5   and more common for me in the last two or three
6   years that that occurs.
7       Q    Do you know why that is?
8       A    Do I know why that is?  I don't know
9   that I know exactly why that is, no.  I know
10   that it is exceptionally the case in Texas that
11   that is happening where there are a lot more
12   fleet cases, you know, for people who are also
13   motor carriers, and a lot of our caseload is in
14   Texas.  So what affects me is probably the
15   portion of these suits that are being filed in
16   Texas and are exposures in Texas to attorneys
17   that have used us before.
18       Q    Okay.  Of cases that you testify in
19   where a tractor-trailer is not involved, what
20   are you generally asked to testify concerning?
21       A    Sometimes it has to do with the
22   applicability of motor carrier rules down to a
23   smaller vehicle.  Sometimes it is to the
24   applicability of motor carrier rules in an
25   intrastate circumstance as opposed to an



1    interstate circumstance.  Sometimes it's related
2    to whether or not another defendant who, in my
3    opinion, is not a or the motor carrier subject
4    movement is controlling or is being -- or in any
5    way should have motor carrier obligations
6    conveyed to them.  Those are the most common
7    examples I can give you off the top of my head.
8         Q    In the later example, do you mean like
9    in a broker/shipper type situation?
10        A    Many times.  Sometimes it is actually
11   in an instance where two vehicles are
12   technically commercial vehicles and where I am
13   making an observation about one motor carrier
14   but actually making criticisms of another one
15   within the same context of litigation.  So those
16   things happen reasonably often, but probably
17   it's approaching 50 percent of my personal
18   caseload that's for a defendant but actually for
19   a defendant who is either not a motor carrier or
20   whose vehicle isn't subject to motor carrier
21   rules as part of the litigation that I'm
22   involved in.  Still defendant but it's becoming
23   remarkably an even split who are not motor
24   carrier defendants in what we do.
25        Q    Does the great state of Texas regulate



1    any vehicles, intrastate vehicles that are not

2    tractor-trailers?

3        A    It depends to what extent and what size

4    vehicle is involved.  I would say that they tend

5    to do it to a lesser extent generally in that

6    they exclude non-CDL vehicles intrastate, but

7    there are often other rules that apply to

8    employers regardless of whether they're

9    technically a motor carrier as well.  So there's

10   some examples where they're less than the

11   federal regulatory context but they may have

12   something freestanding at the state level that

13   raises things up a notch.  It's a little bit of

14   both in Texas.

15       Q    Okay.  Let me ask you, since you

16   authored your August 14, 2020 report, have any

17   of your opinions changed in this case?

18       A    I don't think any of my opinions have

19   changed.  You know, I think the opinions are as

20   they were presented.  I'll do my best to answer

21   any questions that you have, but I understand

22   that a lot of the time that I spend in my

23   depositions I'm not talking about my report,

24   we're talking about other things that may be of

25   interest to you.  Of course, I'll do what I can



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    72

1    to give you my thoughts along those lines.
2    Whether they're opinions unilaterally, I think
3    you see them represented already within the
4    report.
5        Q    Let me ask you, do you hold any
6    opinions in this case that are not contained in
7    your August 14th report?
8        A    Not as I could understand your
9    question, no, I don't think so.
10       Q    Could you not understand my report?
11   Could you not understand my question?
12       A    No, I understood it, and my answer
13   would be I don't know that I have any different
14   opinions as of now, no.
15       Q    Okay.  Why don't you know that, whether
16   or not you have any different opinion?
17       A    I know I don't have any additional
18   opinions; that's what I know.  You know, it's
19   not like I don't have any additional context or
20   that I haven't been provided a couple of expert
21   reports from other people or whatever, but I
22   don't think that there's anything that would
23   implement my opinions or change the opinions as
24   they were outlined in my August 14th report.
25       Q    Okay.  And I apologize; that was my



1   fault.  I misunderstood you.  I think it's the
2   Zoom so excuse me.
3            Okay, let's go to the report.  I want
4   to look at conclusion number one of your report.
5   Now, is conclusion number one one of your
6   opinions in this case?
7       A    Sometimes I say it's almost more a
8   baseline for the remainder of the report, almost
9   more than it is a freestanding, you know,
10  conclusion, but it's both.  It is more a
11  baseline for the remainder of the report,
12  though, honestly.  And some of my experts will
13  actually kind of have a paragraph leading into
14  their conclusions that do what I do in
15  conclusion number one.
16      Q    Okay.  Well, and there again, what I
17  want to know is what are all your conclusions in
18  this case but, you know, there are a lot of
19  pages.  You have, I think, what, six different
20  conclusions and I guess I want to take them one
21  at a time but, first, I want to make sure we're
22  on the same page.  Is each conclusion an
23  opinion?
24      A    I would say yes.
25      Q    All right.  Well, let's start with



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    74

1    conclusion number one, all right?  What are your
2    opinions in conclusion number one?
3         A    Well, I think the whole approach to
4    conclusion number one that results in the
5    opinion is just an observation about what
6    regulatory context can apply to Cintas and this
7    driver in this case, Mr. Robinson.  So it's an
8    opinion that the motor carrier rules as applied
9    by the regulators do not apply to this vehicle,
10   this driver at times relevant to the subject
11   collision.  It's kind of a -- it's the typical
12   conclusion number one that you would see
13   regardless of what Rule 26 report you saw for
14   Lane VanIngen.  This is typically the lead-in --
15   it kind of sets the parameters from where we
16   start in a case and where we move forward from.
17        Q    Well, I'm going to read conclusion
18   number one for you.  It says, "Cintas
19   Corporation No. 2, d/b/a Cintas and its employee
20   Nicholas A. Robinson were not subject to the
21   Federal Motor Carrier Safety Regulations,
22   FMCSRs, or the the Georgia Department of Public
23   Safety Motor Carrier Safety Regulations on April
24   6, 2018, the date of the crash that is the basis
25   for this case."  Did I say that correctly?


COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    75

1      A     You appeared to have been reading it
2   correctly, yes.
3      Q     And is that your opinion in this case?
4      A     It is.
5      Q     All right.  Now, you go down a little
6   further and you say -- I guess you have an
7   excerpt from 390.3, general applicability; you
8   see that?
9      A     Yes, sir.
10     Q     What is 390.3, the general
11  applicability section you're citing from there?
12     A     It is a reference to the Federal Motor
13  Carrier Safety Regulations, part 390, that can
14  apply when by DOT's definition a commercial
15  vehicle is involved in transportation and when
16  interstate commerce so not in question.
17     Q     Well, do you agree that Cintas is a
18  motor carrier?
19     A     I do agree that they are are a motor
20  carrier, yes.
21     Q     They have a DOT number; correct?
22     A     Yes.  And we're specifically speaking
23  about Cintas No. 2, obviously, right?
24     Q     Yes, sir.
25     A     Yes.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          76

1      Q    And so do they have any
2    tractor-trailers in their fleet?
3      A    I don't know if they have
4    tractor-trailers within their fleet.  They
5    definitely have CDL vehicles within their fleet.
6    That's publicly available information.
7      Q    Okay.  Now, under 390.03 (a)(1) it
8    says, The rules in this subchapter are
9    applicable to all employees -- I'm sorry, to all
10   employers, employees and commercial motor
11   vehicles that transport property or passengers
12   in interstate commerce.  Do you see that?
13     A    Yes.
14     Q    Okay.  Do you agree that the Cintas van
15   was being used to transport property?
16     A    I do agree that it was.  Whether I
17   agree that it was a commercial vehicle in
18   interstate commerce is probably a different
19   question.
20     Q    Yes, sir.  But we do agree -- I'm
21   trying to decide what we agree on first before
22   we talk about too much what we disagree on, but
23   you do agree it was being used to transport
24   property; correct?
25     A    When you're in this type of scenario



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    77

1    and you have equipment onboard the vehicle, you

2    know, it is being used to transport that

3    property --

4         Q    Yeah.  I'm sorry, I cut you off.

5         A    I think I was essentially done anyhow.

6         Q    You read Mr. Robinson's deposition;

7    correct?

8         A    I did; correct.

9         Q    And you read Ms. Ferguson's deposition?

10        A    Yes.

11        Q    And you read Ms. Franco's deposition;

12   correct?

13        A    Also correct.

14        Q    So then you're aware of the fact that

15   the property on the Cintas van was being

16   transported by Mr. Robinson to customers for

17   sale; correct?

18        A    Or service or otherwise, yes.

19        Q    Okay.  But he was carrying property

20   that he would sell to customers for compensation

21   to Cintas; correct?

22        A    I have no reason to disagree with that,

23   yes.

24        Q    Okay.  And you read the depositions

25   that say that; correct?



```
 1        A    Yes.  I expected absent the
 2   depositions, to be perfectly candid.
 3             MR. MANN:  And, Clay, can I
 4        interject?  Are you talking about
 5        during the entire day of April the 6th
 6        or specifically at the time of the
 7        crash?
 8             MR. DAVIS:  I'm talking about day
 9        in and day out when the van was driving
10        down the road and Mr. Robinson going to
11        see these different vendors or
12        different clients where he was selling
13        stuff.
14             MR. MANN:  Okay.  I just wanted to
15        clarify that.
16   BY MR. DAVIS:
17        Q    Now, sir, I think you asked me a
18   question and I'm sorry.  Did you just ask me a
19   question, Mr. VanIngen, I'm sorry?
20        A    No.  And that clarification was the
21   context of which I gave the response.
22        Q    Okay, very good, very good.
23             Now, I think what you say, if I'm
24   reading this correctly, in conclusion number
25   one, you're saying that the van doesn't -- well,
```

1    first of all, what's your opinion concerning on

2    what type of vehicle this van is?

3        A    It's a 2015 Ford Econoline van.  My

4    opinion is that it is, what I would call, a

5    fleet vehicle; that it is not a commercial

6    vehicle.  I would use the definition, at least,

7    because it's not of adequate size nor is it

8    involved in interstate commerce, both necessary

9    elements to make it subject to part 3.90 of the

10    Federal Motor Carrier Regulations.

11        Q    Okay.  So what you're saying, if I

12    understand it, is Cintas is subject to the

13    Federal Motor Carrier Safety Regulations but

14    this van might not be; is that correct?

15            MR. MANN:  Object to the form.

16            THE WITNESS:  It's probably

17        stronger that it might not be.  I see

18        no evidence that it is related to this

19        collision or otherwise.

20    BY MR. DAVIS:

21        Q    But because Cintas is a motor carrier

22    and Cintas has a DOT number, there are times

23    when they are subject to the Federal Motor

24    Carrier Safety Regulations; correct?

25        A    I would expect even on the date of this

 COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100       www.coastalcourt.com

1    subject collision just with another category of

2    vehicle or otherwise, yes, sir.

3        Q    Okay.  But then you go on to say that

4    it doesn't meet the definition of a commercial

5    vehicle under the Georgia regulations; is that

6    right?

7        A    Yes, sir.

8        Q    I apologize, I'm going to get a little

9    bit out of order with my exhibits.  Give me a

10   second, sir, I apologize.

11       A    No problem.

12       Q    Does that appear to be the Georgia

13   Department of Public Safety Transportation

14   Rulebook?

15       A    Yes, for motor carriers, yes, sir.

16       Q    And you, I believe in your report, if

17   I'm not mistaken, you stated that was one of the

18   documents you reviewed; correct, under Materials

19   Reviewed in Case, the Georgia Department of

20   Public Safety Transportation Rulebook, Motor

21   Carrier Safety Regulations?  It's on page 14.

22       A    Sure; correct.

23       Q    Okay.  And is it your testimony that

24   under these rules the van is not a commercial

25   motor vehicle?



1      A     I would say that's my understanding of

2   the way motor carrier regulations apply in

3   Georgia, yes.

4      Q     Okay.  And what do you base that on?

5      A     Just my understanding of how they apply

6   within the industry, just my own trucking

7   clients, and such, that have vehicles of varying

8   sizes that are part of their business

9   operations.

10      Q     Do you know what a lightweight

11   commercial motor vehicle is?

12      A     I think those things can vary from

13   state to state.

14      Q     All right.  Let's go to page 13 of the

15   Georgia rules.  Give me just a minute, sir, to

16   catch up with myself.  Lightweight commercial

17   motor vehicle; do you see this?

18      A     Yes, I do.

19      Q     Do you know what a lightweight

20   commercial motor vehicle is?

21      A     You'd have to take a look at the exact

22   definition of that, but I can't recite it to you

23   off the top of my head, if that's what you're

24   asking.

25      Q     Okay.  So as you sit here today, you



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    82

1      don't whether this van fits the definition of a

2      lightweight commercial motor vehicle under

3      Georgia Rule 11-390.5, do you?

4              MR. MANN:  Object to the form.

5              THE WITNESS:  I would say not

6         technically as I haven't referenced

7         that in preparation for today.

8    BY MR. DAVIS:

9       Q    Okay.  But you did say in your report

10   that you had reviewed this rulebook; correct?

11      A    I don't think it's specific to this

12   case.  I mean, I put it there as a reference

13   material, but honestly, you know, I'm involve in

14   enough cases in different states that I usually

15   have a pretty good feel for what they do and

16   what they don't regulate.

17      Q    Give me just a second to get back to

18   the top.

19              This is the Georgia Department of

20   Public Safety Transportation Rulebook; correct?

21      A    Yes, I think you've already asked me

22   that.

23      Q    And, once again, you don't know whether

24   or not this van fits the definition of a

25   lightweight commercial motor vehicle; correct?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    83

1          MR. MANN:  Object to the form.
2      It's been asked and answered.
3          THE WITNESS:  Right, yes, sir, as
4      I responded already.
5   BY MR. DAVIS:
6      Q    So because of that isn't your first
7   conclusion wrong?
8      A    Not from what we discussed so far, no.
9      Q    Sir?
10     A    No, I see no reason --
11     Q    But you say it's not a commercial motor
12  vehicle, don't you?  You said this van is not a
13  commercial motor vehicle, right?
14     A    Yes; correct.
15     Q    But it may very well be a light
16  commercial motor vehicle; correct?
17         MR. MANN:  Object to the form.
18         THE WITNESS:  It definitely is
19     lighter weight than other commercial
20     vehicles that are regulated, generally
21     speaking, yes, sir.
22  BY MR. DAVIS:
23     Q    Okay.  And under -- let me get back to
24  where we were.  And you see that lightweight
25  commercial motor vehicles are subject to some of



1    the Federal Motor Carrier Safety Regulations;

2    correct?

3        A    In the vehicles being used in commerce,

4    right.  If it's not, it's not a commercial

5    vehicle by definition for any of these

6    standards, as I understand it.

7        Q    Well, if the tractor-trailer is driving

8    down the road with a a trailer full of property,

9    it's being used in commerce, isn't it?

10       A    Probably more times than not but not

11   exclusively.  That's why there are personal

12   conveyance interpretations within the industry.

13   There's times when they operate that it's not

14   part of the business enterprise or isn't

15   benefiting the motor carrier.  Those times are

16   excluded.

17       Q    Okay.  Is it your understanding that at

18   the time of the collision of April 6th that

19   Cintas had property, property that was going to

20   be for sale at some point in the back of this

21   van?

22       A    My understanding, yes, sir.

23       Q    Okay.  Now, let's go on and talk

24   about -- let me ask you this:  Did you review --

25   according to your expert report, you reviewed a



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          85

1    number of Cintas's policies; correct?

2         A    I've been presented with the policies,

3    and obviously at least in the depositions that

4    I've been provided for review, I've seen

5    questions and answers about those policies.

6         Q    And you read those policies?

7         A    Sure, yes.

8         Q    Okay.  Did you read them completely?

9         A    I think adequately enough.  I don't

10   know exactly what they do would be relevant to

11   the opinions in this case, but.

12        Q    You read Policy C-67 Vehicle Policy;

13   correct?

14        A    I have, yes, and I've seen that

15   discussed with a couple of deponents as well.

16        Q    And you read Authorized Driver Safety

17   Policy 168, also; correct?

18        A    That one rings a bell, yes, sir.

19        Q    Okay.  I'm going to pull up Policy 8

20   for a second -- or Exhibit 8.  Give me just a

21   minute.  This is corporate policy C-67; do you

22   see this?  It says Vehicle Policy?

23        A    I do.

24        Q    And it says, "Policy:  Cintas is

25   committed to promoting the safe, proper and



1   professional operation of all company and

2   leaseback vehicles."; do you see that?

3        A    I do.

4        Q    Would you read the next paragraph?

5        A    Sure.  "Cintas has adopted the Federal

6   Motor Carrier Safety Regulations, FMCSR, for all

7   company vehicles and the procedures outlined in

8   this policy are designed to meet or exceed those

9   regulations."

10       Q    Now, Cintas can adopt the Federal Motor

11  Carrier Safety Regulations for all company

12  vehicles, can't they?

13       A    Not so far as I'm concerned, they can.

14  If they want to, you know, choose to apply

15  things similar, that's fine, but they don't

16  adopt what don't apply to them factually, at

17  least in my approach.

18       Q    Why can't a private company say they're

19  going to adopt the Federal Motor Carrier Safety

20  Regulations for all of their vehicles?

21            MR. MANN:  Object to the form.

22            THE WITNESS:  I'm not saying they

23       can't say it.  To me, I think that they

24       factually can adopt them in situations

25       where they don't apply.  If they choose



1        to apply the remainder of their fleet

2        in a way consistent with that, to me,

3        that's technically different than

4        formally adopting those rules.

5    BY MR. DAVIS:

6        Q    Well, why do they say they're doing

7     that?

8             MR. MANN:  Object to the form of

9        the question.

10            THE WITNESS:  I don't know.  I

11       mean, that's something that to speak to

12       the company's policy or their intent,

13       I -- what's the company doing.  I just

14       don't -- I don't describe it as

15       adopting because you can adopt

16       something that wouldn't apply

17       otherwise.  You can --

18   BY MR. DAVIS:

19       Q    Okay.  But Cintas described it as

20    adopting, didn't they?

21       A    I'm not calling that into question,

22    yes, sir.

23       Q    Okay.  And it goes on to explain --

24    we've got a definition section; do you see that?

25       A    Yes, and I've been through it previous



1    to this discussion, obviously.

2        Q    Okay.  Well, I mean, first of all, it

3    says "all company vehicles"; correct, up at the

4    top in that section we just read; correct?

5        A    That is correct.

6        Q    Okay.  And below that you'll see

7    there's CDL vehicles, commercial driver's

8    license, CDL, vehicles; do you see that?

9        A    I do.

10       Q    If you go to the next page, there's

11   commercial motor vehicles; do you see that?

12       A    It does.  I see it there.

13       Q    And the final category is company owned

14   vehicles; correct?

15       A    It is, yes.

16       Q    And that's a COV; correct?

17       A    Yes.

18       Q    And that's a company vehicle that has a

19   gross vehicle weight rating or gross combination

20   weight rating or gross vehicle weight or gross

21   combination weight of 2000 pounds or less;

22   correct?

23       A    With a couple other scroll-down

24   provisions but, yes, correct.

25       Q    That are not used in transporting



1    hazardous materials that requires placarding;
2    correct?
3         Q    Correct?
4         Q    And then they specifically mention the
5    Econoline and Sprinter vans; correct?
6         A    They do, that's correct.
7         Q    Okay.  What kind of van was it that Mr.
8    Robinson was driving?
9         A    2015 Ford Econoline van, as I
10   understand.
11        Q    Okay.  So it sounds like he was driving
12   company owned vehicle; correct, a COV?
13        A    Yeah, I can agree with that.
14        Q    Is that not correct?
15        A    I believe that to be correct.
16        Q    Okay.  So that certainly fits into that
17   definition up at the top -- let me get to it --
18   where it says "all company vehicles"; correct?
19        A    They put it within that category, at
20   least in this vehicle policy statement you're
21   showing me.
22        Q    Now, this was -- okay.  Now, after that
23   we're going to go to the next -- let me get out
24   of this; give me just a minute.  And this is
25   Exhibit 8, so I'm going to go to Exhibit 9.



1        Okay.  I've got Exhibit 9 up here.

2   This is Policy C-168; do you see that, sir?

3        A    I do.

4        Q    And that's Exhibit 9, okay?  Now, at

5   the top would you read what it says after

6   "policy"?

7        A    Looks like pretty much the exact same

8   thing that I read the last time you asked me to

9   read.

10       Q    Would you be so good as to read it

11  again for me?

12       A    Sure.  "Cintas has adopted the Federal

13  Motor Carrier Safety Regulations, FMCSR, for all

14  company vehicles and the procedures outlined in

15  this policy are designed to meet or exceed those

16  regulations."

17       Q    Okay.  And, once again, they've got

18  definitions under that; correct, and that

19  definitions include COV, company owned vehicles;

20  correct?

21       A    They do.  I'm kind of going to break my

22  protocol here because I don't want there to be

23  misunderstanding moving forward.  But I do have

24  an issue in that, you know, we're talking about

25  adopting the regulations, but the regulations --



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          91

1    and the definition of commercial motor vehicle

2    in this is not insistent with what the federal

3    regulation says.  There's some differences

4    between how they've defined it and really how

5    the Federal Motor Carrier Safety Administration

6    has defined commercial motor vehicle drivers,

7    the second of the two categories we've been

8    discussing.  And I don't want to assume that --

9    moving forward that I just totally agree with

10   what we've been talking about in hand with the

11   DOT rule.

12        Q    Well, what do you disagree about their

13   definition for commercial motor vehicle drivers?

14        A    Well, I don't know that I'm disagreeing

15   with their definition.  They can define it as

16   they want.  But I don't think that I necessarily

17   exclude people from the commercial motor vehicle

18   drivers definition that they have just because

19   the vehicle is over 26,000 pounds.  It looks

20   like, to me, here that they no longer classify

21   in their terminology, at least, a CDL driver

22   within the commercial motor vehicle driver

23   category, and I think the regulatory context

24   would include both within the commercial

25   vehicle, you know, definition.  There's a floor



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    92

```
 1    in applicable motor carrier regulations but
 2    there's not a feeling is probably the best way
 3    for me to describe my thoughts on that.
 4        Q    Okay.  Do you think -- okay, fair
 5    enough.  Fair enough.  Fair enough.  But do you
 6    have any umbridge with how they define a company
 7    operated vehicle, which is what we said Mr.
 8    Robinson is driving?
 9        A    No.  Like I said, it's their policy.
10    They can use whatever terminology they want or
11    generally.  I'm not going to question what
12    they've done otherwise.
13        Q    So they can say they're going to apply
14    the Federal Motor Carrier Safety Regulations for
15    all company vehicles, can't they?
16        A    They've done that.
17        Q    Yeah.
18        A    You know, whether that's really what
19    they think they're doing or not, again, I'll let
20    them speak to those specifics.
21        Q    Well, you read Ms. Ferguson's
22    deposition, didn't you?
23        A    Yes, sir, I did.
24        Q    Okay.  Do you agree that Cintas is
25    holding its non-CDL drivers to the same
```



1    standards as its CDL drivers?

2            MR. MANN:  Object to the form.

3            THE WITNESS:  Not totally, no.

4    BY MR. DAVIS:

5        Q    Why not?  Based on those two policies,

6    why not?

7        A    Because clearly they don't have Mr.

8    Robinson under an obligation to hold a CDL to

9    operate a non-CDL vehicle, which I guess they

10   could.  They're not doing that so that's an

11   example of an instance where they're applying

12   just any motor carrier rule for any driver or

13   vehicle within their fleet.

14       Q    But isn't Cintas effectively saying

15   that we're going to apply the Federal Motor

16   Carrier Safety Regulations to all our drivers,

17   including Mr. Robinson, even though he doesn't

18   have a CDL?

19       A    Again, I don't know that I can speak to

20   that.  The company really is going to have to be

21   the one that tells you what they believe to be

22   the case and what their policy is.  I'm not

23   within my wheelhouse as an expert.

24       Q    But from what you've read, it certainly

25   looks that way, doesn't it?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                      94

1                MR. MANN:  Object to the form.
2                THE WITNESS:  No, not necessarily.
3        There are definitely ways that they
4        seem to treat all of their drivers
5        regardless, you know, of whether, in my
6        opinion, they're commercial vehicles.
7        They do some things that are consistent
8        with that.  There are things that
9        aren't consistent with that at the same
10       time, including that they define a
11       commercial motor vehicle driver a
12       little bit differently than in the
13       regular normal context.
14   BY MR. DAVIS:
15       Q    We were talking a little earlier about
16   section 390.3, the general applicability
17   section.
18       A    Yes, sir.
19       Q    Isn't it true that section 390.3 B
20   says, Nothing in subchapter B of this chapter
21   shall be construed to prohibit an employer from
22   requiring and enforcing more stringent
23   requirements relating to safety of operation and
24   employee safety health?
25                MR. MANN:  And, Clay, can you show



1        him what you're reading?  I don't know

2        if he has that in front of him.

3             THE WITNESS:  I'm familiar enough

4        with it.

5    BY MR. DAVIS:

6        Q    So what is the answer to that question?

7        A    I know that the regulatory content says

8    that.  I'm not going to agree across the board

9    that there are not situations where they're not

10   allowed to do specifically what this regulation

11   references; but, generally speaking, they are

12   allowed to choose to apply standards that meet

13   or exceed the standards outlined in the

14   regulatory context within their fleet.  There

15   are just some notable instances where they are

16   not allowed to as well.

17       Q    But there's nothing in the Federal

18   Motor Carrier Safety Regulations then that

19   prohibit Cintas for requiring more stringent

20   requirements relating to the safe operation and

21   employee safety and health; correct?

22       A    I think there are exceptions to that,

23   as my previous response.  But I think, generally

24   speaking, it's definitely what the regulation

25   says.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    96

1      Q      Okay.  But there's nothing in here that
2  says Cintas can't apply the Federal Motor
3  Carrier Safety Regulations to all of its
4  vehicles, is there?
5      A      There is not there, but there is in
6  other portions of the regulations where they're
7  specifically disallowing them from doing what
8  this regulation says that they can do, which is
9  kind of going above and beyond.
10     Q      Subchapter B?
11     A      Yeah I'm sure.
12     Q      Tell me what they are.
13     A      A perfect example is that you can't do
14 DOT drug testing on somebody that's not
15 factually a CDL holder or operating a CDL
16 vehicle, so that's a good example.  You are not
17 allowed to test people that aren't subject to
18 the CDL requirement voluntarily.  The regulation
19 specifically prohibits it separately.
20     Q      So Cintas can't drug test its employees
21 if it wants to?
22     A      Under the DOT --
23            MR. MANN:  Object to the form.
24            THE WITNESS:  -- protocols, that
25     is correct.

 COASTAL COURT REPORTING & VIDEO SERVICES
                        800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    97

1   BY MR. DAVIS:

2       Q    Okay.  But Cintas can choose to drug

3   test its employees; correct?

4       A    They can so long as they're not under

5   the DOT and CDL protocol, correct.

6       Q    Just like Cintas can choose to allow

7   other portions of the Federal Motor Carrier

8   Safety Regulations to regulate its drivers;

9   correct?

10      A    I just have a hard time agreeing that

11  they can rely on those regulations or somehow

12  adopt them.  I don't -- they can apply something

13  similar.  To me, that's not adoption of those

14  same rules.  It's application of something

15  similar.

16      Q    So even though it's Cintas's company,

17  they can't do what they want to do?

18           MR. MANN:  Object to the form.

19           THE WITNESS:  There are some

20      limitations to it, and I just carved

21      out an example of one.

22  BY MR. DAVIS:

23      Q    Okay.  Is there any other limitations

24  you can think of under the Federal Motor Carrier

25  Safety Regulations that Cintas would be



1   prohibited from doing to a driver of one of its

2   company owned vehicles?

3        A    Not that are relevant in this case.

4   That's one that immediately comes to mind that I

5   recalled; that's why I offered it to you.

6        Q    Let me ask you something.  In your

7   report why didn't you mention either one of

8   these policies, Policy 67 or Policy 168?

9        A    Well, if you've read some of my

10  previous testimony, you know, generally

11  speaking, I don't -- I let the company discuss

12  what their policy says, what's intended, how

13  they choose to enforce it as a policy and maybe

14  not a factual rule for every instance.  But

15  beyond that, you know, I would say that I don't

16  think company policy necessarily is a basis for

17  any of the opinions that I offer.  I might make

18  a reference to the fact that applying commercial

19  vehicle rules to a vehicle that is smaller than

20  what I would consider a commercial vehicle may

21  benefit the overall fleet, you know, but

22  otherwise I generally don't speak specifically

23  to the propriety of a company's internally

24  developed policy; it's just not what we do.

25        Q    Well, Mr. Grill, he wasn't throwing



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

```
1     stones at Cintas for adopting the Federal Motor

2     Carrier Safety Regulations, was he?

3              MR. MANN:  Object to the form.

4              THE WITNESS:  I think his term was

5         that he applauded them and then he

6         offered examples of other motor

7         carriers that do actually set the

8         standard that, I guess, in his opinion

9         Cintas doesn't do.  So, yeah, he

10        applauded them and I'm not going to

11        criticize him, for sure.

12   BY MR. DAVIS:

13        Q    And it's not your fault -- I mean, you

14   have no control over what policies that Cintas

15   adopts, do you?

16        A    I think that's fair; I do not.

17        Q    Cintas wrote these two policy manuals;

18   correct?

19        A    Apparently so or somebody did on their

20   behalf.

21        Q    You certainly didn't, did you?

22        A    I certainly did not.  I wouldn't do

23   that for any client of mine that asked me.

24        Q    Okay.  You agree that companies should

25   be bound by their company policies?
```



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    100

1              MR. MANN:  Object to the form.
2              THE WITNESS:  I think I leave that
3         to them, you know, especially in this
4         case.  It's kind of notable that some
5         of the people that you've asked a
6         similar question to that have said,
7         hey, listen, you know, this is
8         guidance; we don't expect 100 percent
9         proficiency, but this is kind of what
10        we live by.  I find that to be
11        reasonably normally but it doesn't
12        change my position on speaking to the
13        quality or the ineptness of, you know,
14        a company's individual policies
15        typically.
16   BY MR. DAVIS:
17        Q    Do you agree that whether a company is
18   bound by its written policy is a question better
19   left up to a judge?
20             MR. MANN:  Object to the form.
21             THE WITNESS:  Or a jury, and
22        that's one of the reasons why I
23        typically don't opine on those issues.
24   MR. DAVIS:
25        Q    Okay, thank you.  I think we've beaten

**CCR** COASTAL COURT REPORTING & VIDEO SERVICES
                800-791-1100      www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    101

1     that dead horse as much as we're going to beat

2     it right now.

3               THE WITNESS:  Are we at a place we

4          can take five again for a bathroom

5          break?

6               MR. DAVIS:  Absolutely.

7               AUDIO-VIDEO TECHNICIAN:  Off the

8          video.

9                    (Whereupon, the videocorder was

10                   turned off at approximately

11                   1:25 p.m. and a short break

12                   ensued.)

13                   (Whereupon, the video portion of

14                   this deposition resumed at

15                   approximately 1:31 p.m.)

16    BY MR. DAVIS:

17       Q    Mr. VanIngen, I'm going to take you

18    back -- I'm still going to beat a dead horse.  I

19    can't help myself, I'm sorry.  We're going to go

20    back to Exhibit 7, and on page seven we're going

21    to go -- on Exhibit 7 we're going to go down to

22    page ten.  Now, you read Kimone Ferguson's

23    deposition; correct, sir?

24       A    That is correct, yes.

25       Q    And I think you testified a little



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    102

1    while ago that there were some people who

2    weren't as clear as other people when they were

3    testifying about Cintas adopting the Federal

4    Motor Carrier Safety Regulations; correct?

5         A    Yeah, I think I generally had the

6    understanding that some people really didn't

7    know -- some people had other commentary, some

8    people disagreed, I mean, kind of depending on

9    who you talked to.

10        Q    Well, this is Mr. Grill's report where

11   he has excerpts from Kimone Ferguson's

12   deposition; do you see that?

13        A    I do see that, yes, sir.

14        Q    Okay.  And it says, Question -- this is

15   me asking Ms. Ferguson's questions.  Okay.  Now,

16   you see  the first paragraph where it says

17   Cintas has adopted the Federal Motor Carrier

18   Safety Regulations, FMCSR, for all compnay

19   vehicles:  Answer: Correct."

20             "Question":  Is that a correct

21   statement?"

22             "Answer:  Correct."

23             "Now, if you go down to the next

24   paragraph, Oh, you also say -- it goes on to

25   say -- and the procedures outlined in this



1    policy are designed to meet or exceed those

2    regulations.  Do you see that?  Uh-huh.  Do you

3    know what that means?  That it will comply with

4    those regulations or -- that it'll basically

5    comply with those regulations."

6              "Question:  In some cases even exceed

7    those regulations; correct?"

8              "Answer:  Correct."

9              "Question:  Now, it goes on to say,

10   This policy applies to all employees who operate

11   a motor vehicle owned, leased or rented by

12   Cintas.  Do you see that?"

13             "Answer:  Yes.  That would included

14   include Cintas Corporation No. 2; correct?"

15             "Answer:  Correct."

16             Now, is that some of the testimony you

17   were talking about?

18      A    I'm not referencing the testimony, but

19   I have no reason to doubt that it was some of

20   what I've read, yes.

21      Q    Okay.  And, there again, all the

22   depositions you've read in this case that you've

23   based your opinion upon are set forth in your

24   expert report on pages 13 or 14; correct?

25      A    I think that's probably fair, yes.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    104

1        Q    All right, thank you.  Back to -- we're
2   still on opinion number one -- it's kind of the
3   longest opinion.  At the top of page -- I'm
4   sorry, let me get off of this one, sir.  Let me
5   go back to where we were at which was -- give me
6   just a minute sir.
7             AUDIO-VIDEO TECHNICIAN:  Off the
8        video.
9                  (Whereupon, there was an
10                  off-the-video discussion held.)
11                  (Whereupon, the video portion of
12                  this deposition resumed.)
13   BY MR. DAVIS:
14        Q    Mr. VanIngen, back to your report.
15   Now, we're almost to the end of your first
16   conclusion or first opinion, you have some
17   information on here -- well, first of all, let's
18   go back up.  You see this chart at the top up
19   here; what is that?
20        A    It's a reference to a commercial
21   vehicle E-coder which essentially allows you to
22   put a VIN number for any vehicle up there and it
23   will tell you the actual gross vehicle weight
24   rating range that that vehicle falls within.
25        Q    Okay.  And how much did that vehicle

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    105

1    weigh, Mr. Robinson's vehicle, according to what
2    you found?
3         A    It looked like it was in the range of
4    8- to 9,000 pounds per the manufacturer's
5    stipulation.
6         Q    Okay.  Now, at the very end, right
7    before conclusion number two, I want to really
8    understand what this section about the traffic
9    ticket had to do with opinion number one.  Can
10   you explain that to me?
11        A    Well, I think I've defined a commercial
12   motor vehicle, not a lightweight vehicle of some
13   sort, but I've given clear definitions of both,
14   of a commercial motor vehicle under the Georgia
15   Federal Motor Carrier rules and said that they
16   don't apply.  At the same time, I turned around
17   at the end and I said, hey listen, just because
18   it's not my opinion that those apply there still
19   are some indications, you know, for vehicles
20   being operated and, in my opinion, they're
21   reasonably identical to each other.  That would
22   apply to both Mr. Robinson and Mr.
23   Castle-Foster.
24        Q    Do you have an opinion concerning
25   whether or not Mr. Robinson failed to yield



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    106

1    after stopping at a stop sign?

2              MR. MANN:  Object to the form.

3              THE WITNESS:  I recognize what it

4         is in testimony and on a report in this

5         case.  I don't think I'm offering an

6         opinion about those things at all, I

7         don't believe.

8    BY MR. DAVIS:

9         Q    Okay.  Do you have any opinion

10   concerning whether Mr. Castle-Foster was guilty

11   of any of these four violations you list in your

12   report?

13        A    I would say, no, I don't.  I'm just

14   making them as a reference.

15        Q    Okay, thank you.  Now, do you think

16   we've fully addressed all of the opinions you

17   had under conclusion number one?

18        A    Yeah, I think we have reasonably, at

19   least, yes.

20        Q    Okay.  Can you think of any -- this is

21   the only chance I'm going to have to talk to you

22   before now and trial.  Are there any opinions in

23   conclusion number one, that fall under

24   conclusion number one that we haven't discussed

25   already here today?


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                107

1      A    No.  There is one thing that kind of

2   came to the surface in my preparation for today,

3   I guess, that somehow falls within that last

4   category where you were talking about citations.

5   So it wasn't put in my report but I did have an

6   observation that really came on me yesterday and

7   that I didn't have when August 14th was here, my

8   report was issued.  So if you want me to

9   articulate that, I can.

10     Q    Please do.

11     A    I'm not opining about anything other

12  than what this report really has in it.  The one

13  thing I noticed, though, for Castle-Foster is

14  that at least on the crash report the officer

15  identified a current Georgia address that I

16  guess the driver gave to him, but it was an Ohio

17  license.  How that didn't stick out to me as a

18  sore thumb the first time, I don't know, but I

19  just kind of a have a recognition that when

20  somebody has been in another state for 30 days

21  that they ought to have an in-state-of-residence

22  license.  But I totally missed that the first

23  time through and it just stuck out to me going

24  through my prep process last night.

25     Q    Do you know how long Mr. Castle-Foster



1    had been living in Georgia before the collision

2    took place?

3        A     I would say I don't specifically know.

4        Q     Okay.  So it may have been within 30

5    days?

6        A     I didn't really know either way, but

7    like I said, that's something I probably would

8    have scrolled down on had I recognized it

9    earlier on in the game.

10       Q     Does that affect any of your

11   conclusions in this report?

12       A     I would say no.

13       Q     Okay.  Let's talk about your opinions

14   in conclusion number two.  Specific training

15   required to operate a motor vehicle on the

16   highway is generally limited to commercial motor

17   vehicles as defined by the Federal Motor Carrier

18   Safety Regulations.  Do you see that?

19       A     Yes, I do.

20       Q     What about the Smith System?

21       A     I don't know that that's any

22   requirement within the industry, not even a

23   standard of care as I would use the term, but

24   you and I have already discussed that

25   previously.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                109

1      Q    Well, the Smith System was a standard
2   at Cintas, was it not?
3           MR. MANN:  Object to the form.
4           THE WITNESS:  Well, they'd have to
5        state that.  I said what I thought it
6        was within the industry and have
7        offered no refinement of that
8        discussion.
9   BY MR. DAVIS:
10     Q    Okay.  Well, I think we testified
11  earlier -- I think you testified earlier that
12  you weren't really sure whether the Smith System
13  was the standard throughout the fleet industry
14  or not, is that what you testified to earlier or
15  am I misunderstanding?
16     A    Well, I think you're -- I don't think
17  that's what I said.  I said that I wouldn't even
18  describe it as that way for commercial motor
19  vehicles in that part of the industry, and I
20  certainly didn't think that it would apply, you
21  know, further down to other fleet vehicles.
22  That's the best response I can give, and that
23  stands as I previously presented it today.
24     Q    Did you read in the depositions where
25  all Cintas drivers have to graduate from the

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    110

1    Smith System's course?

2        A    I don't recall reading that, but I

3    would tell you I generally had the understanding

4    that that was part of the orientation process.

5    That's not unusual for a carrier or a fleet.

6        Q    So do you agree that Cintas has

7    specific training that is required to operate

8    their motor vehicles on the highway?

9        A    I think their policy and their

10   testimony of how that policy works its way out

11   is exactly what you've described.

12       Q    Okay.  So then isn't your conclusion

13   wrong when it says "Specific training to operate

14   a motor vehicle on the highway is generally

15   limited to commercial motor vehicles as defined

16   by the FMCSRs."?

17           MR. MANN:  Object to the form.

18           THE WITNESS:  I don't see how

19       that's wrong.  That's what my opinion

20       is, making sure that we understand that

21       any driver, I guess, has to have a

22       certain amount of aptitude to operate

23       the vehicle they're operating, whether

24       it's in commerce or not.  But with that

25       as a floor, I still don't see why that



1      would change my opinion.

2    BY MR. DAVIS:

3      Q    Okay.  You do agree, though, that to

4    operate a Cintas motor vehicle on the highway,

5    you have to have specific training in the Smith

6    System?

7           MR. MANN:  Object to the form.

8           THE WITNESS:  It's something

9      apparently that they're requiring by

10     company policy, yes, sir.  It seems to

11     be the case.

12   BY MR. DAVIS:

13     Q    Okay.  Now, you say about halfway down,

14   If Mr. Robinson had been entrusted with a

15   vehicle requiring a commercial driver's license,

16   he would have been subject to the entry level

17   driver training driving requirements found in 49

18   CFR, Part 380, Subpart E; do you see that?

19     A    He could have been; correct.  And, yes,

20   I do see that, yes.

21     Q    And what are those entry level driver

22   training requirements?

23     A    They are specific requirements within

24   the industry and its regulatory end standard of

25   care that a CDL driver, someone new to that



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                112

1    credential with less than a certain amount of

2    experience, be given very specific and

3    regulatory defined training.

4        Q    And Cintas has adopted the Federal

5    Motor Carrier Safety Regulations for all of its

6    drivers, hasn't it?

7            MR. MANN:  Object to the form;

8        asked and answered.

9            THE WITNESS:  I don't -- obviously

10       the policy documents speak for

11       themselves.  Saying that that's is

12       required for a driver who doesn't have

13       a CDL and in an instance that's only

14       CDL mandated, I just have a hard time

15       agreeing the way you present that

16       question to me.

17   BY MR. DAVIS:

18       Q    But Cintas was free to adopt its own

19   policies that exceeded the standard of care;

20   correct?

21       A    I would not disagree with that had the

22   entry level driver training requirements

23   actually applied to Robinson, yes.

24       Q    And Cintas was free to require Smith

25   System which is what they did; correct?



1       A     There would be no reason to dispute

2    that, yes, sir.

3       Q     The last paragraph, "There is no

4    standard of care regarding training requirements

5    for drivers of noncommercial motor vehicles, but

6    because Cintas is providing training and has

7    reasonable policies in place Cintas is exceeding

8    any minimum requirement a person may impose on a

9    noncommercial motor vehicle fleet."  Do you see

10   that?

11      A     I do.

12      Q     Do you stand by that statement?

13      A     Yes.

14      Q     So Cintas's policies are reasonable;

15   correct?

16      A     I would not call them anything but

17   reasonable because they seem to go beyond

18   industry standards of care and regulatory

19   standards that could apply, especially that of

20   the collision.

21      Q     Do you think we've discussed all of

22   your opinions as they appear in conclusion

23   number two at this point, sir?

24      A     I would say so.

25      Q     All right.  Let's go to conclusion



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    114

1    number three.  It says, "There is no industry

2    standard of care as related to a company's fleet

3    operations of noncommercial motor vehicles

4    beyond proper licensing and a reasonable

5    expectation that drivers will obey applicable

6    laws when operating their assigned vehicle."  Do

7    you see that?

8        A    I do, yes.

9        Q    If that is true, how come so many

10   fleets use the Smith System to train its

11   drivers?

12            MR. MANN:  Object to the form.

13            THE WITNESS:  With the types of

14       fleets and what I think hits the

15       standard of care or not, aside from

16       what I've already testified along that

17       line, you know, companies and

18       especially larger ones that are also

19       DOT-regulated fleets, commonly use

20       Smith System for their compliance and

21       it's very common for them to provide

22       similar training to vehicles that are

23       not DOT regulated.  I think it's a

24       prevalent training tool used for a DOT

25       regulated fleet and it's not uncommon



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    115

1          to teach smaller vehicle drivers to

2          apply similar standards.

3     BY MR. DAVIS:

4          Q    Well, if it's so prevalent, then how

5      come you don't want to call it an industry

6      standard?

7               MR. MANN:  Object to the form.

8               THE WITNESS:  For the same reason

9          that we discussed previously already.

10         I think I've answered that question

11         already.

12    BY MR. DAVIS:

13         Q    Give me your definition of an industry

14     standard.

15         A    An industry standard, in my definition,

16     is something that typically is required within

17     the regulatory context and that beyond that it's

18     just a prevalent thing that a company not doing

19     it is ridiculous because everybody else is

20     literally doing it; and, to me, that's how I

21     approach an industry standard-type definition.

22         Q    Is it an industry standard that

23     tractor-trailers are not supposed to making

24     U-turns?

25         A    I don't know.  I don't know that's



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                  116

1     relevant in a case where we don't have a
2     tractor-trailer involved.
3         Q   Yes, sir.  I'm just trying to drill
4     down what an industry standard is.  If many
5     fleets that own tractor-trailers have in their
6     policies don't make a U-turn, at some point
7     doesn't it become an industry standard because
8     so many tractor-trailer fleets have adopted that
9     standard of care?
10             MR. MANN:  Object to the form.
11             THE WITNESS:  Are you suggesting
12        to me that the majority of people have
13        adopted and have that in their
14        policies, because that's not been my
15        experience.
16    BY MR. DAVIS:
17        Q   Okay.  But you would agree that the
18    majority of fleets have adopted the Smith
19    System; correct?
20        A   No, I can't agree to that.  I can say
21    it's more prevalent for larger fleets and I
22    think that's what my testimony was, but then I
23    couldn't call it the standard of care even for
24    DOT subject vehicles.
25        Q   Do you know how many, what percentage



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    117

1    of fleets have adopted the Smith System?

2        A    I couldn't tell you that I do, no, not

3    specifically.

4        Q    So you don't know if it's half, more

5    than half or less than half, do you?

6        A    I don't have a specific number.  I do

7    have an inclination that it's way less than

8    half, you know, just based on my exposures to

9    the industry over the last 30 years.

10       Q    I'm sorry, sir, based on your exposure

11   on what?

12       A    To the trucking industry over the last

13   20 or 30 years.  Like I said, there are plenty

14   of big carriers using it, large carrier, but

15   they are not the majority of the trucking

16   industry, and I think my representation is what

17   I think is normal in the entire industry, not

18   just for a very large or very sophisticated

19   carrier.

20       Q    Okay.  I'm going to show you -- if I

21   can get it up here.  Give me just a minute.

22   Sir, you read Mr. Robinson; s deposition, didn't

23   you?

24       A    I did, yes, sir.

25       Q    Okay.  Hold on just a minute, sir, let



1    me grab something (brief pause).

2            You read Mr. Robinson's deposition;

3    correct?

4        A    Correct.

5        Q    And you saw the exhibits in the back of

6    his deposition; correct?

7        A    I don't remember whether I saw them

8    there or I've seen them referenced elsewhere,

9    but I obviously saw his deposition because I

10   reviewed it.

11       Q    Do you remember the picture that I'm

12   referencing right here with the red circle

13   around it which I will tell you is a picture of

14   the five keys of safety that was plastered in

15   the back of Mr. Robinson's van?

16       A    I do recall that discussion, yes.

17       Q    Okay.  And you remember this

18   photograph?

19       A    Vaguely.

20       Q    So clearly Cintas thinks enough of the

21   five keys of safety that not only do they teach

22   their drivers, they post them in the van where

23   the driver can see them; correct?

24            MR. MANN:  Object to the form.

25            THE WITNESS:  I'm offering no



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    119

1        criticism or opinion about that.
2    BY MR. DAVIS:
3        Q    Is it the industry standard to run stop
4    signs?
5             MR. MANN:  Object to the form.
6             THE WITNESS:  I would expect not
7        because it violates an underlying
8        obligation that every driver has to
9        obey whatever local law applies to
10       them.
11   BY MR. DAVIS:
12       Q    Okay.  Is there anything in the Smith
13   System that would help a driver to not pull out
14   into a street in front of another vehicle?
15       A    I'm not sure that I am in a position to
16   answer that question, though I'm sure Smith
17   System doesn't somehow suggest not to obey
18   traffic control devices; I could anticipate that
19   for sure.
20       Q    Are you familiar with the concept of a
21   cushion of space cushion from the Smith System?
22       A    Yeah.  I don't know that I think that
23   is truly an intersection, controlled
24   intersection, especially, type of opinion or
25   type of topic, but I am familiar with that,



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    120

1    generally speaking.

2        Q    Well, doesn't Smith System teach you to

3    keep adequate distance between yourself and

4    other vehicles?

5        A    It does.  I think that's really within

6    the context where you're traveling along with

7    them, not when you're stopping at a stop sign or

8    otherwise.  I think it's more an over-the-road

9    application, as I understand it.

10       Q    Do you understand why the Smith System

11   is used among fleet owners but it's not

12   necessarily taught to individuals in driver

13   education classes, at least not on a large

14   scale?

15       A    I don't know that I could make the

16   statement that you just made so I'm really not

17   in a position to respond to the question that

18   you asked.

19       Q    Okay, fair enough.  Let me go back to

20   where we were.  Go back to Exhibit 6, if I can

21   find it.  Go back to your report again.  See

22   that opinion, "There is no industry standard of

23   care as related to a company's fleet operations

24   of noncommercial motor vehicles beyond proper

25   licensing and a reasonable expectation that



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    121

1    drivers will obey applicable laws when operating

2    their assigned vehicle."

3            If you go to the next page, you're

4    going to see this document here at the top.

5    What is this?

6        A    This is information that we pulled from

7    DOT's SMS system for Cintas.  I'm assuming that

8    it was pulled off of the data sometime after we

9    were retained in the case.

10       Q    And what does this tell us exactly;

11   what does this tell you exactly?

12       A    Well, you know, we've got a situation

13   where we've got a large carrier that is a motor

14   carrier and operates the way I would use the

15   term, at least, commercial vehicles; that

16   there's discussion of whether those rules are

17   applied somewhat down to other vehicles that

18   don't meet my definition of a commercial motor

19   vehicle, and I think what I've done is I went

20   out to find at times relevant to the subject

21   collision what the company's performance was

22   from a perspective that I could compare their

23   operational metrics, and especially as it

24   relates to having their drivers roll stop signs,

25   violate, you know, speed or otherwise because



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    122

1   there's a metric for that for every fleet that

2   is DOT regulated.

3       Q    And when you're looking for the

4   conclusions you took away this particular

5   document that you transposed on page seven of

6   your report?

7       A    I think the reason it was included is

8   because when I went to take a look at the

9   company's safe driving score, knowing its

10  speeding infractions, running any type of -- not

11  obeying a traffic control device of some sort,

12  whether it was a light, a sign, or whatever, is

13  actually given a numeric performance number

14  compared to other trucking companies and other

15  fleets within the country.  So as you might

16  expect, this is something I do in just about

17  every case that I take on here in-house, whether

18  it's my case or otherwise, and I just notice an

19  unsafe driving score of .28 is ridiculously low.

20  It actually outpaces, you know, the companies

21  that Mr. Grill suggested have, I guess, better

22  or more appropriate standards of care

23  internally, you know, your C. R. England, your

24  Schneider, your UPS, your FedEx.  I mean, this

25  company outperformed all of them in the unsafe



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    123

1   driving metric and, to me, it's important not
2   lose track of that.
3       Q    Well, are these vehicles -- I'm sorry,
4   did I cut you off?
5       A    I don't think so, no, sir.
6       Q    Okay.  The vehicles on this document,
7   what kind of vehicles are they?
8       A    They're ones that are subject to DOT
9   rules either applied by the state or the feds
10  for vehicles.
11      Q    Are these all tractor-trailers?
12      A    They're not, but contrary to what Mr.
13  Grill said about them maybe being all non-CDL
14  vehicles, it's clearly not an all non-CDL
15  vehicle analysis; it's for some of the smaller
16  vehicles as well and predominantly, I would say.
17      Q    What number of these vehicles are CDL
18  versus non-CDL?
19      A    At one stage in the game, I think I
20  tried to analyze that and my numbers were that
21  about percent of the inspection events or crash
22  events that show up in this system were CDL
23  vehicles and the remainder were non-CDL
24  vehicles.  So it's a clear mixture but heavier
25  non-CDL than CDL required.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    124

1        Q     Heavier non-CDL?

2        A     I'm sorry, can you say that again?

3        Q     Heavier non-CDL?

4        A     I was estimating it was a 90 percent

5    non-CDL to 10 percent CDL or somewhere within

6    that range of expectancy.

7        Q     Okay.  So only about 10 percent of the

8    drivers in this document would be required to

9    carry a CDL under the Federal Motor Carrier

10   Safety Regulations; correct?

11       A     I think that's fair.  If they happen to

12   have held a CDL but didn't require one for the

13   vehicle they were operating, those would

14   probably be excluded, I agreement.

15       Q     But the 90 percent, or more, vans like

16   like Mr. Robinson was driving; correct?

17       A     No, to me they're your non-CDL vehicles

18   within the company's operations for sure, yes.

19       Q     Wouldn't you agree the vast majority of

20   Schneider's vehicles are CDL vehicles?

21       A     I would.

22             MR. MANN:  Object to the form.

23   BY MR. DAVIS:

24       Q     As would be the other companies Mr.

25   Grill was talking about?



COASTAL COURT REPORTING & VIDEO SERVICES
                800-791-1100      www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    125

1        A    Correct.

2             MR. MANN:  Same objection.

3             THE WITNESS:  But he's the one who

4        defined the standard of care as

5        companies whose performance was

6        suitable so it's irrelevant to take a

7        look at them comparatively to Cintas.

8        Cintas way outperforms everyone but

9        FedEx.  And hardly any --

10    BY MR. DAVIS:

11       Q    Come on down under the two paragraphs

12    starting "although".  Go to the second sentence.

13    It says, "The safety management controls are

14    similar for the commercial and noncommercial

15    drivers in that both must be properly licensed

16    and qualified, both must attend orientation, and

17    both must participate in defensive driver

18    training prior to operating their assigned

19    vehicle."  Do you see that?

20       A    I do, yes.

21       Q    Okay.  So are you saying then that

22    those safety management controls are similar for

23    both CDL drivers and non-CDL drivers?

24       A    In many ways.  What we agree or

25    disagree makes up those standard of cares may be



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    126

1    different.  I think the whole point is that a

2    company like this seems to be choosing at least

3    on some levels to apply a safety management

4    control that would normally apply to a DOT

5    subject vehicle and potentially applying it

6    downward to the extent they've chosen.

7        Q    Now, do you think that we've dealt with

8    all of your opinions as set forth in conclusion

9    number three at this point?

10       A    I would think so.  Otherwise, the

11   report speaks for itself, I would say.

12       Q    All right.  Let's go to conclusion

13   number four.  "The decision to hire and entrust

14   Nicholas A. Robinson with the operation of a

15   light duty vehicle by Cintas met the reasonable

16   standard of care for a company entrusting a

17   noncommercial vehicle to an employee."  Do you

18   see that?

19       A    I do.

20       Q    Okay.  Tell me what you base that

21   opinion on.

22       A    My experiences within the industry, my

23   understanding of what rules can apply, you know,

24   to an operator of a vehicle, whether it's within

25   the commercial scope of the company that they're



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    127

1    operating for or not.

2         Q    Okay.  If Mr. Robinson had a CDL and if

3    Mr. Robinson had been hired two operate a

4    tractor-trailer, would the decision to hire and

5    entrust him with a tractor-trailer had met the

6    reasonable standard of care for a company

7    entrusting a tractor-trailer to an employee?

8              MR. MANN:  I will object to the

9         form.

10             THE WITNESS:  I'm not sure that

11        I've looked at it from that perspective

12        to be able to answer that question live

13        here, so I'm not sure I'm in a position

14        to answer that.

15   BY MR. DAVIS:

16        Q    Well, how many violations did Mr.

17   Robinson have?

18        A    Violations of what?

19        Q    Well, violations -- how many motor

20   vehicle violations did he have in his record

21   before the collision with Jacob Castle-Foster?

22        A    Over what scope of time?

23        Q    Over his driving record.  You say in

24   the first paragraph -- it says, Cintas ensured

25   Nicholas A. Robinson had a valid Georgia



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    128

1   driver's license by not only accepting a copy of

2   his license, but by checking his motor vehicle

3   driving record to ensure it was valid.  Not only

4   was Mr. Robinson's license valid as evidenced by

5   the MVR, predating his hiring in 2016, Mr.

6   Robinson had not had a traffic violation since

7   2013.

8            So my question for you, what traffic

9   violations had Mr. Robinson had that Cintas was

10  aware of?

11      A    None before they decided to hire the

12  driver and entrust him at least within the range

13  of what an employer would normally look back to

14  for a driver, a three-year window.

15      Q    Okay.  Now, after he was hired he had

16  some violations, though, didn't he?

17      A    I think I recall that the driver had a

18  speeding violation or maybe even two but

19  subsequent to the hire by Cintas and the initial

20  entrustment of a vehicle to him.

21      Q    He had two violations, two speeding

22  violations that he failed to tell Cintas about;

23  correct?

24      A    I believe that was his testimony that

25  he -- I think he knew he needed to but somehow


COASTAL COURT REPORTING & VIDEO SERVICES
                800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    129

1    didn't, I guess, they probably found out by

2    running an MVR on him.

3        Q    Do you know understand why Mr. Robinson

4    was fired from Cintas or, well, let go from

5    Cintas?

6        A    I'm not sure it was something that I

7    really focused on as it relates to the opinions

8    in this report.  It seems to me I think -- I

9    believe I saw something that said that because

10   he hadn't disclosed them and they ended up

11   finding it out later, that may have been the

12   reason leading to the separation, but I'm not

13   100 percent certain.

14       Q    Did you also read where Mr. Robinson

15   had backed into a building and caused some

16   property damage?

17       A    I believe I recall that, but it

18   wouldn't surprise me that I wouldn't have

19   because it's not going to disqualify the guy or

20   take his licensing privilege away technically to

21   operate the vehicle that he was assigned.

22       Q    Here's my question:  If in fact the

23   Federal Motor Carrier Safety Regulations apply

24   in this case because Cintas has adopted them,

25   did Cintas -- do you have an opinion concerning



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                          130

1     whether Cintas would have violated those

2     regulations by retaining Mr. Robinson?

3              MR. MANN:  Object to the form.

4              THE WITNESS:  I don't want to get

5        mixed up here because a couple

6        questions back you were having me

7        assume that he required a CDL and was

8        operating a tractor-trailer and other

9        things, and we've never really clearly

10       moved on from that testimony.  So we

11       know that's not the case, but a lot of

12       your questions here recently had been

13       had that was the case, did they

14       reasonably interpret in a new-hire and

15       everything else.  So maybe we need to

16       redefine that before I answer that

17       question.

18   BY MR. DAVIS:

19       Q    I want you to assume that a judge rules

20     that Cintas was bound to follow the Federal

21     Motor Carrier Safety Regulations because their

22     policy said so.  If that is the case, was Cintas

23     in violation by retaining Mr. Robinson in light

24     of these two speeding tickets that he failed to

25     report and in light of the incident when he

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    131

1    backed into the building and failed to report

2    it?

3            MR. MANN:  Object to the form.

4            THE WITNESS:  Good question.  I

5        would say that none of those items or

6        all of them in total would lead to the

7        position of driver disqualification

8        under those -- under an applicable

9        motor carrier rule, so I would say no.

10   BY MR. DAVIS:

11       Q    Okay.  Do you think that we have

12   discussed all of your opinions under conclusion

13   number four at this time?

14       A    Yeah, either that or the report speaks

15   for itself separately, yes, sir.

16       Q    It says, "If there is" -- in conclusion

17   number four you say, "If there is no need for a

18   larger vehicle and a smaller vehicle will

19   accomplish the task, then it's unreasonable to

20   expect an employer to abide by regulations and

21   standards for a class of vehicle which it does

22   not intend to entrust with a particular driver."

23   Do you see that?

24       A    I do, yes, sir.

25       Q    What do you base that part of your



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100      www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    132

1    opinion on?

2        A    I guess my understanding of CDL rules

3    since I helped the State of Alabama implement

4    them.  Licensing rules generally in our country

5    all take into consideration a maximum size

6    vehicle or maximum complexity of a vehicle

7    that's somebody is licensed to operate.  That's

8    why there's endorsements to certain grades of

9    license and otherwise.  So inherent within our

10   transportation community, that proper licensing

11   needs to be represented for the maximum vehicle

12   that a driver could be expected to use but not

13   beyond that.  You know, I don't know any other

14   way to explain it other than that.

15       Q    But you do agree that the State of

16   Georgia has a classification for lightweight

17   commercial vehicles; correct?

18       A    You've shown me that and I have not

19   made any reference to anything other than the

20   definition of a commercial vehicle within my

21   opinions in this case.

22       Q    Yes, sir.  But you did make reference

23   to the Georgia Department of Public Safety

24   Transportation Rulebook,  Chapter 1, Motor

25   Carrier Safety Regulations; correct?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                133

1       A    That is correct, yes, sir.

2       Q    And under 390.50, there are certain

3    portions of the Federal Motor Carrier Safety

4    Regulations that apply to lightweight commercial

5    motor vehicles; correct?

6       A    That is correct.

7       Q    And you don't know whether this van is

8    a lightweight commercial motor vehicle or not,

9    do you?

10          MR. MANN:  Object to the form.

11          THE WITNESS:  Certainly I do.  And

12       you said at different points in the day

13       the current reference to that potential

14       applicability or not, but out of

15       fairness to me, earlier in this

16       deposition you asked me what

17       differences there were between the

18       federal and Georgia's rules, and I said

19       that even within Georgia I thought that

20       they actually had additional classes of

21       licenses for certain people that were,

22       I guess, over and above what the

23       Federal Motor Carrier Safety rules are.

24       I mean, I gave the example of passenger

25       operations and other categories of CDL



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    134

1          endorsements for small passenger
2          transporters that are freestanding in
3          only Georgia.  But what I haven't lost
4          focus on is whether any vehicle,
5          regardless of how you might define it
6          or I might define it, is a commercial
7          vehicle and being used in commerce.
8          There's going to be an identical
9          application of those under either the
10          federal or a state's rules, I would
11          think.
12     BY MR. DAVIS:
13          Q     Okay.  Let me ask you this first of
14     all:  The van Mr. Robinson was driving, does it
15     meet the definition of a lightweight commercial
16     motor vehicle under the Georgia Department of
17     Public Safety Transportation Rulebook, Chapter
18     1, Motor Carrier Safety Regulations?
19               MR. MANN:  Object to form.
20               THE WITNESS:  I think I've
21          answered that previously.  My response
22          is, I guess, in a refined manner that
23          maybe at certain times.  If it's at a
24          time when the driver hasn't been
25          performing company duty for hours and



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    135

1          hours, not even then, no, and I think
2          that's where we work my focus in this
3          litigation is about.
4     BY MR. DAVIS:
5          Q    Well, presupposing that he was driving
6     the van between Cintas and a vendor at the time
7     of the wreck, do you know whether this van would
8     meet the definition for a lightweight commercial
9     motor vehicle under Georgia rules?
10         A    That's a totally different question
11    than factually has been presented in this case.
12    I don't really have a reason to disagree that it
13    could.  I just literally haven't done that
14    evaluation in this case.
15         Q    You don't know, do you?
16         A    No, but like I said, I think at times
17    relevant to the case, which was what really what
18    my opinions are, that there's no way that I can
19    see that it would be applicable.
20         Q    Does the Federal Motor Carrier Safety
21    Regulations apply to a tractor-trailer driving
22    down the road?
23         A    It depends.
24         Q    Okay.  If the tractor-trailer is
25    driving down the road between a logistics



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                 136

1   warehouse and a place he's going to offload the

2   merchandise, do the Federal Motor Carrier Safety

3   Regulations apply?

4       A    In many circumstances portions of them

5   may, yes.

6       Q    If he stops to buy a sandwich at the

7   Subway, do the Federal Motor Carrier Safety

8   Regulations apply?

9       A    Generally not due to personal

10  conveyance interpretations to the rule, I would

11  say.

12      Q    Okay.  Where are those interpretations

13  contained that you just mentioned?

14      A    Within Federal Motor Carrier Safety

15  Regulations that apply to commercial vehicles,

16  as I define it, end in interstate commerce.

17      Q    Okay.  So if a tractor-trailer is

18  carrying a trailer, the tractor is hauling a

19  trailer and is full of merchandise and he stops

20  to get a sandwich, he's no longer subject to the

21  Federal Motor Carrier Safety Regulations?

22          MR. MANN:  Object to the form.

23          THE WITNESS:  In some

24      circumstances that is the case, yes.

25      Maybe not in all but in some,



COASTAL COURT REPORTING & VIDEO SERVICES
                800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    137

1        certainly.

2    BY MR. DAVIS:

3        Q    Well, where is the dividing line; where

4    do the Federal Motor Carrier Safety Regulations

5    stop applying to tractor-trailers?

6        A    If it's not in commerce, number one, in

7    the -- that's the primary answer.  An

8    observation of what the driver is doing at that

9    time is where he's still responsible for that

10   vehicle under applicable regulation and is not

11   in a position to have been officially considered

12   relieved from those duties.

13       Q    Where would I find that in the

14   regulations where it says the Federal Motor

15   Carrier Safety Regulations don't apply to a

16   driver a tractor-trailer when he stops for a

17   sandwich?

18       A    I don't think it's going to be that

19   specific.  I think you have to apply some

20   prudence to understand that in some situations

21   the vehicle operations are commercial in nature.

22   There are plenty of situations that are personal

23   in nature and not furthering the company's

24   business and you'd have to apply a reasonable

25   standard to them.



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    138

1    Q    Okay.  I think that's going to take us
2    into conclusion number five.  Do you think we've
3    wrapped up your opinions in conclusion number
4    four?
5    A    I thought we had about 15 minutes ago,
6    to be perfectly honest.
7    Q    Thank you, sir.  Let's go to conclusion
8    number five.  "Nicholas A. Robinson was not
9    performing a job-related function for Cintas and
10   was not being compensated for the time he spent
11   driving to his residence when he was involved in
12   the accident on April 6, 2018."  Do you see
13   that?
14   A    I do, yes, sir.
15   Q    Do you know how he was compensated?
16   A    Do I know how he was compensated?
17   Q    Yeah.
18   A    I forget exactly in this case, to be
19   perfectly honest with you.
20   Q    Was he salaried?  Was he paid by the
21   mile?
22   A    I doubt he was paid by the mile.  It
23   wouldn't surprise me if it was salaried or even
24   hourly with a performance bonus.  That's pretty
25   typical within this part of the transportation



1    community for other people to do the same thing,
2    but I don't remember what it was off the top of
3    my head.
4         Q    Where was he coming from at the time of
5    the collision, to your understanding?
6         A    My understanding was, you know, he had
7    visited the last customer, which was an
8    International Paper affiliate; read something in
9    the afternoon that he had been going by to visit
10   his parents; had some recreational fishing
11   activity; and then that he had left there,
12   heading home at the time the subject collision
13   took place.
14        Q    Okay, give me just a minute.  These are
15   from Mr. Robinson's deposition.  You may have
16   seen them in a couple of other depositions, Mr.
17   Franco's, Ms. Ferguson.  In Mr. Robinson's
18   deposition they were Exhibit 4.  I think they're
19   listed as Inspection Report, but in other places
20   they were referred to as DVIRs.  I believe that
21   stands for Driver Vehicle Inspection Report; do
22   you see that?
23        A    I do.
24        Q    And you read Mr. Robinson's deposition;
25   correct?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    140

1       A     Yes, sir.

2       Q     And you read Ms. Franco and Ms.

3   Ferguson's depositions; correct?

4       A     Correct; as we've discussed.

5       Q     Okay.  So you understands then, don't

6   you, that when Mr. Robinson got home at the end

7   of the night, he had to record his odometer

8   reading; correct?

9       A     That's right; that's part of most daily

10  vehicle inspection reports or driver vehicle

11  inspection reports industry-wide, yes.

12      Q     And when he got home at the end of the

13  night, he also had to do an inspection of the

14  vehicle and to record any unsatisfactory

15  conditions on the vehicle; correct?

16      A     I have no reason to dispute that; very

17  commonly what happens within the industry and

18  it's very commonly reported on this type of

19  document.

20      Q     And also when he got home in the

21  evening, he had to park his vehicle at his home;

22  that was company policy; correct?

23      A     No, I think he could have left it at

24  the company and driven his own vehicle back and

25  forth.



COASTAL COURT REPORTING & VIDEO SERVICES
                800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                     141

1      Q     Okay.  Do you understand that Mr.
2   Robinson lived very far away from where Ms.
3   Ferguson and Ms. Franco worked, in a different
4   town?
5      A     I don't know the focus of what I looked
6   at, but I think your question is appropriate
7   still.
8      Q     Do you recall seeing testimony from Ms.
9   Ferguson that said he was required to park his
10   vehicle at home and if he wanted to park it
11   somewhere else, he had to get permission from a
12   supervisor?
13      A     I have that general recollection, yes,
14   sir.
15      Q     Okay.  Do you also recall that he had a
16   responsibility to lock his vehicle at home at
17   night?
18      A     Sure.
19      Q     Okay.  So then at the time of the
20   collision, where do you understand Mr. Robinson
21   was going?
22      A     Home.
23      Q     Okay.  And when he got home, he had to
24   report his odometer reading; correct?
25      A     I think he was under that obligation if



COASTAL COURT REPORTING & VIDEO SERVICES
                    800-791-1100      www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    142

1    that's what the company required of him on his

2    DVIR, yes.

3         Q    When he got home, he had to do an

4    inspection of the exterior of the vehicle to say

5    if the condition was satisfactory or

6    unsatisfactory; correct?

7         A    Correct; very common within the

8    industry.

9         Q    And he had to park it at his house and

10   lock it at his house; correct?

11        A    Sure.

12        Q    So Mr. Robinson still had job duties he

13   had to perform when he got home that night;

14   correct?

15             MR. MANN:  I will object to the

16        form.

17             THE WITNESS:  I am not going to

18        disagree with that.

19   BY MR. DAVIS:

20        Q    Okay.  Because that's in the testimony,

21   isn't it?

22        A    It's in the testimony.  It's just

23   commonly an understood practice within the

24   industry at the same time.

25        Q    And Mr. Robinson testified to that,



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                      143

1    didn't he?

2         A    I believe he did.

3         Q    And Ms. Ferguson and Ms. Franco

4    testified to it; correct?

5         A    I'm assuming that to be correct.

6    (Inaudible)

7         Q    So Mr. Robinson had been fishing

8    earlier in the day; correct?

9         A    That's my understanding, yes, sir.

10        Q    But now he was on his way home to

11   perform these remaining job-related functions he

12   had to do every day; correct?

13             MR. MANN:  Object to the form.

14             THE WITNESS:  He was definitely on

15        his way home.

16   BY MR. DAVIS:

17        Q    Yeah.  And as you just testified, he

18   had to perform these jobs when he got home;

19   correct?

20             MR. MANN:  Form.

21             THE WITNESS:  I'm definitely not

22        going to disagree with that.

23   BY MR. DAVIS:

24        Q    Yeah.  And he was in a Cintas van with

25   Cintas on the side; correct?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    144

1      A      He was, as I understand it, yes.

2      Q      Cintas property in the back of the van;

3   correct?

4      A      Correct.

5      Q      He's wearing a Cintas shirt, Cintas

6   uniform; correct?

7      A      I don't know about that, but I have no

8   reason to disagree with that.

9      Q      Okay.  When he got home, he was going

10   to perform those job-related functions like he

11   did every day; correct?

12          MR. MANN:  Form.

13          THE WITNESS:  I'm expecting that

14      would occur at some point in time, yes,

15      sir.

16   BY MR. DAVIS:

17      Q      Okay.  So why do you say in conclusion

18   number five "Nicholas A. Robinson was not

19   performing a job-related function for Cintas and

20   was not being compensated for the time he spent

21   driving to his residence when he was involved in

22   the accident on April 6, 2018"?

23      A      Because of the personal nature and the

24   personal use of the vehicle, I would not apply

25   those standards in the industry.  It seemed to


COASTAL COURT REPORTING & VIDEO SERVICES
                800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    145

1    be similar to how OSHA applied them based on

2    other testimony in this case.

3        Q    So OSHA applies them?

4        A    No.  I said other deponents I've seen

5    in here have actually said that OSHA standards

6    didn't apply at this point in time either; much

7    like I'm saying, motor carrier rules couldn't

8    either.

9        Q    But he had permission to drive that van

10   home every night, didn't he from his employer's?

11       A    Directly home, as I understand it, yes.

12       Q    Right now he was on his way directly

13   home, wasn't he?

14       A    You can tell that to the jury.  I don't

15   whether I buy that.

16       Q    Well, at the time of the wreck he

17   testified he was driving to his house, that

18   would be his next stop; correct?

19            MR. MANN:  Object to the form.

20            THE WITNESS:  I'm assuming that

21       probably would be correct.  I don't

22       know that your approach to this is

23       consistent with motor carriers that I'm

24       speaking to.

25   BY MR. DAVIS:



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    146

1        Q    So now he's a motor carrier?

2             MR. MANN:  Form.

3             THE WITNESS:  No.  You're talking

4        about applying motor carrier standards

5        and I just said that your approach to

6        this evaluation is inconsistent with

7        those standards that I'm opining on.

8   BY MR. DAVIS:

9        Q    Okay.  Have you ever heard of the

10   doctrine of -- oh heck, help me, Peter.  I'm

11   sorry, sir, it's late in the day.  Have you ever

12   heard of the Doctrine of Frolic and Detour?

13       A    Not in those terms, no, sir.

14       Q    All right.  If he had been in the wreck

15   going to his mom and dad's, he would have been

16   on his way to go fishing, wouldn't he?

17       A    Applying the standards of care as I

18   would do it in the industry, yes.

19       Q    But now he was on his way home to do

20   what he did every night when he got off work

21   with that van; correct?

22            MR. MANN:  Object to the form.

23            THE WITNESS:  I have no reason to

24       disagree with what you're saying.

25   BY MR. DAVIS:



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                      147

1      Q    How is that any different then, what he
2   would do every night?
3      A    How it's different, it's clearly
4   outside of the course of the scope of commerce.
5   I have no clear answer to that.
6      Q    You said course and scope.  Do you know
7   what course and scope of employment is?
8      A    I use course and scope maybe in my own
9   way in using my own definition.  I'm not trying
10  to suggest to the Court here that they can't
11  apply whatever Georgia standards are to that
12  because I don't know what those standards are.
13  That's my use of the term separately.
14     Q    Okay.  So you don't know what the law
15  is on course and scope in the State of Georgia,
16  do you?
17     A    No, but like I said, you know, that's
18  kind of where the personal conveyance ends, and
19  they do use that terminology in their own
20  internal guidance, probably nothing specific to
21  Georgia.
22     Q    Okay.  So when you say "Nicholas A.
23  Robinson was not performing a job-related
24  function for Cintas", you're not giving an
25  opinion on whether or not he was in the course



COASTAL COURT REPORTING & VIDEO SERVICES
              800-791-1100      www.coastalcourt.com

1    and scope of employment, are you?

2        A    Not as I think you would use that term

3    within Georgia and applying Georgia law, no,

4    clearly not.

5        Q    Okay, so let me get this straight.  It

6    says, At all times relevant to subject crash,

7    Mr. Robinson had completed his job-related

8    functions for Cintas for the day; do you see

9    that?

10       A    I do.

11       Q    And we just established that he still

12   had some job-related functions to do when he got

13   home that night; correct?

14       A    He could do them there or I think he

15   could at International Paper Plant, to be

16   perfectly honest with you, if that's where the

17   commercial purposes really ended, but I wasn't

18   going to fight you, you know, with what he

19   already said about performing the inspection

20   technically after he worked.

21       Q    Sir, are you getting any messages from

22   anybody?

23       A    I'm assuming my e-mails are piling up.

24       Q    Okay.  Are you reading any messages

25   from anybody right now?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    149

1        A     I'm reading what you displayed on my
2    screen but other than --
3        Q     Very good.  Thank you, sir.  Thank you.
4        A     You're welcome.
5        Q     But you agree what we just said -- we
6    said it several times -- he had job-related
7    functions to do when he got home; correct?
8        A     If that's when he chose to do them as
9    opposed to when he got to his folks or even
10   before then, I don't have a problem with -- I'm
11   not fighting you on the fact that he might have
12   done them after.
13       Q     That's what he testified to; correct?
14       A     I'm not going to disagree.  That's
15   correct.
16       Q     And that's what Ms. Franco and Ms.
17   Ferguson testified to; correct?
18       A     Sure.
19             MR. MANN:  Object to the form.
20       We've been down this road.  Asked and
21       answered.
22   BY MR. DAVIS:
23       Q     Do you think we have discussed all of
24   your opinions in conclusion number five to the
25   best of your knowledge?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                 150

1       A     Yes, I would think.

2       Q     All right.  We're getting there, sir.

3   Number six, this is the last one, I believe,

4   conclusion number six.  "The report issued by

5   Lew Grill and his deposition testimony fails to

6   consider the use of the vehicle by Mr. Robinson.

7   Mr. Grill also blurs the lines regarding the use

8   of commercial motor vehicles and non-commercial

9   motor vehicles by motor carriers.  Additionally,

10  there are regulatory and procedural errors in

11  Mr. Grill's report and testimony."  Let's

12  discuss those opinions, please, sir.

13      A     All right.

14      Q     Okay.  What do you base those opinions

15  upon?

16      A     My knowledge of commercial vehicle

17  regulation law, industry standards, my review as

18  to kind of how maybe he took a company's

19  definition of a company-owned vehicle and

20  amended it in a way, I think, was convenient for

21  him to include not just commercial purpose but

22  business -- personal purpose.  That's a good

23  starting point, I would say.

24      Q     Now, do you believe that your knowledge

25  of the Federal Motor Carrier Safety Regulation



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    151

1      in trucking trumps Mr. Grill's?

2              MR. MANN:  Object to the form.

3              THE WITNESS:  I would say when it

4         comes to certain issues and especially

5         having been in a law enforcement

6         position myself, I think my technical

7         knowledge of motor carrier regulatory

8         applicability I expect to be better.

9         There are things that he does that he

10        does better than me; I'm sure there

11        are, but I generally feel like I'm in

12        the best position to speak directly to

13        the regulatory applicability and maybe

14        even to the industry standards based on

15        my consultation, but that in no way

16        could diminish his experience

17        historically in the industry either.

18    BY MR. DAVIS:

19        Q    Go down to that second bullet.  It

20    says, "Mr. Robinson should not be considered a

21    professional driver because his assigned vehicle

22    did not require any additional licensing, nor

23    was there any training requirement to operate

24    the vehicle."; do you see that?

25        A    I do, yes, sir.


COASTAL COURT REPORTING & VIDEO SERVICES
                800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    152

1      Q    We've already established that Cintas

2    required training requirements to operate that

3    vehicle; correct?

4      A    I do.  I don't know that they

5    classified them as a professional driver, which

6    is really the underlying disagreement I have

7    with Mr. Grill on that subject.

8      Q    He drove that van every day he worked;

9    correct?

10     A    As a salesman, not a driving

11   professional; correct.

12     Q    He was paid to drive the van, wasn't

13   he?

14     A    He was paid to sell and service clients

15   and it involved driving the van which, to me, is

16   a little bit different.

17     Q    Well, he was paid to sell and service

18   and make deliveries; correct?

19     A    Yes, and to the jury I would explain it

20   that driving is more secondary to his

21   responsibility than primary.  To me, that's the

22   difference between a professional driver and

23   someone who is not a professional driver.

24     Q    Are you aware of any training he got on

25   sales at Cintas?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    153

1        A    Not specifically, but honestly that's
2    not the focus of my evaluation in any of these
3    type cases.
4        Q    But they made him take specific
5    training on driving; correct?
6        A    Right, even though they didn't have to;
7    correct?
8        Q    Yeah.  Well, he made them take training
9    and become qualified in Smith System; correct?
10       A    They did, although they didn't have to.
11       Q    The same as many fleets require their
12   professional drivers to undergo; correct?
13       A    Any of the large sophisticated carriers
14   have a similar approach, right.
15       Q    Yeah.  And those large sophisticated
16   carriers, they're not salesman, are they;
17   they're delivery men; correct?
18       A    I think Mr. Grill gave us examples of
19   UPS Ground and FedEx.  I think both of those
20   are, you know, good examples of people that are
21   drivers, that are salesmen, that do operate
22   vehicles beyond the DOT subjectivity threshold.
23   I think those are some pretty good examples.
24       Q    A UPS driver is a salesman?
25       A    I've seen scenarios where they are



COASTAL COURT REPORTING & VIDEO SERVICES
              800-791-1100       www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    154

1    considered that because they're collecting

2    monies and stuff like that, so I'd say

3    technically they do fall within that scenario in

4    some circumstances.

5        Q    But you think a UPS driver is a

6    salesman instead of a delivery man?

7             MR. MANN:  Object too the form.

8             THE WITNESS:  I'm saying that

9       there are elements of their job that

10      are within the sales category.

11   BY MR. DAVIS:

12       Q    Is a UPS driver a professional driver?

13       A    If they're holding a CDL, I will call

14   them a professional driver.  I think the whole

15   point to this commentary is I've never seen

16   another expert call somebody a professional

17   driver absent the context of a CDL being

18   required.  That's the category that I think it's

19   appropriate to use that terminology within the

20   DOT category but no broader than that.

21       Q    Is a taxi driver a professional driver?

22       A    In the states that would require a CDL

23   be held of a certain class, maybe so, but

24   otherwise I would say no.

25       Q    So your definition of a professional



1    driver is restricted to people who are required
2    to hold a CDL under the Federal Motor Carrier
3    Safety Regulations; is that correct?
4        A    I don't think it's my definition.  I
5    think it's my observation that people generally
6    do not call people within the industry
7    professional drivers absent them being a CDL
8    holder; that's my observation.  It's not that
9    I'm defining it that way; it's my observation of
10   what everybody else does, if you understand the
11   difference between one and the other as I
12   explained it.
13       Q    Do you agree that reasonable minds can
14   differ upon your personal observation regarding
15   that?
16       A    Sure.  I think your own experts, you
17   know, didn't totally agree either.  I remember
18   seeing Chris Stewart that said that he thought
19   he was more of a salesperson than a driver but,
20   sure, that can happen.  And, you know, just
21   because I disagree with Mr. Grill on that
22   doesn't make me right or him wrong, I guess.
23       Q    Okay, thank you, sir.  Let's go to page
24   ten of your report; let me find it.  Let me go
25   to that, sir.  Hold on just a minute and I'll



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    156

1    get it pulled up for you.

2              THE WITNESS:  I mean, at some

3         point -- I don't know how long you plan

4         to go but I do have to eat a little bit

5         throughout the day because I got to

6         watch my sugar.

7              MR. DAVIS:  Sure.

8                   (Whereupon, the videocorder was

9                   turned off at approximately

10                  2:41 p.m. and a short break

11                  ensued.)

12                  (Whereupon, the video portion of

13                  this deposition resumed at

14                  approximately 3:01 p.m.)

15   BY MR. DAVIS:

16        Q    Sir, do you know how many miles a year

17   Cintas drives?

18        A    I assume it varies within a year, but I

19   think the number was in the 90 million-plus

20   range in January.

21        Q    Yeah, like 92 million miles, something

22   like that?

23        A    That sounds about correct, yes, sir.

24        Q    Roughly, the distance to the sun?

25        A    I don't know if I can speak to that.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                157

1        Q    All right.  We're getting close to the

2    end.  I know you're getting tired.  I'm getting

3    kind of tired, too.  Let's go to page ten of

4    your report.

5        A    Okay.

6        Q    "Page 12 of Mr. Grill's report contains

7    a rather outlandish opinion.  'It is reasonable

8    for me to opine that Cintas has recognized that

9    trucking industry standards, custom and

10   practices, including FMCSRs apply to their

11   driver, Mr. Robinson.'"  Then you say, It is

12   outrageous to even suggest that that the Federal

13   Motor Carrier Safety Regulations apply to Mr.

14   Robinson.  Tell me, what do you base that on?

15       A    Personal conveyance use of the vehicle;

16   not a large enough vehicle size, not in

17   interstate commerce at any point that I

18   understand it.  I'd say those are the primary

19   elements of that criticism.  I guess in addition

20   to the fact of our earlier discussion that I

21   don't think anybody can truly even adopt them

22   even if they want to.  They're not applicable

23   for adoption in my field, at least.

24       Q    You've never heard of anyone doing this

25   before, making the Federal Motor Carrier Safety



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

1    Regulations applicable to all their drivers?

2         A    I've seen people do versions of it, but

3    much like as the case here, you know, it's --

4    even for people who say that they do it, I find

5    that it's not as it could be.  People require

6    people to have CDLs don't have an obligation to

7    have CDLs nor test under the federal protocol

8    because they're not allowed to.  I mean, there

9    are reasons why somebody couldn't officially

10   adopt them even beyond the fact that from a

11   regulatory perspective initially they're not

12   applicable.  So that's my best response.

13        Q    We talked about the corporate policy

14   C-67 and C-168 where it says Cintas has adopted

15   the Federal Motor Carrier Safety Regulations for

16   all company vehicles and the procedures outlined

17   in this policy are designed to meet or exceed

18   those regulations.  Let me ask you, was it

19   outrageous for Cintas to do that?

20        A    I have no criticism of Cintas doing

21   that.  I think that there's the potential for

22   better controls top to bottom within the

23   organization by applying the standards to people

24   to who they factually don't apply independently.

25        Q    Come on down.  The next bullet point,



1    it says, "The next couple of pages of Mr.

2    Grill's report focuses upon commercial driver's

3    license standards, defensive driving standards,

4    strategy of safe driving, and gatekeepers to

5    highway safety."  It says -- then you have a

6    clear bullet point that says, "Mr. Robinson was

7    not required to possess a commercial driver's

8    license to operate his assigned vehicle."

9    Another clear bullet point saying, "Regarding

10   defensive driving, safe driving, and gatekeepers

11   to highway safety, the vehicle operated by Mr.

12   Robinson on the date of the subject crash did

13   not require any enhanced training to operate,

14   nor is there any standard, regulatory or

15   implied, that employers are required to follow

16   when assigning a noncommercial vehicle for

17   company use."  Do you see that?

18       A    I do.

19       Q    If all that's true, then why does

20   Cintas require the Smith System training?

21            MR. MANN:  Object to the form.

22            THE WITNESS:  I don't think that

23       we can take that discussion any further

24       than we already have.  I've been

25       perfectly candid about that.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    160

1           MR. DAVIS:  Okay.  I think my
2      observation is that within the industry
3      there's a uniform standard of care that
4      pretty much applies to any motorist as
5      it comes to how to deal with an
6      intersection.  You know, to me, whether
7      there's a CDL driver in one vehicle and
8      a driver of a lower class elsewhere, I
9      don't think that there's a different
10     obligation other than to stop at a stop
11     sign when it presents itself.  You
12     know, to me I think those standards of
13     care are regardless of whether somebody
14     is in a commercial operation or not, at
15     least that's my opinion, my basis.
16  BY MR. DAVIS:
17     Q    And you think it goes beyond just
18  stopping at a stop sign but also yielding the
19  right of way to a vehicle so close as to
20  constitute a hazard?
21     A    Yes.  I mean, I don't know that I get
22  specific into discussing hazards because that
23  can get beyond my expertise in reconstruction.
24  But, yeah, I think abiding by traffic laws, you
25  don't go down the road and see, generally

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    161

1    speaking, traffic laws that only apply, you
2    know, to one type of driver; they apply pretty
3    uniformly across the board when it comes to
4    stopping, yielding, not driving more than a
5    certain speed or whatever.  They're pretty
6    uniform.  There's no difference, to me, in those
7    obligations between a commercial vehicle or a
8    noncommercial vehicle the way I would define it.
9        Q    Let's go to the bottom of page ten.  It
10   says, "Page 17 of Mr. Grill's report references
11   again, 'Mr. Robinson failed to adhere to
12   industry safe driving standards and practices as
13   it relates to space management.'"  Do you see
14   that?
15       A    I do.
16       Q    What do you take umbridge with with
17   that statement?
18       A    Pretty much the reference made by Mr.
19   Grill in his report.  When he says that, he
20   doesn't say it in just any context that he
21   could.  He says that and references CDL
22   requirements in Part 383.  So my disagreement
23   with the approach here is that we're suggesting
24   what, I believe, Mr. Grill thinks is a CDL
25   standard of care and trying to apply it down to



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                      162

1    a vehicle that it clearly doesn't apply to.

2    That's my difference of opinion on that topic.

3        Q    Why do you think when he's talking

4    about space management, he's talking about the

5    Federal Motor Carrier Safety Regulations?

6        A    Because he made reference to Part 383

7    in the portion his report where he makes that

8    commentary or maybe previously but with the same

9    context.

10       Q    Isn't space management one of the parts

11   of the Smith System?

12       A    It is.  It's also part of anybody's

13   driver's test before they get licensed at any

14   level.  So are there specifics to the commercial

15   and CDL-requiring vehicle?  Sure, there's some

16   training that way and Smith System, I'm sure,

17   contains it, but I don't think that there's a

18   total absence of knowledge of space management

19   for any licensed driver; I think that's

20   unreasonable.

21       Q    Okay.  You make reference to the SMS

22   inspection data in this particular document.  I

23   want to show you 15 and 16 real quick, if I can

24   find them.  First of all, 15, give me just a

25   minute.  What is this document I'm showing you?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    163

1    This particular document was provided to me, I

2    believe, by defense counsel last night, this

3    SMS, Safety Measurement System.

4         A    Yes, sir.

5         Q    Did we talk about this already once?

6    If we did, I apologize.

7         A    We've made reference to it, yes,

8    because I made commentary about the fact that

9    within the industry there is actually a metric

10   that DOT has where they measure the number of

11   safe driving actions that DOT has, and those are

12   the ones that, importantly in this case, apply

13   to speeding issues, failing to obey a traffic

14   control device issue and stuff like that and

15   actually gives me perspective to speak

16   comparably to how Cintas result in their 90

17   million miles of operation, to compare to them

18   to other companies and to say whether I think

19   that their performance globally is good,

20   average, less than average or whatever.

21        Q    Now, it says, A quick search of Cintas

22   SMS inspection data and a filter using the

23   source and filter tool in Excel shows at least

24   134 of the inspections performed on Cintas

25   drivers and equipment were on vehicles requiring



1    a CDL; do you see that?

2        A    Yeah, I think we've also had a little

3    bit of commentary already on that matter.

4        Q    Okay.  So does that mean that 1,039

5    were performed on vehicles that did not require

6    a CDL?

7        A    Yes, and I think my estimation was that

8    90 percent of what was on their data, this SMS

9    data was non-CDL and only 10 percent of it was

10   CDL just based on a quick sort that I was able

11   to do when looking at the information live at

12   one point.

13       Q    All right.  Thank you, sir.  Let me go

14   off this and this, hopefully, will be our last

15   exhibit; we'll see.  Hold on a second.  What is

16   this document that's been marked as Plaintiff's

17   Exhibit 16?

18       A    It is the same kind of data that I

19   think I referenced earlier in this deposition

20   that when I get called in a case, I kind of go

21   out to see who I'm dealing with, what's the

22   size, the weight is.  If you'll notice, if you

23   scroll up to the top of this document, the top

24   of it has a couple of links built into it, and I

25   think the top link of the page that you can



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    165

1    actually, when you're live on your computer, can
2    click on it and it takes you to that SMS data
3    that we just discussed.  And it gives you the
4    ability to sort and, you know, look back at the
5    data historically over the last ten years to see
6    how a company is trending in their performance
7    and the like.  I do this in every case that take
8    regardless -- and for all parties involved,
9    typically, that are a motor carrier.
10        Q    All right, thank you.  Let me pop out
11   of that; hold on just a minute.  Okay, get back
12   to -- just a second, get back to Exhibit 6.
13   We're on page 11 is what I want to ask you
14   about, if I can get down there.  Okay.  You see
15   at the bottom of page 11 -- this is back to your
16   report -- Mr. Grill testifies on page 25, lines
17   8 to 13, regarding disqualifying offenses for
18   the operation of a CMV requiring a CDL.  Mr.
19   Grill is correct would be -- is correct that a
20   driver would be disqualified from operating a
21   CMV given the circumstances he describes.  So
22   that part you agree with Mr. Grill; correct?
23             MR. MANN:  Object to the form.
24             THE WITNESS:  I don't remember all
25    of the underlying analysis there, but



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                        166

1        it seems that I would potentially agree

2        that you can apply a disqualification

3        standard in those instances.

4    BY MR. DAVIS:

5        Q    Okay.  And, of course, Mr. Grill admits

6    in his deposition that the Cintas Ford van

7    involved in the accident doesn't meet the

8    definition of a commercial truck as defined by

9    the FMCSA; correct?

10       A    He did, yes, sir; correct.

11       Q    All right, very good.  Give me just a

12   second to check my notes.

13            Oh, do you think at this point -- is

14   there anything more about your opinions

15   regarding conclusion six that you think we need

16   to talk about today?

17       A    Well, we've talked about most all of

18   it, I guess.  We've skipped over some things.  I

19   think, really, my best way to summarize things,

20   understanding that different people approach the

21   same thing a different way, is we've -- the last

22   two exhibits that you've shown me are based --

23   are company data about their size, about how

24   they perform, whether it's the safer

25   documentation or whether it's the SMS



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    167

1    documentation.

2         Q    Yes, sir.

3         A    Clearly the difference between our

4    approaches that I would say to a jury is this:

5    I think Mr. Grill suggests that somehow

6    Robinson, as one of the drivers that covers the

7    distance between here and the sun, as you would

8    say it, somehow were representative of Cintas

9    controls are.  My approach to that is somewhat

10   different.  You know, I don't think that a

11   single driver's operations, whether it's odd,

12   are always representative of the company's

13   controls.  That's why I take look at these

14   measurements available within the industry.  I

15   think any large company's controls aren't always

16   going to prevent something from happening that

17   they wish didn't happen or that violates the

18   standard of care.  You know, they're there to

19   keep those situations as much to a minimum as

20   they can be kept.  That's why I'm using the

21   comparative data and especially the unsafe

22   driving score.  If you look at it with that as

23   part of the perspective and not just the total

24   flip side -- which is really, at least, the way

25   I think Mr. Grill is approaching this subject.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    168

1        Q     Now, I understand what you meant about
2    conclusion six.  We haven't touched on every
3    example you gave on conclusion six because you
4    give a number of examples; they go on for
5    several pages.  But as far as the opinion, "The
6    report issued by Lew Grill and his deposition
7    testimony fails to consider the use of the
8    vehicle by Mr. Robinson.  Mr. Grill also blurs
9    the lines regarding the use of commercial motor
10   vehicles and noncommercial motor vehicles by
11   motor carriers.  Additionally, there are
12   regulatory and procedural errors in Mr. Grill's
13   report and testimony."; I mean, do you think
14   we've dealt with your opinion as complete as we
15   can for conclusion six?
16       A     Or we could spend another hour to keep
17   talking about it if you choose; but I think
18   between you and I having the discussions on
19   things that you had questions about and that
20   what the report automatically provides, I think
21   those are sufficient.
22       Q     Okay.  Now, other than what we've
23   talked about today, do you have -- and other
24   than what we talked about today and what is
25   contained in the four corners of your report, do



COASTAL COURT REPORTING & VIDEO SERVICES
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    169

1   you have any other opinions regarding this case?

2       A    Not as I would define opinions.  I'm

3   aware that there's plenty of testimony in this

4   case that you and Mr. Mann are aware of and that

5   I may not have seen.  I guess I have an

6   understanding that Cintas people maybe have a

7   different understanding of what they're trying

8   to do by implementing something similar to the

9   Federal Motor Carrier Safety rules internally.

10  And I guess I understand that they're -- you

11  know there maybe some other revisions of

12  people's opinion about, hey, this only would

13  apply to a CDL vehicle; some people said I don't

14  know.  I mean, I understand that there are

15  different responses and I'm not going to solve

16  that, but I do understand that that's somewhat

17  contested, I guess, at this point in time.  I'm

18  just not going to try to solve that myself.

19      Q    I understand.  Let me go back to page

20  13; hold on just a minute.

21           But, sir, once again, for the record,

22  the document -- all the materials, documents and

23  depositions you reviewed in this case are

24  contained on pages 13 and 14 of your report;

25  correct?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    170

1       A     I would say that's correct.

2       Q     All right.

3       A     For clarification on further, though,

4    there are some things that I feel like I can

5    speak to without a specific reference to them

6    just from familiarity from time to time.  I have

7    those as well, depending on the question you ask

8    me.

9       Q     Yes, sir.  But these are all the

10   depositions you reviewed; correct?

11      A     I have seen excerpts from some

12   depositions since this time but I clearly did

13   not have that information to have considered it

14   for inclusion in the report.

15      Q     What excerpts have you seen depositions

16   from that were not in this report?

17      A     I since seen some excerpts for Ray

18   Cronin who I think is a regional business

19   director within the first aid line of business.

20   I've seen some experts from Liz Thrasher, the HR

21   manager -- are you throwing that at me or what?

22      Q     I'm a little irritated, sir.  Why are

23   these depositions not in this report; why are

24   they not mentioned?  Why are Mr. Cronin and Ms.

25   Thrasher's depositions not identified in the



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    171

1    Rule 26 report?

2        A    Maybe you can listen to my responses

3    instead of throwing your glasses.  My response

4    was that since the time of this report, I have

5    talked to counsel and have received some

6    excerpts that I didn't have at this point in

7    time.  That's exactly the response I gave you

8    about two minutes ago.

9        Q    So counsel -- I'm sorry, sir, were you

10   done?

11       A    I was done, yes, sir.

12       Q    So counsel provided you with

13   depositions after you turned in this report,

14   after you signed it on August 14th; is that

15   correct?

16       A    I haven't got entire depositions.  I

17   received a couple excerpts; that's how I

18   described it.

19       Q    So counsel cherry-picked portions of

20   depositions to provide to you; is that what

21   you're saying?

22            MR. MANN:  Object to the form.

23            THE WITNESS:  I would say I

24       requested some specific information

25       from them, but I don't think those



1          things have anything to do with the

2          base opinion, nor were they necessary

3          to give the opinions outlined in this

4          report.

5     BY MR. DAVIS:

6          Q     Okay.  Which counsel are we talking

7      about?

8          A     Which counsel are we talking about?

9      I'm not sure.  I'm assuming it was Mr. Mann or

10     Ms. Boone, one or the other.

11         Q     Have you had any conversations with Mr.

12     Septon?

13         A     I recognize the name from this

14     litigation but no, sir.

15         Q     Okay.  When were you provided with

16     excerpts from other depositions?

17         A     This morning.

18         Q     This morning?

19         A     This morning.

20         Q     Tell me what led to that.

21         A     My discussion with them about, you

22     know, whether there was agreement across the

23     board about how the company was choosing to try

24     to apply or adopt, or whatever, the motor

25     carrier rules.  As I understood, that not



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                173

1    everybody could speak to that knowledge.

2        Q    Okay.  Besides Mr. Cronin and Ms.

3    Thrasher -- what position do you understand Ms.

4    Thrasher holds with the company?

5        A    I think at times relevant to this crash

6    she was an HR manager within the first aid line

7    of business, as I would describe it.

8        Q    Okay.  So Ms. Thrasher had nothing to

9    do with the operations or driving vans; correct?

10       A    I don't know specifically what she had

11   other than HR responsibilities over that

12   category of people.

13       Q    Cronin, what was he responsible for?

14       A    He was a business director so I would

15   assume that his roles were much broader than

16   what Ms. Thrasher's were.

17       Q    How many pages were you provided of

18   each deposition?

19       A    Just a couple.

20       Q    Please define.  I need to know this.

21       A    Pages 93 to 96 of Mr. Cronin's --

22       Q    Hold on just a minute; let me make some

23   notes of this.  Ninety-three to 96 of Mr.

24   Cronin?

25       A    And 117 to 120 from Ms. Thrasher.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    174

1        Q    Say that again, sir.

2        A    One-seventeen to 120 for Ms. Thrasher.

3        Q    Okay.  Now, what from these depositions

4    affected your opinions in this case?

5        A    None of them.

6             MR. MANN:  I'll object to the

7        form.  He's already answered that these

8        depositions were not involved in

9        forming his opinions.

10            MR. DAVIS:  Then why give them to

11       him, Will?

12            MR. MANN:  That's a discussion we

13       can have, and my discussions with Mr.

14       VanIngen, he asked some questions so I

15       wanted to make sure he had the

16       information that he was asking me

17       about.

18            MR. DAVIS:  I should have been

19       apprised of this before the deposition

20       began.

21            MR. MANN:  He's testified already,

22       Clay, that they had no basis for his

23       opinions or his Rule 26 report.

24   BY MR. DAVIS

25        Q    Okay.  Ninety-three to 96, tell me what



COASTAL COURT REPORTING & VIDEO SERVICES
                    800-791-1100      www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    175

1    you recall from Cronin that he said on those

2    four pages.

3        A    I think he was pretty clear when asked

4    about the adoption of the motor carrier rules

5    that he really wasn't in a position to answer

6    your question.  You know, he didn't feel like he

7    had adequate knowledge to respond to you; that

8    was my understanding.

9        Q    So Mr. Cronin really didn't know

10   anything about the policies; is that right?

11       A    He chose not to offer anything in

12   response to your question; I think that's the

13   observation I had.

14       Q    Okay.  And Ms. Thrasher, what did Ms.

15   Thrasher have to say?

16       A    I think her observation was that the

17   only people that she thought that the company

18   tried to apply motor carrier rules to were

19   technically CDL drivers and that they didn't

20   have any of those within the first aid line of

21   business.  That's generally what I recall of her

22   testimony that was provided in response to my

23   request.

24       Q    Did you read anything from Ms. Thrasher

25   where Ms. Thrasher testified she had never



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    176

1    driven any Cintas vehicles?

2        A    I don't remember that being within the

3    context of the excerpts.

4        Q    Do you remember where Ms. Thrasher

5    testified that she didn't have anything to do

6    with the day-to-day operations of any motor

7    vehicle operations of Cintas?

8        A    I didn't specifically that I recall,

9    no.

10       Q    Okay.  Do you understand that Ms.

11   Ferguson and Ms. Franco are Mr. Robinson's

12   supervisors?

13       A    I understand that, yes, sir.

14       Q    Do you understand that Ms. Ferguson is

15   a Smith System trainer?

16       A    Sure.  You asked them that and I read

17   their responses.

18       Q    Okay.  You understand that Ms. Franco

19   had been a driver at some point in her career

20   with Cintas?

21       A    I do recall that in her testimony in

22   that regard, yes.

23       Q    Okay.  Did you take anything away from

24   these depositions besides what we've already

25   spoken about today?



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    177

1        A    No.
2             MR. DAVIS:   Okay. I'm going to
3        need to take a short break and confer
4        with counsel.
5             AUDIO-VIDEO TECHNICIAN:   Off the
6        video.
7                  (Whereupon, the videocorder was
8                   turned off at approximately
9                   3:25 p.m. and a short break
10                  ensued.)
11                 (Whereupon, the video portion of
12                  this deposition resumed at
13                  approximately 3:34 p.m.)
14   BY MR. DAVIS:
15        Q    All right.  Mr. VanIngen, we've been
16   provided with the document that you e-mailed to
17   us earlier, you e-mailed to counsel, counsel
18   e-mailed to us.  It says Foster versus Cintas
19   Corporation.  It's -- what did we call it
20   before; not a flow sheet, an Excel spreadsheet?
21        A    That's what I call it.
22        Q    Like you said, you really can't tell
23   anything about what you charged, but do you have
24   any way of knowing, any way of telling right now
25   what you may have billed so far in this case?

CCR  COASTAL COURT REPORTING & VIDEO SERVICES
          800-791-1100      www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                178

1      A    Yes, the invoice that you already have,

2   number 560.  We have not billed or charged

3   anything else yet.  There are simply some

4   charges we will bill sometime in the next week

5   when we get around to doing that.

6      Q    I've just been provided the deposition

7   pages Raymond Cronin for page 93 through 96.  Do

8   you agree that for Mr. Cronin, the only

9   testimony you looked at for Mr. Cronin was pages

10  93 through 96?

11     A    Yes, sir, I think that's what I told

12  you.

13     Q    And what time today were you provided

14  with this?

15     A    I don't know what time it came in.  I

16  had a 9:00 a.m. conference call and I looked at

17  it after I got off of my 9:00 a.m. conference

18  call, in my time, central.

19     Q    Okay.  Right now I'm looking at

20  Thrasher's.  Just a second, sir.

21     A    Okay.

22     Q    Okay.  And you think that all you read

23  on Ms. Thrasher was pages 117 through 120; is

24  that correct?

25     A    I'm certain that's all I received, yes.



1          MR. DAVIS:   Thank you very much.
2      I would ask you when you get the
3      opportunity, please provide counsel
4      with your updated billing so he can
5      pass it onto me.   And for the record,
6      sir, I was not throwing my glasses at
7      you.   I wasn't throwing them at you
8      either, Will.
9          MR. MANN:   Fair enough.
10         THE WITNESS:   That sounds good.
11     So, Will, when Ina generates invoices
12     in the next week or so -- I don't know
13     who gets them
14         MR. MANN:   Yeah, she usually sends
15     them to Bianca, who is or paralegal,
16     and she gives it to us.
17         Clay, when we get the updated
18     invoice, we'll send it to you.
19         MR. DAVIS:   Okay.
20         THE WITNESS:   I'm happy to report
21     to be blissfully ignorant of most
22     things, income and collection-related
23     on my business.
24  BY MR. DAVIS:
25     Q    Okay.   Just a couple of brief

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    180

1    background questions and I'll let you go.  Do
2    you have any relatives by blood or by marriage
3    that reside around the Savannah, Georgia area?
4        A    How far is Hilton Head?
5        Q    That's in South Carolina.  We don't
6    care about them folks.  No, I'm kidding.  No,
7    it's over the jurisdictional limits.
8        A    I figured it was but I wasn't sure
9    physically how far away it was.  My closest
10   relatives that I know of are in Hilton Head.
11   I've got some relatives in the upstate of South
12   Carolina, too, but not in Georgia that I'm aware
13   of.
14       Q    Okay.  Do you -- have you ever been
15   arrested or convicted of a crime?
16       A    I have not.  I mean, I've had a
17   speeding before but it's been quite a while.
18           MR. DAVIS:  All right.  If anybody
19       has bot anything else, I'm done.  Thank
20       you very much.
21           MR. MANN:  I don't have any
22       questions either.  Thank you, Mr.
23       VanIngen, for your time today.
24           MR. DAVIS:  Thank you Mr.
25       VanIngen.



MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    181

1      ( RESERVED SIGNATURE. )

2    ( Thereupon, the videorecorder was

3    turned off at approximately

4    3:39 p.m )

5    ( Whereupon, the videotaped

6    deposition of Lane VanIngen via

7    video conference was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



COASTAL COURT REPORTING & VIDEO SERVICES
                    800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    182

1                C E R T I F I C A T E

2

3    STATE OF GEORGIA:

4    CHATHAM COUNTY:

5

6            I, Cathy M. Knoettner, Certified Court

7    Reporter and Notary Public in and for the above

8    county and state, do hereby certify that the

9    foregoing testimony was taken before me at the time

10   and place hereinbefore set forth; that the witness

11   was by me first duly sworn to testify to the truth,

12   the whole truth, and nothing but the truth, that

13   there upon the foregoing testimony was later reduced

14   by computer transcription; and I certify that this is

15   a true and correct transcript of my stenographic

16   notes so taken.

17           I further certify that I am not of counsel

18   to either party, nor interested in the event of this

19   cause.

20

21                    *Cathy M. Knoettner*

22

23              Cathy M. Knoettner, (B-718)

24              Notary Public

25              Beaufort, South Carolina

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    183

1                 D I S C L O S U R E

2

3              Pursuant to Article 8.B. of the Rules

4    and Regulations of the Board of Court Reporting

5    of the Judicial Council of Georgia, I make the

6    following disclosure:

7              I am a Georgia Certified Court Reporter.

8    I was contacted by my office of Coastal Court

9    Reporting, Inc. to provide court reporting

10   services for this deposition.

11             I will not be taking this deposition

12   under any contract that is prohibited by

13   O.C.G.A. 15-14-37(a) and (b).

14             I have no contract/agreement to provide

15   reporting services with any party to the case,

16   any counsel in the case or any reporter or

17   reporting agency from whom a referral might have

18   been made to cover the deposition.

19             I will charge its usual and customary

20   rates to all parties in the case, and a

21   financial discount will not be given to any

22   party to this litigation.

23

24             ---------------------------
                Date: September 1, 2020
25              Cathy M. Knoettner, (B-718)



COASTAL COURT REPORTING & VIDEO SERVICES
              800-791-1100       www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    184

1                          ERRATA SHEET

2

3         CAPTION:   MICHAEL JACOB CASTLE-FOSTER
                     -VS-
4                    CINTAS CORPORATION NO. 2 d/b/a
                     CINTAS CORPORATION, and, CINTAS
5                    CORPORATE SERVICES, INC.

6

7
             DECLARATION UNDER PENALTY OF PERJURY
8
                 I declare under penalty of perjury
9         that I have read the entire transcript
          of my Deposition taken in the
10        above-captioned matter or the same
          has been read to me and the same is
11        true and accurate, save and except for
          changes and/or corrections, if any, as
12        indicated by me on the COASTAL COURT
          REPORTING DEPOSITION ERRATA SHEET
13        hereof, with the understanding that I
          offer these changes as if still under
14        oath. Signed on the _____ day of
          _____, 2020.
15

16

17

18   _____
     LANE VANINGEN (Deponent)
19

20
     SWORN TO and subscribed before me
21   THIS _____ day of _____, 2020

22

23
     NOTARY PUBLIC: _____
24

25   My commission Expires: _____

 COASTAL COURT REPORTING & VIDEO SERVICES
                    800-791-1100      www.coastalcourt.com

```
 1                    DEPOSITION ERRATA SHEET
        Reason for
 2      change:_____
        Page No._____ Line No._____ Change to:_____
 3      _____
        Reason for
 4      change:_____
        Page No._____ Line No._____ Change to:_____
 5      _____
        Reason for
 6      change:_____
        Page No._____ Line No._____ Change to:_____
 7      _____
        Reason for
 8      change:_____
        Page No._____ Line No._____ Change to:_____
 9      _____
        Reason for
10      change:_____
        Page No._____ Line No._____ Change to:_____
11      _____
        Reason for
12      change:_____
        Page No._____ Line No._____ Change to:_____
13      _____
        Reason for
14      change:_____
        Page No._____ Line No._____ Change to:_____
15      _____
        Reason for
16      change:_____
        Page No._____ Line No._____ Change to:_____
17      _____
        Reason for
18      change:_____
        Page No._____ Line No._____ Change to:_____
19      _____
        Reason for
20      change:_____
        Page No._____ Line No._____ Change to:_____
21      _____
        Reason for
22      change:_____
        Page No._____ Line No._____ Change to:_____
23      _____

24
        SIGNATURE:_____ DATE:_____
25                    LANE VANINGEN
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

MICHAEL CASTLE-FOSTER vs CINTAS CORP. NO. 2
4:19-CV-139 RSB - LANE VANINGEN                    186

1                    DEPOSITION ERRATA SHEET
    Reason for
2   change:_____
    Page No._____Line No._____Change to:_____
3   _____
    Reason for
4   change:_____
    Page No._____Line No._____Change to:_____
5   _____
    Reason for
6   change:_____
    Page No._____Line No._____Change to:_____
7   _____
    Reason for
8   change:_____
    Page No._____Line No._____Change to:_____
9   _____
    Reason for
10  change:_____
    Page No._____Line No._____Change to:_____
11  _____
    Reason for
12  change:_____
    Page No._____Line No._____Change to:_____
13  _____
    Reason for
14  change:_____
    Page No._____Line No._____Change to:_____
15  _____
    Reason for
16  change:_____
    Page No._____Line No._____Change to:_____
17  _____
    Reason for
18  change:_____
    Page No._____Line No._____Change to:_____
19  _____
    Reason for
20  change:_____
    Page No._____Line No._____Change to:_____
21  _____
    Reason for
22  change:_____
    Page No._____Line No._____Change to:_____
23  _____

24
    SIGNATURE:_____DATE:_____
25              LANE VANINGEN

 COASTAL COURT REPORTING & VIDEO SERVICES
                    800-791-1100      www.coastalcourt.com

### Exhibits

EX-1  4:3 11:15,16,17,20
EX-2  4:5 12:3 13:19,21
EX-3  4:7 13:25 14:6
    20:12
EX-4  4:8 27:22,23
    139:18
EX-5  4:10 37:3,14
EX-6  4:11 38:3 39:3,4
    65:6 120:20 165:12
EX-7  4:12 101:20,21
EX-8  4:13 85:20 89:25
EX-9  4:14 89:25 90:1,4
EX-10  4:16
EX-11  4:17
EX-12  4:19
EX-13  5:4
EX-14  5:5
EX-15  5:7
EX-16  5:8 164:17

### $

$1500  15:9
$19,321.85  17:15
$2,000  15:14,15
$345  15:9

### (

(a)(1)  76:7

### 1

1  11:15,17,20 12:6,7
    18:1 132:24 134:18
1,039  164:4
10  124:5,7 164:9

10-  63:14
100  100:8 129:13
103  67:20
11  16:16 165:13,15
11-390.5  82:3
117  173:25 178:23
12  157:6
120  173:25 174:2
    178:23
13  42:12 81:14 103:24
    165:17 169:20,24
134  163:24
14  18:3,5 39:9 41:7
    71:16 80:21 103:24
    169:24
14th  24:8 28:18 42:23
    43:2,6,9 72:7,24 107:7
    171:14
15  20:18 138:5 162:23,
    24
16  22:6 162:23 164:17
168  85:17 98:8
17  161:10
19  67:16
19,321.85  26:8
1989  57:4
1:25  101:11
1:31  101:15
1st  15:16

### 2

2  7:6 12:3 13:19,21
    74:19 75:23 103:14
20  117:13
2000  88:21
2002  31:21 55:15 57:4
    58:10
2013  128:7

2014  56:4
2015  68:24 79:3 89:9
2016  128:5
2018  9:10 74:24 138:12
    144:22
2020  12:6,7,20 16:16
    17:9,14 18:3 19:13
    24:15 39:9 41:7 71:16
21  24:13
22  40:20
23  39:22 66:24
24  26:6
24th  15:24 16:14,20
    21:10
25  165:16
26  25:23 26:3 39:22
    40:24 66:21 74:13
    171:1 174:23
26,000  63:14 91:19
28  12:19 14:4,9 122:19
28-page  20:11 25:1
2:41  156:10

### 3

3  13:25 14:6 20:12
3.90  79:9
30  49:24 60:24 107:20
    108:4 117:9,13
30th  28:7
31st  22:19 23:5,16 24:7
345  15:17
380  111:18
383  161:22 162:6
390  75:13
390.03  76:7
390.3  75:7,10 94:16,19
390.50  133:2
395  15:17

3:00  12:19
3:01  156:14
3:25  177:9
3:34  177:13

### 4

4  27:22,23 139:18
40  60:24
49  111:17
4:19-CV-139  7:8

### 5

5  37:3,14
50  70:17
53  38:16
56  38:17
560  25:14,17 26:11
    178:2

### 6

6  9:10 38:3 39:4 65:6
    74:24 120:20 138:12
    144:22 165:12
65  50:4 57:16
67  98:8
6th  78:5 84:18

### 7

7  17:9,14 19:13 24:15
    101:20,21
7th  17:18 18:5 25:4,5,
    21

### 8

8  67:21 85:19,20 89:25
    165:17
8-  105:4



9

9  89:25 90:1,4

9,000  105:4

90  124:4,15 156:19
163:16 164:8

90s  57:6

92  156:21

93  173:21 178:7,10

96  173:21,23 174:25
178:7,10

9:00  178:16,17

A

A-001  39:19 40:14

A-23  40:9

a.m.  178:16,17

abide  131:20

abiding  160:24

ability  10:24 165:4

absence  162:18

absent  78:1 154:17
155:7

Absolutely  38:8,24
64:9 101:6

accept  22:1

acceptable  8:12,13

accepted  46:14 52:11

accepting  128:1

access  21:2

accident  46:3 138:12
144:22 166:7

accompanied  16:4

accomplish  131:19

accountant  54:16

accounting  27:14
54:7,20

accredited  54:10,12

accumulative  25:2

accurate  9:21

acronym  57:22 60:15

Action  7:7

actions  163:11

actively  61:21

activity  139:11

actual  58:8 61:16
104:23

addition  157:19

additional  18:21 19:23
72:17,19 133:20 151:22

Additionally  150:9
168:11

address  107:15

addressed  106:16

adequate  22:23 68:6
79:7 120:3 175:7

adequately  85:9

adhere  161:11

administration  30:12
55:7 57:3,13 61:10 91:5

Administration's  57:8

admits  166:5

adopt  86:10,16,19,24
87:15 97:12 112:18
157:21 158:10 172:24

adopted  61:11 62:10
86:5 90:12 102:17
112:4 116:8,13,18
117:1 129:24 158:14

adopting  87:4,15,20
90:25 99:1 102:3

adoption  97:13 157:23
175:4

adopts  99:15

advance  17:5

advice  29:2 32:3

affect  108:10

affected  174:4

affects  69:14

affiliate  139:8

afraid  44:25

afternoon  14:6 139:9

agencies  61:11

agent  57:2

agree  17:13 18:8 41:6
48:23 52:10 53:2 57:11
68:17,22 75:17,19
76:14,16,17,20,21,23
89:13 91:9 92:24 95:8
99:24 100:17 110:6
111:3 116:17,20 124:19
125:24 132:15 149:5
155:13,17 165:22 166:1
178:8

agreeing  97:10 112:15

agreement  7:9,12
16:15 124:14 172:22

ahead  38:8

aid  170:19 173:6 175:20

aim  57:23

Alabama  21:16,17 22:2
33:25 34:2,6,7 61:2,25
62:8 63:11,19,22 132:3

Alabama's  62:17

Alabama-based  62:2

alcohol  55:20 56:7,14

alliance  61:4,7,8

allowed  95:10,12,16
96:17 158:8

amend  41:18

amended  12:2 150:20

amount  17:14,17,20
26:8 60:20 110:22
112:1

analysis  123:15 165:25

analyze  123:20

annexed  12:18

answers  85:5

anticipate  119:18

anybody's  162:12

apologies  22:1

apologize  13:18 72:25
80:8,10 163:6

apparently  25:20
28:18 99:19 111:9

appeared  35:11 75:1

appears  15:23 17:16
19:4 37:6 40:10

applauded  99:5,10

applicability  69:22,24
75:7,11 94:16 133:14
151:8,13

applicable  7:18 76:9
92:1 114:5 121:1 131:8
135:19 137:10 157:22
158:1,12

application  48:19
97:14 120:9 134:9

applied  74:8 112:23
121:17 123:9 145:1

applies  63:15 103:10
119:9 145:3 160:4

apply  63:4 71:7 74:6,9
75:14 81:2,5 86:14,16,
25 87:1,16 92:13 93:15
95:12 96:2 97:12
105:16,18,22 109:20
113:19 115:2 126:3,4,
23 129:23 133:4 135:21
136:3,8,15 137:15,19,
24 144:24 145:6 147:11
157:10,13 158:24
161:1,2,25 162:1
163:12 166:2 169:13
172:24 175:18

applying  93:11 98:18
126:5 137:5 146:4,17
148:3 158:23

apprised  174:19

approach  29:21 48:16
52:14 74:3 86:17
115:21 145:22 146:5
153:14 161:23 166:20
167:9



approaches 167:4

approaching 70:17 167:25

appropriately 33:10

approximately 50:4 67:9 101:10,15 156:9, 14 177:8,13

April 9:10 74:23 78:5 84:18 138:12 144:22

aptitude 110:22

area 180:3

arises 9:8

arranging 37:16 56:8

arrested 180:15

arrived 24:10

articulate 107:9

articulated 24:11

Ashley 44:17

assemble 40:22

assembled 29:8

assembles 39:14

assigned 114:6 121:2 125:18 129:21 151:21 159:8

assigning 159:16

assistants 24:19

assisting 8:22

associates 61:22

association 60:6,17 61:3,15 62:1,2,7

associations 59:14,23 62:22

assume 9:19 11:1 14:21 17:22 59:24 60:4 91:8 130:7,19 156:18 173:15

assuming 10:2 60:10 121:7 143:5 145:20 148:23 172:9

attached 20:24 22:9 24:21

attachment 22:8

attend 125:16

attorney 20:25 25:11

attorneys 60:7 69:16

audio 9:17

AUDIO-VIDEO 101:7 104:7 177:5

August 12:19 17:9,14, 18 18:3,5 19:13 24:8,15 25:4,5,21 26:16 28:18 39:8 41:7 42:24 43:2,5, 9 71:16 72:7,24 107:7 171:14

Augusta 9:11

authored 71:16

Authorized 85:16

automatically 168:20

automobile 9:9

average 163:20

aware 32:11 43:12 49:9,16 50:11 77:14 128:10 152:24 169:3,4 180:12

**B**

Bachelor 54:19

back 13:14 19:11 21:6 28:10 36:1 40:1 41:2 65:4,6 82:17 83:23 84:20 101:18,20 104:1, 5,14,18 118:5,15 120:19,20,21 128:13 130:6 140:24 144:2 165:4,11,12,15 169:19

backed 129:15 131:1

background 46:4 54:1 180:1

bad 47:17

base 81:4 126:20 131:25 150:14 157:14 172:2

based 24:4 29:16 34:6, 7 36:22 41:19 67:18

93:5 103:23 117:8,10 145:1 151:14 164:10 166:22

baseline 61:12 73:8,11

basically 62:13 103:4

basis 18:15 26:14 52:22 55:3 56:6 68:12 74:24 98:16 160:15 174:22

bathroom 101:4

BB 36:6

Beach 21:16,17

bear 67:23 68:7

beat 101:1,18

beaten 100:25

beg 31:9

began 174:20

behalf 31:5 99:20

bell 44:18 85:18

benefit 98:21

benefiting 84:15

Beth 15:24 20:25 22:22 28:9 66:12

Bethea's 45:12

Bianca 20:21 22:7 24:16 25:21 179:15

big 117:14

bill 18:4,7 26:14,15,16 178:4

billed 17:15,19,21 18:7, 22 177:25 178:2

billing 24:25 179:4

bit 12:23 53:25 65:7 68:13 71:13 80:9 94:12 152:16 156:4 164:3

blissfully 179:21

blood 180:2

blurb 26:19

blurs 150:7 168:8

board 52:6 95:8 161:3 172:23

Bob 54:2,3,5,6,10,11,18

bonus 138:24

Boone 15:24 16:6,9,16, 21 20:14,25 28:10 29:1 36:4 39:5,17 66:8,12 172:10

Boone's 20:16,21

Booth 65:16,23

borne 55:8

bot 180:19

bottom 19:14 36:6 39:18 40:7 158:22 161:9 165:15

bound 99:25 100:18 130:20

brand 46:25

break 11:7 20:3 64:8, 10,22 90:21 101:5,11 156:10 177:3,9

broader 154:20 173:15

broker/shipper 70:9

Bronowski 45:1

Bryson 20:21

building 129:15 131:1

built 164:24

bullet 151:19 158:25 159:6,9

Burke 33:22 34:22

business 11:12 14:14 34:16 58:17,18,21 59:11 81:8 84:14 137:24 150:22 170:18, 19 173:7,14 175:21 179:23

buy 136:6 145:15

**C**

C-168 90:2 158:14

C-67 85:12,21 158:14



calendar 26:25

call 14:24 19:8 38:12
  39:11 52:13 79:4
  113:16 115:5 116:23
  154:13,16 155:6
  177:19,21 178:16,18

called 14:22 22:8
  164:20

calling 87:21

calls 9:23

Candace 37:5

candid 78:2 159:25

Cape 33:23

care 108:23 111:25
  112:19 113:4,18 114:2,
  15 116:9,23 120:23
  122:22 125:4 126:16
  127:6 146:17 160:3,13
  161:25 167:18 180:6

career 28:20 58:1
  176:19

cares 125:25

Carolina 180:5,12

carrier 30:12 34:21
  41:17 50:14,22 51:13
  55:1 57:3,13 61:10
  62:11 63:15 67:13,14
  69:22,24 70:3,5,13,19,
  20,24 71:9 74:8,21,23
  75:13,18,20 79:10,13,
  21,24 80:21 81:2 84:1,
  15 86:6,11,19 90:13
  91:5 92:1,14 93:12,16
  95:18 96:3 97:7,24 99:2
  102:4,17 105:15 108:17
  110:5 112:5 117:14,19
  121:13,14 124:9 129:23
  130:21 131:9 132:25
  133:3,23 134:18 135:20
  136:2,7,14,21 137:4,15
  145:7 146:1,4 150:25
  151:7 155:2 157:13,25
  158:15 162:5 165:9
  169:9 172:25 175:4,18

carriers 49:22 57:9
  69:13 80:15 99:7
  117:14 145:23 150:9
  153:13,16 168:11

carry 124:9

carrying 77:19 136:18

carved 97:20

case 7:4 9:8 15:2,7
  16:7,10 17:15 18:3,9,12
  19:8,9 21:11,25 22:24
  23:8,17 25:19 27:3
  28:16 29:12 35:1,16
  42:13,18 43:1,11,22,24
  44:21 45:21 46:8,14
  50:15 57:15 65:16 66:5,
  7,17,22 68:9,16,19
  69:2,10 71:17 72:6
  73:6,18 74:7,16,25 75:3
  80:19 82:12 85:11
  93:22 98:3 100:4
  103:22 106:5 111:11
  116:1 121:9 122:17,18
  129:24 130:11,13,22
  132:21 135:11,14,17
  136:24 138:18 145:2
  158:3 163:12 164:20
  165:7 169:1,4,23 174:4
  177:25

caseload 69:13 70:18

cases 10:2 15:19 34:20
  35:9 66:14 67:1,10,20,
  22 68:11 69:1,12,18
  82:14 103:6 153:3

casework 24:22,24

Castle-foster 7:5 9:4
  105:23 106:10 107:13,
  25 127:21

catch 12:10 81:16

categorically 34:13
  63:13

categories 91:7
  133:25

category 49:12 53:21
  80:1 88:13 89:19 91:23
  107:4 154:10,18,20
  173:12

caught 12:6

caused 129:15

CDL 47:10,11,12,13,14,
  17,22 50:18 56:8 62:14
  76:5 88:7,8 91:21 93:1,

8,18 96:15,18 97:5
  111:25 112:13,14
  123:17,22,25 124:5,9,
  12,20 125:23 127:2
  130:7 132:2 133:25
  154:13,17,22 155:2,7
  160:7 161:21,24 164:1,
  6,10 165:18 169:13
  175:19

CDL-REQUIRING
  162:15

CDLS 47:20 158:6,7

central 178:18

certified 48:8,12

CFR 111:18

chance 10:20 106:21

change 15:4 63:8
  72:23 100:12 111:1

changed 62:15 71:17,
  19

chapter 94:20 132:24
  134:17

charged 177:23 178:2

charges 178:4

chart 104:18

check 166:12

checking 128:2

cherry-picked 171:19

Chicu 27:8,9,10

choice 50:2

choose 7:22 86:14,25
  95:12 97:2,6 98:13
  168:17

choosing 126:2 172:23

chose 20:2 149:8
  175:11

chosen 42:5 46:25
  47:9 62:12,14 63:13,17
  126:6

Chris 45:17 155:18

chronological 35:17
  58:5

Cintas 7:5,6 9:5 32:10
  42:6 74:6,18,19 75:17,
  23 76:14 77:15,21
  79:12,21,22 84:19
  85:24 86:5,10 87:19
  90:12 92:24 93:14
  95:19 96:2,20 97:2,6,25
  99:1,9,14,17 102:3,17
  103:12,14 109:2,25
  110:6 111:4 112:4,18,
  24 113:6,7 118:20
  121:7 125:7,8 126:15
  127:24 128:9,19,22
  129:4,5,24,25 130:1,20,
  22 135:6 138:9 143:24,
  25 144:2,5,19 147:24
  148:8 152:1,25 156:17
  157:8 158:14,19,20
  159:20 163:16,21,24
  166:6 167:8 169:6
  176:1,7,20 177:18

Cintas's 85:1 97:16
  113:14

circle 118:12

circumstance 69:25
  70:1

circumstances 136:4,
  24 154:4 165:21

citations 107:4

citing 75:11

Civil 7:7,18 12:16

clarification 78:20
  170:3

clarify 78:15

class 131:21 154:23
  160:8

classes 63:17 120:13
  133:20

classification 132:16

classified 152:5

classify 30:2 33:2
  34:14 91:20

Clay 8:15,19 9:2 78:3
  94:25 174:22 179:17

clear 102:2 105:13
  123:24 147:5 159:6,9



175:3

click 165:2

client 58:24,25 99:23

clients 21:22 48:11
49:14 50:21 56:6 63:1
78:12 81:7 152:14

close 157:1 160:19

closest 180:9

CLR 7:8

CMV 165:18,21

Coleman 66:10,15

collecting 154:1

collection-related
179:22

college 54:2,21

collision 9:9 56:13
68:18 74:11 79:19 80:1
84:18 108:1 113:20
121:21 127:21 139:5,12
141:20

combination 30:8
88:19,21

comfortable 24:3

commanded 12:17

commentary 102:7
154:15 162:8 163:8
164:3

commerce 63:5,11
75:16 76:12,18 79:8
84:3,9 110:24 134:7
136:16 137:6 147:4
157:17

commercial 50:9,13
51:8,24 52:6,9 53:21
61:3,6 70:12 75:14
76:10,17 79:5 80:4,24
81:11,16,20 82:2,25
83:11,13,16,19,25 84:4
88:7,11 91:1,6,13,17,
22,24 94:6,11 98:18,20
104:20 105:11,14
108:16 109:18 110:15
111:15 121:15,18
125:14 126:25 132:17,
20 133:4,8 134:6,15

135:8 136:15 137:21
148:17 150:8,16,21
159:2,7 160:14 161:7
162:14 166:8 168:9

commercial-vehicle-
out-of-service 61:13

committed 85:25

common 17:3 52:14
56:17,21 69:5 70:6
114:21 142:7

commonly 50:9
114:19 140:17,18
142:23

commonplace 50:16,
19

communications
20:15 66:12

community 132:10
139:1

companies 46:24 47:1,
18,19,20 49:5 51:4
62:3,4 99:24 114:17
122:14,20 124:24 125:5
163:18

company 30:20,21,22,
23 31:20 32:9,12 42:7
48:1,3 49:2,11 50:1
52:5 58:20 59:3,6 86:1,
7,11,18 87:13 88:3,13,
18 89:12,18 90:14,19
92:6,15 93:20 97:16
98:2,11,16 99:25
100:17 111:10 115:18
122:25 126:2,16,25
127:6 134:25 140:22,24
142:1 158:16 159:17
165:6 166:23 172:23
173:4 175:17

company's 87:12
98:23 100:14 114:2
120:23 121:21 122:9
124:18 137:23 150:18
167:12,15

company-owned
150:19

comparably 163:16

comparative 167:21

comparatively 125:7

compare 121:22
163:17

compared 56:18 63:22
67:25 122:14

compensated 138:10,
15,16 144:20

compensation 77:20

complaint 16:24 68:13

complete 19:21 46:13
168:14

completed 39:5 148:7

completely 85:8

completing 29:2

complexity 132:6

compliance 31:1,6,8,
16,24 32:6,14,22,25
46:22 47:6 50:19 58:15,
18 60:22 68:5,7 114:20

comply 103:3,5

compnay 102:18

comprehensive 36:13

computer 165:1

concept 119:20

concern 38:19

concerned 86:13

conclusion 73:4,5,10,
15,22 74:1,2,4,12,17
78:24 83:7 104:16
105:7 106:17,23,24
108:14 110:12 113:22,
25 126:8,12 131:12,16
138:2,3,7 144:17
149:24 150:4 166:15
168:2,3,15

conclusions 41:15
42:10 73:14,17,20
108:11 122:4

condition 142:5

conditions 140:15

confer 177:3

conference 8:11,20
178:16,17

conflict 16:25

confused 21:25

connections 21:20,23

consecutively 39:13

consideration 37:22
132:5

considered 137:11
151:20 154:1 170:13

consistent 87:2 94:7,9
145:23

Consortium 47:7
55:17

constitute 160:20

construed 94:21

consult 49:11

consultant 51:8

consultants 48:11

consultation 14:11
31:22 33:7 55:4 151:15

consulting 30:7 32:6
47:4 51:3 55:24 58:24
59:7

consumed 22:23

contact 66:9,11

contained 26:2 72:6
136:13 168:25 169:24

content 23:19 29:10
95:7

contested 169:17

context 53:23 70:15
71:11 72:19 74:6 78:21
91:23 94:13 95:14
115:17 120:6 154:17
161:20 162:9 176:3

continue 26:1

contractor 33:14,20,
23,24,25 34:4,12 38:7

contractors 33:19

contrary 123:12



control 99:14 119:18
122:11 126:4 163:14

controlled 119:23

controlling 70:4

controls 125:13,22
158:22 167:9,13,15

convenience 21:3
36:12

convenient 150:20

conversations 172:11

conveyance 16:5 17:5
84:12 136:10 147:18
157:15

conveyed 25:21 70:6

convicted 180:15

coordinating 56:6

copied 25:6

copies 24:21

copy 16:24 18:25 20:4
40:2 41:4 128:1

corners 168:25

corporate 7:6 85:21
158:13

Corporation 7:5 9:5
74:19 103:14 177:19

Corporation's 42:6

correct 10:3,4 13:7
15:10,14,19 16:11
17:16 19:18 25:4,12,13,
18 26:9,11 40:16,24
41:7 42:19,23,24 43:2,
3,6,7,10,12,17 44:22,23
45:10,11,13,18 48:24
50:14 52:4,12 53:5,16,
18 55:15,16 57:4 58:16
65:10 67:20 68:23
75:21 76:24 77:7,8,12,
13,17,21,25 79:14,24
80:18,22 82:10,20,25
83:14,16 84:2 85:1,13,
17 88:3,4,5,14,16,22,24
89:2,3,5,6,12,14,15,18
90:18,20 95:21 96:25
97:3,5,9 99:18 101:23,
24 102:4,19,20,22

103:7,8,14,15,24
111:19 112:20,25
113:15 116:19 118:3,4,
6,23 124:10,16 125:1
128:23 132:17,25
133:1,5,6 139:25 140:3,
4,8,15,22 141:24 142:6,
7,10,14 143:4,5,8,12,
19,25 144:3,4,6,11
145:18,21 146:21
148:13 149:7,13,15,17
152:3,9,11,18 153:5,7,
9,12,17 155:3 156:23
165:19,22 166:9,10
169:25 170:1,10 171:15
173:9 178:24

corrected 12:7 13:22

correctly 9:24 66:22
74:25 75:2 78:24

correspondence
20:25 47:4,5,7,8

counsel 7:9,13 12:18,
25 13:6,10 39:11 66:4
163:2 171:5,9,12,19
172:6,8 177:4,17 179:3

counted 67:19,20

country 30:19 122:15
132:4

County 9:10

couple 17:23 19:1 22:3
23:21 24:13 38:20
72:20 85:15 88:23
130:5 139:16 159:1
164:24 171:17 173:19
179:25

courses 47:16,17,20
58:2,6

court 7:13 9:23 22:11
35:11,12 37:18 65:2
147:10

courtroom 35:15

COV 88:16 89:12 90:19

cover 39:7,10 40:13

covers 167:6

COVID-19 7:12

crash 74:24 78:7
107:14 123:21 148:6
159:12 173:5

credential 112:1

credible 41:20,23,24
42:1,3,7

crime 180:15

criticism 119:1 157:19
158:20

criticisms 70:14

criticize 99:11

Cronin 170:18,24
173:2,13,24 175:1,9
178:7,8,9

Cronin's 173:21

cross-claims 60:9

cross-examination
7:16

curiosity 46:18

current 7:12 20:5 65:14
107:15 133:13

curriculum 48:16 50:2
53:10

cushion 119:21

custom 157:9

customarily 40:25

customer 139:7

customers 77:16,20

cut 43:16 77:4 123:4

CV 46:18 55:11 61:1

CVSA 61:21

                D

D-U-N-N 44:17

d/b/a 74:19

dad's 146:15

daily 15:9,15 140:9

damage 129:16

Danny 33:20

data 121:8 162:22
163:22 164:8,9,18
165:2,5 166:23 167:21

date 12:11 16:18 17:14,
18 24:4,7 36:15 41:16
42:20 45:7 58:2 74:24
79:25 159:12

dated 15:23 16:14 17:8
22:19 24:15 28:7 39:8
41:6

Dave 33:21 34:2,24

Davis 6:25 8:2,7,14,19,
20 9:1,2 23:13 29:14
44:3 46:16 50:3 52:1
53:1,13,24 56:25 64:9,
15,20 65:1,5,22 78:8,16
79:20 82:8 83:5,22
87:5,18 93:4 94:14 95:5
97:1,22 99:12 100:16,
24 101:6,16 104:13
106:8 109:9 111:2,12
112:17 115:3,12 116:16
119:2,11 124:23 125:10
127:15 130:18 131:10
134:12 135:4 137:2
142:19 143:16,23
144:16 145:25 146:8,25
149:22 151:18 154:11
156:7,15 160:1,16
166:4 172:5 174:10,18,
24 177:2,14 179:1,19,
24 180:18,24

day 11:24 12:4 13:22
19:10,20 33:13 34:24
67:2 78:5,8,9 133:12
143:8,12 144:11 146:11
148:8 152:8 156:5

day-to-day 56:6 176:6

days 17:23,25 19:1
26:25 107:20 108:5

dead 101:1,18

deal 34:20 51:9 160:5

dealing 164:21

deals 28:7

dealt 126:7 168:14



decade 35:9

decades 22:3

decide 76:21

decided 63:4 128:11

decision 126:13 127:4

defendant 25:12 60:11 67:13,25 70:2,18,19,22

defendants 8:18 70:24

defense 12:25 13:6,10 44:11,25 59:14 60:3,6, 7,17 163:2

defense-retained 7:2

defensive 125:17 159:3,10

define 68:20 91:15 92:6 94:10 134:5,6 136:16 161:8 169:2 173:20

defined 91:4,6 105:11 108:17 110:15 112:3 125:4 166:8

defining 155:9

definition 75:14 79:6 80:4 81:22 82:1,24 84:5 87:24 89:17 91:1,13,15, 18,25 115:13,15,21 121:18 132:20 134:15 135:8 147:9 150:19 154:25 155:4 166:8

definitions 90:18,19 105:13

degree 54:7,18

degrees 54:22

deliveries 152:18

delivery 153:17 154:6

demonstrated 46:1

Dennis 33:22 34:22

Department 74:22 80:13,19 82:19 132:23 134:16

depending 102:8 170:7

depends 71:3 135:23

deponent 12:16

deponents 85:15 145:4

deposition 7:1,10,14, 21 8:6,12,22 10:8 12:5 15:8 17:6,12 19:2 20:6 22:10,12,15 23:2,6,15 36:16 64:25 77:6,9,11 92:22 101:14,23 102:12 104:12 117:22 118:2,6, 9 133:16 139:15,18,24 150:5 156:13 164:19 166:6 168:6 173:18 174:19 177:12 178:6

depositions 10:3 46:2 71:23 77:24 78:2 85:3 103:22 109:24 139:16 140:3 169:23 170:10, 12,15,23,25 171:13,16, 20 172:16 174:3,8 176:24

derive 60:21

describe 34:14 61:24 87:14 92:3 109:18 173:7

describes 165:21

descriptions 52:16

designed 86:8 90:15 103:1 158:17

determining 61:12

Detour 146:12

develop 68:12

developed 98:24

development 58:1

device 122:11 163:14

devices 119:18

differ 155:14

difference 27:13 57:9 152:22 155:11 161:6 162:2 167:3

differences 91:3 133:17

differential 12:11

differently 94:12

diminish 151:16

direct 46:6

directed 44:7

direction 7:13

directly 145:11,12 151:12

director 170:19 173:14

disagree 76:22 77:22 91:12 112:21 125:25 135:12 142:18 143:22 144:8 146:24 149:14 155:21

disagreed 102:8

disagreeing 91:14

disagreement 152:6 161:22

disallowing 96:7

disbursed 30:18

disclosed 129:10

discovery 7:15

discuss 98:11 150:12

discussed 83:8 85:15 106:24 108:24 113:21 115:9 131:12 140:4 149:23 165:3

discussing 91:8 160:22

discussion 88:1 104:10 109:8 118:16 121:16 157:20 159:23 172:21 174:12

discussions 168:18 174:13

displayed 55:12 149:1

dispute 113:1 140:16

disqualification 131:7 166:2

disqualified 165:20

disqualify 129:19

disqualifying 165:17

distance 120:3 156:24 167:7

distinction 32:17 57:10

District 28:23

dividing 137:3

Dmitri 37:7

doctrine 146:10,12

document 11:8,21,23 12:3 14:3,4,18,22,25 15:2,3,23 17:2 18:20,23 19:3,4,6,12,17,19,25 20:4,11,19,20 21:8 22:5,7,18 24:25 25:2,7, 9,10,20,22,24,25 26:2,7 27:18 28:1,4 36:15 37:2,13 38:25 39:4,7,12 41:24,25 42:11 46:19, 23 66:20 67:15 121:4 122:5 123:6 124:8 140:19 162:22,25 163:1 164:16,23 169:22 177:16

documentation 166:25 167:1

documents 11:6 12:9, 25 13:5,14 14:2,13,19 16:5,9,19,21,23 17:4 21:1 22:23 23:7,16 24:14 36:13,22 37:24 41:15,20,24 42:7 44:5 67:18 80:18 112:10 169:22

docyments 12:17

Donald 37:4

Doo 12:8

Dorado 33:23

DOT 32:5 33:17,24,25 34:1 48:2 49:1,3,6 50:18 52:9 56:8,10 58:6 61:11 62:4 75:21 79:22 91:11 96:14,22 97:5 114:23,24 116:24 122:2 123:8 126:4 153:22 154:20 163:10,11

DOT's 75:14 121:7



DOT-REGULATED
114:19

doubt 24:1 53:22 57:18
103:19 138:22

downward 126:6

drawn 41:15

drill 116:3

drive 145:9 152:12

driven 140:24 176:1

driver 47:22 48:16
56:13 74:7,10 85:16
91:21,22 93:12 94:11
98:1 107:16 110:21
111:17,21,25 112:12,22
118:23 119:8,13 120:12
125:17 128:12,14,17
131:7,22 132:12 134:24
137:8,16 139:21 140:10
151:21 152:5,22,23
153:24 154:5,12,14,17,
21 155:1,19 157:11
160:7,8 161:2 162:19
165:20 176:19

driver's 6:18 88:7
111:15 128:1 159:2,7
162:13 167:11

drivers 47:22 91:6,13,
18 92:25 93:1,16 94:4
97:8 109:25 112:6
113:5 114:5,11 115:1
118:22 121:1,24 124:8
125:15,23 153:12,21
155:7 158:1 163:25
167:6 175:19

drives 156:17

driving 56:13 78:9 84:7
89:8,11 92:8 111:17
122:9,19 123:1 124:16
127:23 128:3 134:14
135:5,21,25 138:11
144:21 145:17 152:10,
15,20 153:5 159:3,4,10
161:4,12 163:11 167:22
173:9

drove 152:8

drug 55:20 56:6,14
58:24 96:14,20 97:2

due 9:16 18:11 43:1
136:9

Dunn 44:17

duties 137:12 142:12

duty 126:15 134:25

DVIR 142:2

DVIRS 139:20

———————
E

E-CODER 104:21

e-mail 10:16 12:20
20:3,15,20 21:3 22:21
24:15 26:19

e-mailed 177:16,17,18

e-mails 20:13 148:23

earlier 10:16 21:9 25:1
26:14 36:4 57:15 58:4
64:4 94:15 108:9
109:11,14 133:15 143:8
157:20 164:19 177:17

early 68:9

easier 29:21

easy 33:11

eat 156:4

Econoline 68:24 79:3
89:5,9

ecxpect 22:25

education 120:13

effectively 93:14

Effingham 9:10

electronic 12:20 16:4

electronically 11:3

elements 79:9 154:9
157:19

Elsbury 66:24

else's 30:21

emblem 31:14

employed 57:1

employee 33:14,21
34:1,6 38:6 56:8 74:19
94:24 95:21 126:17
127:7

employee-fitness-for-
duty 55:20

employees 30:7 33:16,
18 55:25 76:9,10 96:20
97:3 103:10

employer 94:21 128:13
131:20

employer's 145:10

employers 56:21 71:8
76:10 159:15

employment 147:7
148:1

Encl 36:7

enclosure 36:2

encountered 35:2,4,6

end 17:24 26:21 65:13
68:15 104:15 105:6,17
111:24 136:16 140:6,12
157:2

ended 129:10 148:17

endorsements 132:8
134:1

ends 147:18

enforce 98:13

enforcement 151:5

enforcing 94:22

engineer 44:16

England 122:23

enhanced 159:13

ensued 64:23 101:12
156:11 177:10

ensure 128:3

ensured 127:24

entered 41:20

enterprise 84:14

entire 78:5 117:17
171:16

entities 31:24 59:10

entity 31:11,24 32:15,
23 47:4 55:19,24 56:4

entries 18:17

entrust 126:13 127:5
128:12 131:22

entrusted 111:14

entrusting 126:16
127:7

entrustment 128:20

entry 47:21 111:16,21
112:22

equipment 77:1
163:25

errors 150:10 168:12

essentially 56:5 77:5
104:21

established 148:11
152:1

estate 48:3

estimating 124:4

estimation 164:7

evaluate 35:8

evaluated 68:4

evaluation 135:14
146:6 153:2

evaluations 55:21
56:10

evening 140:21

events 55:10 123:21,22

eventually 26:3

evidence 41:21 46:8
79:18

evidenced 128:4

exact 81:21 90:7

examples 70:7 71:10
99:6 153:18,20,23
168:4

exceed 86:8 90:15
95:13 103:1,6 158:17



exceeded 112:19

exceeding 113:7

Excel 163:23 177:20

exception 23:1

exceptionally 69:10

exceptions 95:22

excerpt 75:7

excerpts 102:11
170:11,15,17 171:6,17
172:16 176:3

exclude 71:6 91:17

excluded 84:16 124:14

exclusively 32:22,24
51:21 84:11

excuse 73:2

exemptions 63:4

exhibit 11:15,16,20
12:3 13:19,21,25 14:6
20:12 27:22,23 37:3,14
38:3 39:3,19 40:9,14
65:6 85:20 89:25 90:1,4
101:20,21 120:20
139:18 164:15,17
165:12

exhibits 10:16 22:12
80:9 118:5 166:22

existed 36:24 57:5

expand 41:18

expect 18:8 20:17
21:11 28:25 51:7 55:23
59:22 79:25 100:8
119:6 122:16 131:20
151:8

expectancy 124:6

expectation 13:8
28:15 68:3 114:5
120:25

expected 28:17 78:1
132:12

expecting 144:13

experience 51:22 55:9
112:2 116:15 151:16

experiences 126:22

expert 7:2 9:6,7 10:1
18:2 21:25 22:10 23:21
24:20 27:5 29:25 31:7,
11,12,24 32:16,19
34:14,15 35:10 37:6,12,
17 38:1,25 39:13 40:21
42:5 43:1 44:11 45:15,
24 58:17 59:1,9 65:12
68:7,16 72:20 84:25
93:23 103:24 154:16

expert's 17:6 44:24,25

expertise 30:9 45:16
160:23

experts 29:19,23,24
30:2,4,5,6,11 31:1,6,8,
16 32:14,18,20,23,25
33:3,5,12,15 34:17,20
44:11 46:23 47:6 58:15,
18 60:22 66:1 73:12
155:16 170:20

explain 32:14 87:23
105:10 132:14 152:19

explained 155:12

exposure 59:7 66:16
117:10

exposures 51:18 52:7
60:10 69:16 117:8

expressly 8:4

extent 50:24 51:2 52:8
63:12 71:3,5 126:6

exterior 142:4

F

fact 9:25 46:12,14
77:14 98:18 129:22
149:11 157:20 158:10
163:8

factual 98:14

factually 86:16,24
96:15 135:11 158:24

failed 105:25 128:22
130:24 131:1 161:11

failing 163:13

fails 150:5 168:7

fair 16:12 49:16 92:4,5
99:16 103:25 120:19
124:11 179:9

fairly 62:17

fairness 133:15

fall 106:23 154:3

falls 104:24 107:3

familiar 29:13,15 45:2,
3 62:17,24 95:3 119:20,
25

familiarity 170:6

fast 28:11 39:24

fault 73:1 99:13

favor 10:13

federal 7:17,19 12:15
28:15,19 29:11,16,19
30:11 33:16 34:20
37:18,20 50:13,22
51:13 54:25 55:7 57:2,
8,12 61:9 62:11,13
63:15,21 71:11 74:21
75:12 79:10,13,23 84:1
86:5,10,19 90:12 91:2,5
92:14 93:15 95:17 96:2
97:7,24 99:1 102:3,17
105:15 108:17 112:4
124:9 129:23 130:20
133:3,18,23 134:10
135:20 136:2,7,14,21
137:4,14 150:25 155:2
157:12,25 158:7,15
162:5 169:9

Fedex 122:24 125:9
153:19

feds 123:9

fee 15:9 17:1

feed 9:17

feeding 59:2,9

feel 18:3 43:19 66:1
68:5 82:15 151:11
170:4 175:6

feeling 92:2

felt 43:23

Ferguson 139:17
141:3,9 143:3 149:17
176:11,14

Ferguson's 77:9 92:21
101:22 102:11,15 140:3

field 30:16 157:23

fight 148:18

fighting 52:15,17
149:11

figured 180:8

file 12:20 19:2 40:2 44:9
45:7

filed 9:5 39:5 69:15

filter 163:22,23

final 88:13

finalized 22:11

financially 56:2

find 19:4 22:9 100:10
120:21 121:20 137:13
155:24 158:4 162:24

finding 129:11

fine 41:5 86:15

finish 10:12

finished 45:8

fired 129:4

firm 32:6 65:25

fishing 139:10 143:7
146:16

fit 68:20

fitness-for-duty 56:9

fits 82:1,24 89:16

five- 64:7

fleet 48:19,24 49:6
50:18 51:12 56:14,18,
19 69:12 76:2,4,5 79:5
87:1 93:13 95:14 98:21
109:13,21 110:5 113:9
114:2,25 120:11,23
122:1

fleets 32:4,5 49:9,17
50:10,17 51:18,23 52:8,



22 55:21 62:6 114:10,
14,19 116:5,8,18,21
117:1 122:15 153:11

flip 167:24

floor 91:25 110:25

flow 177:20

FMCSA 30:5 33:17,21,
22 55:2,6 57:5 58:6
166:9

FMCSR 86:6 90:13
102:18

FMCSRS 74:22 110:16
157:10

focus 134:4 135:2
141:5 153:2

focused 129:7

focuses 159:2

folks 34:19 149:9 180:6

follow 47:1 61:11
130:20 159:15

follow-up 28:15

Ford 68:22,24 79:3 89:9
166:6

forget 138:18

form 6:19 8:8 15:1 20:5
23:10 29:4 43:25 46:10
49:19 51:15 52:20 53:6,
17 56:15 65:19 79:15
82:4 83:1,17 86:21 87:8
93:2 94:1 96:23 97:18
99:3 100:1,20 106:2
109:3 110:17 111:7
112:7 114:12 115:7
116:10 118:24 119:5
124:22 127:9 130:3
131:3 133:10 134:19
136:22 142:16 143:13,
20 144:12 145:19
146:2,22 149:19 151:2
154:7 159:21 165:23
171:22 174:7

formalized 55:6 58:6

formally 87:4

formed 45:21

forming 42:18 174:9

forward 36:18 74:16
90:23 91:9

forwarded 10:19

Foster 177:18

found 105:2 111:17
129:1

Franco 140:2 141:3
143:3 149:16 176:11,18

Franco's 77:11 139:17

free 112:18,24

freestanding 31:23
71:12 73:9 134:2

Friday 12:5 22:19

Frolic 146:12

front 10:23 41:4 55:12
65:9 95:2 119:14

full 6:14 84:8 136:19

fully 106:16

function 55:22 138:9
144:19 147:24

functions 143:11
144:10 148:8,12 149:7

furthering 137:23

G

game 108:9 123:19

gatekeepers 159:4,10

gave 19:1 37:21 38:5
46:2 66:23 78:21
107:16 133:24 153:18
168:3 171:7

general 75:7,10 94:16
141:13

generally 27:16 32:2,5
43:13 69:20 71:5 83:20
92:11 95:11,23 98:10,
22 102:5 108:16 110:3,
14 120:1 132:4 136:9
151:11 155:5 160:25
175:21

generates 179:11

Georgia 28:23 62:22
63:1,4,10 74:22 80:5,
12,19 81:3,15 82:3,19
105:14 107:15 108:1
127:25 132:16,23
133:19 134:3,16 135:9
147:11,15,21 148:3
180:3,12

Georgia's 62:24 63:20
133:18

Gerald 38:11

Gerry 38:9,12 64:3

get all 40:6

give 9:18 11:15 13:19
14:1 20:19 27:22 34:19
37:1 38:2 70:7 72:1
80:9 81:15 82:17 85:20
89:24 104:5 109:22
115:13 117:21 139:14
162:24 166:11 168:4
172:3 174:10

giving 9:21 29:1 68:15
147:24

glad 21:19

glasses 171:3 179:6

globally 163:19

good 8:2,25 11:10
12:12 26:12 37:25 46:4
50:16 57:23 59:1,5,15
61:23 64:10 68:5 78:22
82:15 90:10 96:16
131:4 149:3 150:22
153:20,23 163:19
166:11 179:10

gosh 16:19

government 6:19
61:16

grab 118:1

grades 132:8

graduate 54:2,9 109:25

graduated 54:1

great 51:9 70:25

greater 63:12,19

Griffen 33:21

Griffin 34:3,24

Grill 22:11 23:2 35:2,5,
12 98:25 122:21 123:13
124:25 150:5,7 152:7
153:18 155:21 161:19,
24 165:16,19,22 166:5
167:5,25 168:6,8

Grill's 22:12,14 23:6,14
45:10 102:10 150:11
151:1 157:6 159:2
161:10 168:12

gross 88:19,20 104:23

ground 10:5 153:19

group 34:17,18 60:5
61:17,20

groups 59:20

guess 11:2 15:1 20:2
27:13 30:24 32:17
35:21 39:7,21 40:20
41:25 46:24 54:24 55:8
59:3,16 63:3 73:20 75:6
93:9 99:8 107:3,16
110:21 122:21 129:1
132:2 133:22 134:22
155:22 157:19 166:18
169:5,10,17

guidance 100:8 147:20

guide 55:2

guilty 106:10

guy 34:22,23 129:19

H

half 42:14 117:4,5,8

halfway 111:13

Hall 65:16,23

hand 91:10

handle 13:1 27:12

handles 55:19

handling 60:8

happen 49:7 70:16
124:11 155:20 167:17



happening 69:11
167:16

happy 9:15 179:20

hard 97:10 112:14

Hashemi 8:24

hate 64:12

hauling 136:18

hazard 160:20

hazardous 89:1

hazards 160:22

HAZMAT 33:20

head 18:14,19 38:11
43:19 63:7 70:7 81:23
139:3 180:4,10

heading 139:12

health 94:24 95:21

hear 9:13 54:4

heard 9:20 146:9,12
157:24

heavier 123:24 124:1,3

heavily 49:1 61:15

heck 146:10

held 47:12,13,14
104:10 124:12 154:23

helped 47:13 132:3

hereto 12:18

hesitate 36:17

hey 59:5 100:7 105:17
169:12

high 57:24

highway 55:7 57:8
108:16 110:8,14 111:4
159:5,11

Hilton 180:4,10

hire 126:13 127:4
128:11,19

hired 32:5 127:3 128:15

hiring 128:5

historically 48:20

62:19 67:24 151:17
165:5

history 25:24

hit 34:11

hits 114:14

hold 9:8 11:19 15:22
16:19 17:7 28:11 33:4
39:6 47:10,11 54:22
65:6 72:5 93:8 117:25
155:2,25 164:15 165:11
169:20 173:22

holder 33:23 34:23
96:15 155:8

holders 47:23

holding 92:25 154:13

holds 173:4

home 139:12 140:6,12,
20,21 141:10,16,22,23
142:3,13 143:10,15,18
144:9 145:10,11,13
146:19 148:13 149:7

hone 68:13

honest 12:10 29:7 42:4
54:12 60:14 138:6,19
148:16

honestly 26:22 73:12
82:13 153:1

horse 101:1,18

hour 15:9 168:16

hourly 15:16 138:24

hours 134:25 135:1

house 32:20 33:17
142:9,10 145:17

Howard 8:23

HR 170:20 173:6,11

hundred 56:5

hundreds 28:21 49:21

Hunter 34:5,25

_____

I

ID 6:19

identical 105:21 134:8

identified 107:15
170:25

identifies 19:9

identify 44:2

ignorant 179:21

immediately 36:18
98:4

implement 47:14
72:23 132:3

implementation
63:20,24,25

implementing 169:8

implied 159:15

important 123:1

importantly 163:12

impose 113:8

in-classroom 58:8

in-house 27:15 29:18
122:17

in-state-of-residence
107:21

lna 18:18 26:18 27:5,7,
8,10,13,14 179:11

Inaudible 143:6

incident 130:25

inclination 117:7

include 33:19 90:19
91:24 103:14 150:21

included 21:4 36:13
103:13 122:7

includes 41:14 50:24

including 93:17 94:10
157:10

inclusion 170:14

inclusive 43:20

income 60:19,21,24
179:22

inconsistent 146:6

Incorporated 7:7
60:22

independently 158:24

indications 105:19

individual 100:14

individuals 120:12

industries 51:10,12

industry 31:22 32:4,7
33:8 41:17 48:17,18,21,
24 49:23,24 51:22 52:3,
11,14,18 53:4,8,11,15,
20 55:5,9 56:12 59:18
60:6,17 61:8,14 62:7
67:13 81:6 84:12
108:22 109:6,13,19
111:24 113:18 114:1
115:5,13,15,21,22
116:4,7 117:9,12,16,17
119:3 120:22 126:22
140:17 142:8,24 144:25
146:18 150:17 151:14,
17 155:6 157:9 160:2
161:12 163:9 167:14

industry-wide 140:11

ineptness 100:13

information 46:5 76:6
104:17 121:6 164:11
170:13 171:24 174:16

infractions 122:10

infrequently 59:16,17

inherent 132:9

initial 66:11 128:19

initially 55:23 158:11

insistent 91:2

inspection 123:21
139:19,21 140:10,11,13
142:4 148:19 162:22
163:22

inspections 163:24

instance 24:10 70:11
93:11 98:14 112:13

instances 95:15 166:3

instructions 29:2



intend 131:22

intended 98:12

intent 87:12

interactions 58:23
66:6

interest 71:25

interject 78:4

internal 56:23 147:20

internally 98:23 122:23
169:9

International 139:8
148:15

interpret 130:14

interpretations 84:12
136:10,12

interrupt 10:10

intersection 9:11
119:23,24 160:6

interstate 70:1 75:16
76:12,18 79:8 136:16
157:17

intrastate 48:2 62:8,
14,18,25 63:2,5,11
69:25 71:1,6

introduced 9:3

investment 48:3

invited 59:25

invoice 17:8,9,21,23,24
25:14,15,16,18,20 26:8,
9,11 178:1 179:18

invoices 27:1 179:11

invoicing 18:15

involve 82:13

involved 32:18 34:15
61:21 68:18 69:2,19
70:22 71:4 75:15 79:8
116:2 138:11 144:21
152:15 165:8 166:7
174:8

irrelevant 125:6

irritated 170:22

issuance 44:13

issue 23:18 39:14
59:18 90:24 163:14

issued 24:6,7 25:19
27:1 42:21,22 43:8 67:7
107:8 150:4 168:6

issues 33:15 100:23
151:4 163:13

issuing 24:3

items 131:5

Ivey 37:4


                    J

Jacob 7:4 9:3 127:21

January 156:20

job 59:6 142:12 154:9

job-related 138:9
143:11 144:10,19
147:23 148:7,12 149:6

jobs 143:18

John 33:23 34:23 45:12

Jones 54:2,3,5,6,10,11,
18

Jr 37:5

judge 100:19 130:19

Judy 18:18 24:15,18
25:20 27:4,6,11,14,15

July 15:16,23 16:14,20
21:10 22:19 23:5,16
24:7 28:7

June 16:16

jurisdiction 29:20

jurisdictional 180:7

jury 100:21 145:14
152:19 167:4


                    K

K-E-I-F-E-R 38:11

Keifer 38:9,11

Keifer's 64:4

keys 57:20 118:14,21

kidding 180:6

Kids 57:23

Kimone 101:22 102:11

kind 29:8 36:1 39:10
45:23 52:24 56:3 61:12
64:14 73:13 74:11,15
89:7 90:21 96:9 100:4,9
102:8 104:2 107:1,19
123:7 147:18 150:18
157:3 164:18,20

knew 12:11 57:16
128:25

knowing 18:10 122:9
177:24

knowledge 51:10 53:3
149:25 150:16,24 151:7
162:18 173:1 175:7


                    L

Lane 6:16 7:2 39:1
46:21 74:14

Lane's 25:23

large 117:14,18 120:13
121:13 153:13,15
157:16 167:15

larger 51:20 56:18,21
114:18 116:21 131:18

late 57:6 146:11

law 7:19 119:9 147:14
148:3 150:17 151:5

laws 114:6 121:1
160:24 161:1

lawsuit 9:4

lawyers 59:14,21,23
60:3 66:7

lead 131:6

lead-in 74:14

leading 73:13 129:12

leads 58:25

Leander 34:1

learned 55:3

leaseback 86:2

leased 103:11

leave 100:2

led 172:20

left 100:19 139:11
140:23

lengthy 11:6

lesser 71:5

letter 15:23 16:2,3,14
21:5,10 28:7 29:3,6
36:3,22,23 39:8,10
40:13

letterhead 31:13 46:20
47:3

level 47:21 68:6 71:12
111:16,21 112:22
162:14

levels 126:3

Lew 22:10 23:1 35:2
45:9 150:5 168:6

Lewgrill 22:8

libraries 48:10

license 6:18 88:8
107:17,22 111:15
128:1,2,4 132:9 159:3,8

licensed 125:15 132:7
162:13,19

licenses 61:2 133:21

licensing 114:4 120:25
129:20 132:4,10 151:22

life 38:23

light 83:15 122:12
126:15 130:23,25

lighter 83:19

lightweight 81:10,16,
19 82:2,25 83:24
105:12 132:16 133:4,8
134:15 135:8

Likewise 9:16



limitations 97:20,23

limited 108:16 110:15

limits 180:7

lines 56:22 72:1 150:7
165:16 168:9

link 21:4 164:25

links 164:24

list 36:13 44:8,20 45:5
58:9 106:11

listed 12:17 13:5 55:11
139:19

listen 100:7 105:17
171:2

listing 44:7

literally 58:22 115:20
135:13

litigation 14:11,25
33:7,8 34:15 36:14
44:19 45:4 70:15,21
135:3 172:14

live 19:25 25:25 100:10
127:12 164:11 165:1

lived 22:2 141:2

living 19:19 25:10
108:1

Liz 170:20

local 119:9

location 35:7

lock 141:16 142:10

logistics 135:25

long 14:4,9 22:1,3
64:16 97:4 107:25
156:3

longer 22:21 57:12
91:20 136:20

longest 104:3

looked 25:3 105:3
127:11 141:5 178:9,16

lose 123:2

lost 63:23 134:3

lot 29:24 37:22 38:22
45:3 48:11,25 49:22
63:15 69:11,13 71:22
73:18 130:11

Lou 23:14

Love 57:23

low 122:19

lower 160:8

_____

M

Madam 65:2

made 56:3 120:16
132:19 153:4,8 161:18
162:6 163:7,8

main 55:24

maintained 44:8

majority 30:5 51:7,18
58:4,5 116:12,18
117:15 124:19

make 28:9 33:9,11 40:7
43:18 52:23 73:21 79:9
98:17 116:6 120:15
132:22 152:18 155:22
162:21 173:22 174:15

makes 25:7 125:25
162:7

making 26:20 29:10
70:13,14 106:14 110:20
115:23 157:25

Malone 66:23

man 154:6

management 125:13,
22 126:3 162:4,10,18

management.' 161:13

manager 170:21 173:6

mandated 112:14

Mann 7:25 8:13,15,18,
25 10:19 20:4 23:9 29:4
43:25 46:10 49:19
51:15 52:20 53:6,17
56:15 64:18 65:19 66:7
78:3,14 79:15 82:4
83:1,17 86:21 87:8 93:2

94:1,25 96:23 97:18
99:3 100:1,20 106:2
109:3 110:17 111:7
112:7 114:12 115:7
116:10 118:24 119:5
124:22 125:2 127:8
130:3 131:3 133:10
134:19 136:22 142:15
143:13,20 144:12
145:19 146:2,22 149:19
151:2 154:7 159:21
165:23 169:4 171:22
172:9 174:6,12,21
179:9,14 180:21

manner 134:22

manually 40:3

manuals 99:17

manufacturer's 105:4

marked 11:20 13:25
14:6 37:13 39:3,18
67:15 164:16

marriage 180:2

Mary 8:24

material 17:12 82:13

materials 17:6 42:12,
17 43:9,21,24 44:21
45:5 80:18 89:1 169:22

math 18:19 67:19

matter 33:15 41:18
45:16 47:2 164:3

matters 13:15 14:25
33:5,6,7,8

maximum 132:5,6,11

means 10:25 103:3

meant 168:1

measure 163:10

Measurement 163:3

measurements
167:14

meet 80:4 86:8 90:15
95:12 103:1 121:18
134:15 135:8 158:17
166:7

meetings 59:24

member 62:21

memberships 61:1

men 153:17

mention 89:4 98:7

mentioned 34:2 36:3
60:16 136:13 170:24

mentions 22:8 25:22

merchandise 136:2,19

mess 11:14 45:1

message 25:6

messages 148:21,24

met 35:18,20 126:15
127:5

metric 122:1 123:1
163:9

metrics 121:23

Michael 7:4

Michigan 33:24 34:23

middle 36:11 64:13

mile 138:21,22

miles 156:16,21 163:17

Milk 57:23

million 156:21 163:17

million-plus 156:19

mind 21:18 98:4

minds 155:13

mine 34:1 99:23

minimum 15:10,15
113:8 167:19

Minneapolis 21:14,18,
21,22

minute 11:16,19 14:1
15:22 17:8 20:18,19
27:22 28:8 39:6 65:7
81:15 85:21 89:24
104:6 117:21,25 139:14
155:25 162:25 165:11
169:20 173:22



minutes 40:1 64:19
138:5 171:8

missed 107:22

missing 34:8,9

Missouri 33:23 34:23

mistaken 80:17

misunderstanding
90:23 109:15

misunderstood 73:1

mixed 130:5

mixture 33:14 49:3
123:24

model 37:11,20

mom 146:15

monies 154:2

month 17:24,25 26:16,
21,25

monthly 26:14

morning 10:17 172:17,
18,19

motor 30:11 34:21
41:17 48:19 49:21
50:13,14,22 51:11,13
54:25 57:2,8,12 61:10
62:11 63:15 67:12,14
69:3,13,22,24 70:3,5,
13,19,20,23 71:9 74:8,
21,23 75:12,18,19
76:10 79:10,13,21,23
80:15,20,25 81:2,11,17,
20 82:2,25 83:11,13,16,
25 84:1,15 86:6,10,19
88:11 90:13 91:1,5,6,
13,17,22 92:1,14 93:12,
15 94:11 95:18 96:2
97:7,24 99:1,6 102:4,17
103:11 105:12,14,15
108:15,16,17 109:18
110:8,14,15 111:4
112:5 113:5,9 114:3
120:24 121:13,18 124:9
127:19 128:2 129:23
130:21 131:9 132:24
133:3,5,8,23 134:16,18
135:9,20 136:2,7,14,21
137:4,14 145:7,23

146:1,4 150:8,9,25
151:7 155:2 157:13,25
158:15 162:5 165:9
168:9,10,11 169:9
172:24 175:4,18 176:6

motorist 160:4

mouth 58:23 59:12

move 28:11,12 59:6
74:16

moved 130:10

movement 70:4

moving 39:24 90:23
91:9

multiples 30:25

MVR 128:5 129:2


N

named 37:7

names 33:1 38:19 45:3

nature 56:11 137:21,23
144:23

necessarily 44:19 45:4
46:15 91:16 94:2 98:16
120:12

needed 11:3 23:7
37:16 128:25

new-hire 130:14

Nicholas 74:20 126:14
127:25 138:8 144:18
147:22

night 19:23 107:24
140:7,13 141:17 142:13
145:10 146:20 147:2
148:13 163:2

Ninety-three 173:23
174:25

non-cdl 71:6 92:25
93:9 123:13,14,18,23,
25 124:1,3,5,17 125:23
164:9

non-commercial
150:8

non-dot 50:17

non-dot-regulated
49:3

non-regulated 50:25

noncommercial 52:22
113:5,9 114:3 120:24
125:14 126:17 159:16
161:8 168:10

normal 94:13 117:17

notable 95:15 100:4

notch 71:13

note 25:6,16

notes 166:12 173:23

notice 7:8 12:2 13:22
36:2 38:17 122:18
164:22

noticed 107:13

number 7:7 10:1 11:15,
16 17:4 25:17 26:11
29:17 32:17 35:3,8
40:15 48:3 55:10 61:14
67:16 73:4,5,15 74:1,2,
4,12,18 75:21 78:24
79:22 85:1 104:2,22
105:7,9 106:17,23,24
108:14 113:23 114:1
117:6 122:13 123:17
126:9,13 131:13,17
137:6 138:2,3,8 144:18
149:24 150:3,4 156:19
163:10 168:4 178:2

numbers 39:24,25
123:20

numeric 122:13

numerous 10:2


O

obey 114:5 119:9,17
121:1 163:13

obeying 122:11

object 23:9 29:4 43:25
46:10 49:19 51:15
52:20 53:17 56:15
65:19 79:15 82:4 83:1,

17 86:21 87:8 93:2 94:1
96:23 97:18 99:3 100:1,
20 106:2 109:3 110:17
111:7 112:7 114:12
115:7 116:10 118:24
119:5 124:22 127:8
130:3 131:3 133:10
134:19 136:22 142:15
143:13 145:19 146:22
149:19 151:2 154:7
159:21 165:23 171:22
174:6

objection 125:2

objections 8:8

obligation 93:8 119:8
141:25 158:6 160:10

obligations 70:5 161:7

observation 70:13
74:5 107:6 137:8 155:5,
8,9,14 160:2 175:13,16

occasionally 59:16

occur 144:14

occurred 31:22 35:22
67:6

occurs 69:6

odd 167:11

odometer 140:7
141:24

off-the-video 104:10

offenses 165:17

offer 32:2 49:23 98:17
175:11

offered 23:25 98:5 99:6
109:7

offering 46:6 106:5
118:25

offers 32:6

office 8:23,24 14:19
16:6 18:18 20:14,15,16,
21 26:18 27:2 30:11,15,
17 44:7 57:8 66:10

officer 45:24 107:14

officially 137:11 158:9



offload 136:1

Ohio 107:16

older 38:23 57:16

on-the-job 58:7

onboard 77:1

One-seventeen 174:2

ongoing 16:6

open 11:2

operate 52:8 84:13
93:9 103:10 108:15
110:7,13,22 111:4
127:3 129:21 132:7
151:23 152:2 153:21
159:8,13

operated 92:7 105:20
159:11

operates 121:14

operating 96:15
110:23 114:6 121:1
124:13 125:18 127:1
130:8 165:20

operation 86:1 94:23
95:20 126:14 160:14
163:17 165:18

operational 121:23

operations 63:2 81:9
114:3 120:23 124:18
133:25 137:21 167:11
173:9 176:6,7

operator 126:24

opine 100:23 157:8

opining 107:11 146:7

opinion 23:8,12,25
40:16 41:11,14,18 43:4
46:15 50:20 52:23 70:3
72:16 73:23 74:5,8 75:3
79:1,4 94:6 99:8 103:23
104:2,3,16 105:9,18,20,
24 106:6,9 110:19
111:1 119:1,24 120:22
126:21 129:25 132:1
147:25 157:7 160:15
162:2 168:5,14 169:12
172:2

opinions 9:7 22:25
23:17 24:4,6,11 35:8
36:17 42:18 43:5 45:20,
21,25 46:6 55:4 71:17,
18,19 72:2,6,14,18,23
73:6 74:2 85:11 98:17
106:16,22 108:13
113:22 126:8 129:7
131:12 132:21 135:18
138:3 149:24 150:12,14
166:14 169:1,2 172:3
174:4,9,23

opportunity 179:3

opposed 69:25 149:9

opposing 17:5

options 32:3,7

Orange 21:16,17

order 28:18 58:5 80:9

organization 158:23

orientation 110:4
125:16

original 66:9

OSHA 30:6 33:12,15,16
34:4 56:10 58:25 145:1,
3,5

outlandish 157:7

outline 35:25

outlined 72:24 86:7
90:14 95:13 102:25
158:16 172:3

outpaces 122:20

outperformed 122:25

outperforms 125:8

outrageous 157:12
158:19

outsourcing 32:3,7

over-the-road 120:8

overwhelming 51:7

Owen 24:15,18

owned 31:20 88:13
89:12 90:19 98:2
103:11

owners 120:11

P

p.m. 12:19 101:11,15
156:10,14 177:9,13

package 39:13 40:22
55:11

pages 14:4,9 17:2
40:20 42:14 66:19
73:19 103:24 159:1
168:5 169:24 173:17,21
175:2 178:7,9,23

paid 138:20,22 152:12,
14,17

Pam 66:10

pandemic 7:12

panel 59:18

pans 68:14

Paper 139:8 148:15

paragraph 12:15 24:3
36:11 41:10 73:13 86:4
102:16,24 113:3 127:24

paragraphs 125:11

paralegal 179:15

parameters 74:15

pardon 31:9

parents 139:10

park 140:21 141:9,10
142:9

Parris 33:24

part 45:6 59:17 70:21
75:13 79:9 81:8 84:14
109:19 110:4 111:18
131:25 138:25 140:9
161:22 162:6,12 165:22
167:23

participate 125:17

parties 8:17 165:8

parts 162:10

pass 179:5

passenger 63:18

133:24 134:1

passenger-
transporting 49:13

passengers 76:11

past 29:17

pause 118:1

PDFT 22:8

people 27:2 30:1,3
33:18,19 34:13,18 48:4
59:5 62:13 69:12 72:21
91:17 96:17 100:5
102:1,2,6,7,8 116:12
133:21 139:1 153:20
155:1,5,6 158:2,4,5,6,
23 166:20 169:6,13
173:12 175:17

people's 169:12

percent 60:24 67:24
70:17 100:8 123:21
124:4,5,7,15 129:13
164:8,9

percentage 60:19,20
116:25

perfect 96:13

perfectly 12:10 29:7
42:3 60:14 78:2 138:6,
19 148:16 159:25

perform 142:13
143:11,18 144:10
166:24

performance 121:21
122:13 125:5 138:24
163:19 165:6

performed 163:24
164:5

performing 134:25
138:9 144:19 147:23
148:19

period 31:25 57:7

permission 141:11
145:9

permit 6:21

permitted 7:17



permitting 42:2

person 113:8

personal 70:17 84:11
136:9 137:22 144:23,24
147:18 150:22 155:14
157:15

perspective 121:22
127:11 158:11 163:15
167:23

perspectives 52:25

Peter 8:21 146:10

photograph 118:18

physically 35:7 180:9

physicals 56:8

Pickens 34:1

picture 118:11,13

piling 148:23

pistol 6:21

placarding 89:1

place 9:9 15:6 64:6
101:3 108:2 113:7
136:1 139:13

places 139:19

plaintiff 7:3 12:19
59:22 60:1,11 67:9,12,
21,24 68:8,11

plaintiff's 11:15 13:25
22:10 27:23 59:21
164:16

Plaintiffs 37:5

plan 156:3

Plant 148:15

plastered 118:14

platform 49:5

pleading 39:4,17

plenty 37:20 117:13
137:22 169:3

point 22:4,16 35:17
36:8 58:19 60:23 63:8
84:20 113:23 116:6
126:1,9 144:14 145:6

150:23 154:15 156:3
157:17 158:25 159:6,9
164:12 166:13 169:17
171:6 176:19

points 133:12

policies 42:7 85:1,2,5,6
93:5 98:8 99:14,25
100:14 112:19 113:7,14
116:6,14 175:10

policy 85:12,17,19,21,
22,24 86:8 87:12 89:20
90:2,6,15 92:9 93:22
98:8,12,13,16,24 99:17
100:18 103:1,10 110:9,
10 111:10 112:10
130:22 140:22 158:13,
17

pop 165:10

portion 64:24 69:15
101:13 104:11 156:12
162:7 177:11

portions 96:6 97:7
133:3 136:4 171:19

position 53:14 61:23
100:12 119:15 120:17
127:13 131:7 137:11
151:6,12 173:3 175:5

possess 159:7

possession 19:17

post 118:22

potential 133:13
158:21

potentially 42:1 59:2
126:5 166:1

pounds 63:14 88:21
91:19 105:4

practice 24:20 59:8
142:23

practices 30:8 157:10
161:12

pre-suit 68:9

predating 128:5

predecessor 55:7

predominantly 123:16

prefer 41:6

prep 107:24

preparation 82:7
107:2

prepared 27:1

prepares 43:21

preparing 19:24 26:23

present 8:17 60:5
112:15

presentation 59:19
60:5

presented 71:20 85:2
109:23 135:11

presenting 60:13

presents 160:11

President 46:22

president/owner
55:14

presupposing 135:5

pretrial 8:11

pretty 17:3 22:3 27:12
43:20 50:16 61:15
66:11 68:1,5 82:15 90:7
138:24 153:23 160:4
161:2,5,18 175:3

prevalent 114:24
115:4,18 116:21

prevent 167:16

previous 38:4 65:8
66:14 87:25 95:23
98:10

previously 108:25
109:23 115:9 134:21
162:8

primarily 31:21 51:23
52:8 60:1,3,7 62:3

primary 137:7 152:21
157:18

print 10:23 11:8

prior 125:18

private 32:4 86:18

privilege 129:20

problem 80:11 149:10

problems 11:5

procedural 150:10
168:12

Procedure 7:18 12:16

procedures 56:23 86:7
90:14 102:25 158:16

process 107:24 110:4

produce 12:17

produced 14:19 15:1
26:4 36:14 65:11 67:16

product 27:13

professional 86:1
151:21 152:5,11,22,23
153:12 154:12,14,16,
21,25 155:7

proficiency 100:9

program 47:14

programs 56:7

prohibit 94:21 95:19

prohibited 98:1

prohibits 96:19

promoting 85:25

pronounced 27:9

proper 85:25 114:4
120:24 132:10

properly 125:15

Properties 47:5 48:2

property 76:11,15,24
77:3,15,19 84:8,19
129:16 144:2

propose 8:7

propriety 98:23

protocol 90:22 97:5
158:7

protocols 56:23 96:24

provide 25:11 28:17
29:25 114:21 171:20
179:3



provided 12:25 13:6,9
14:5 18:2 20:13,14
32:16 36:24 41:16,19
47:21 58:7,11 72:20
85:4 163:1 171:12
172:15 173:17 175:22
177:16 178:6,13

providing 58:12 113:6

provisions 88:24

prudence 137:20

Public 74:22 80:13,20
82:20 132:23 134:17

publicly 76:6

pull 38:1 40:5 85:19
119:13

pulled 38:25 121:6,8
156:1

pur 27:21

purpose 16:3 150:21,
22

purposes 7:15,17
16:25 47:9 148:17

pursuant 7:8,11 12:15
40:23

put 8:16 17:11 49:12
82:12 89:19 104:22
107:5

Q

qualified 125:16 153:9

quality 100:13

question 8:9 9:15,19,
20 33:9 40:6 47:18,25
50:7 64:13 65:2 72:9,11
75:16 76:19 78:18,19
87:9,21 92:11 95:6
100:6,18 102:14,20
103:6,9 112:16 115:10
119:16 120:17 127:12
128:8 129:22 130:17
131:4 135:10 141:6
170:7 175:6,12

questioning 46:12

questions 9:6,14,22

24:14 41:3 71:21 85:5
102:15 130:6,12 168:19
174:14 180:1,22

quick 162:23 163:21
164:10

quiet 10:11

R

raises 71:13

ran 45:22 46:9

range 104:24 105:3
124:6 128:12 156:20

rate 14:11 15:5,16

rates 15:4

rating 88:19,20 104:24

Ray 170:17

Raymond 178:7

read 7:21,23,24 8:1,5
9:25 12:7 22:14 23:15
41:13 45:9,12,17 65:3
74:17 77:6,9,11,24
85:6,8,12,16 86:4 88:4
90:5,8,9,10 92:21 93:24
98:9 101:22 103:20,22
109:24 117:22 118:2
129:14 139:8,24 140:2
175:24 176:16 178:22

reading 23:1 29:6
66:21 75:1 78:24 95:1
110:2 140:8 141:24
148:24 149:1

ready 26:17

real 48:3 162:23

reason 57:17 63:24
64:3 77:22 83:10
103:19 113:1 115:8
122:7 129:12 135:12
140:16 144:8 146:23

reasonable 113:7,14,
17 114:4 120:25 126:15
127:6 137:24 155:13
157:7

reasons 100:22 158:9

recall 38:10 59:19
66:13,18 110:2 118:16
128:17 129:17 141:8,15
175:1,21 176:8,21

recalled 98:5

receipt 22:13

receive 10:15,21 21:2

received 16:9,21,23
23:3,21,23 24:5 58:13
171:5,17 178:25

recently 23:2 28:2
130:12

recite 57:24 81:22

recognition 23:20
47:1,9 107:19

recognize 14:3 19:6
37:15 59:25 60:2 66:3
106:3 172:13

recognized 37:19
48:16 108:8 157:8

recognizing 59:1

recollection 35:22
36:25 44:12 141:13

reconstruction
160:23

reconstructionists
46:3

record 6:25 8:16 65:3
127:20,23 128:3 140:7,
14 169:21 179:5

recreational 139:10

red 118:12

redefine 130:16

reference 17:12 43:14,
18,23 61:19 75:12
82:12 98:18 104:20
106:14 132:19,22
133:13 161:18 162:6,21
163:7 170:5

referenced 21:1 25:1
58:3 82:6 118:8 164:19

references 26:10
95:11 161:10,21

referencing 19:8 21:9
103:18 118:12

referred 139:20

referring 21:6 25:15

refined 134:22

refinement 109:7

reflects 43:5

regard 26:23 51:11
176:22

regional 170:18

regular 94:13

regularly 51:3

regulate 62:12,14
63:11,13,17 70:25
82:16 97:8

regulated 49:1 50:22
51:1,5,13 83:20 114:23,
25 122:2

regulation 30:12 91:3
95:10,24 96:8,18
137:10 150:17,25

regulations 34:21
50:14,23 51:14 55:1
62:5,9,11,18,25 74:21,
23 75:13 79:10,13,24
80:5,21 81:2 84:1 86:6,
9,11,20 90:13,16,25
92:1,14 93:16 95:18
96:3,6 97:8,11,25 99:2
102:4,18 103:2,4,5,7
108:18 112:5 124:10
129:23 130:2,21 131:20
132:25 133:4 134:18
135:21 136:3,8,15,21
137:4,14,15 155:3
157:13 158:1,15,18
162:5

regulators 61:16 74:9

regulatory 32:2 71:11
74:6 91:23 95:7,14
111:24 112:3 113:18
115:17 150:10 151:7,13
158:11 159:14 168:12

related 29:9 70:1 79:18
114:2 120:23



relates 62:5 121:24 129:7 161:13

relating 94:23 95:20

relatives 180:2,10,11

relevance 46:6

relevant 46:15 74:10 85:10 98:3 116:1 121:20 135:17 148:6 173:5

relied 43:23 61:15

relieved 137:12

relocate 48:5

rely 97:11

remainder 66:20 73:8, 11 87:1 123:23

remaining 143:11

remarkably 70:23

remember 29:5 35:14, 20 36:23 38:6,18 64:3 118:7,11,17 139:2 155:17 165:24 176:2,4

remotely 7:11

render 22:24,25 23:7, 17

rented 103:11

rephrase 9:15

report 9:7 18:2 23:19, 25 24:8,9 26:3 28:16,24 29:2,8,18 31:12 37:7, 12,17 38:2 39:1,13,15, 16 40:12,15,22 42:21, 22 43:1,5,8 44:14,16 45:7,10,12,18 46:1 65:12 66:21 71:16,23 72:4,7,10,24 73:3,4,8, 11 74:13 80:16 82:9 84:25 98:7 102:10 103:24 104:14 106:4,12 107:5,8,12,14 108:11 120:21 122:6 126:11 129:8 130:25 131:1,14 139:19,21 141:24 150:4,11 155:24 157:4, 6 159:2 161:10,19 162:7 165:16 168:6,13,

20,25 169:24 170:14, 16,23 171:1,4,13 172:4 174:23 179:20

reported 140:18

reporter 9:24 22:11 65:2

reports 23:22 28:20 29:17 37:21 43:1 44:11 72:21 140:10,11

represent 9:3 14:4 18:21

representation 20:1 117:16

representative 167:8, 12

represented 31:5 50:20 72:3 132:11

request 8:1 175:23

requested 65:4 171:24

require 112:24 124:12 151:22 153:11 154:22 158:5 159:13,20 164:5

required 28:18 108:15 110:7 112:12 115:16 123:25 124:8 130:7 141:9 142:1 152:2 154:18 155:1 159:7,15

requirement 96:18 108:22 113:8 151:23

requirements 29:12, 16 94:23 95:20 111:17, 22,23 112:22 113:4 152:2 161:22

requires 29:20 89:1

requiring 94:22 95:19 111:9,15 163:25 165:18

requisite 53:3

reserve 41:17

reserved 8:5,10

reside 180:3

residence 138:11 144:21

respective 11:8

respond 120:17 175:7

responded 83:4

response 9:21,24 38:5 57:15 78:21 95:23 109:22 134:21 158:12 171:3,7 175:12,22

responses 169:15 171:2 176:17

responsibilities 27:15 173:11

responsibility 31:3 141:16 152:21

responsible 137:9 173:13

responsiveness 8:9

restate 9:14

restricted 155:1

result 163:16

results 74:4

resume 46:17

resumed 64:25 101:14 104:12 156:13 177:12

retained 15:7 34:19 59:8 65:16,17 66:4 68:16 121:9

retainer 14:24 16:15

retaining 130:2,23

retentions 32:19

return 10:13

review 16:7 17:4 23:7 36:16,19,24 41:15 45:5, 6 84:24 85:4 150:17

reviewed 23:6 37:13 42:13,18 43:10,24 44:5, 10,21 80:18,19 82:10 84:25 118:10 169:23 170:10

revisions 169:11

Rick 33:24 34:5,25

ridiculous 115:19

ridiculously 122:19

Rincon-stillwell 9:12

rings 44:18 85:18

risks 56:1

road 9:11,12 78:10 84:8 135:22,25 149:20 160:25

Robinson 45:22 46:9 74:7,20 77:16 78:10 89:8 92:8 93:8,17 105:22,25 111:14 112:23 117:22 124:16 126:14 127:2,3,17,25 128:6,9 129:3,14 130:2, 23 134:14 138:8 140:6 141:2,20 142:12,25 143:7 144:18 147:23 148:7 150:6 151:20 157:14 159:6,12 161:11 167:6 168:8

Robinson's 77:6 105:1 118:2,15 128:4 139:15, 17,24 176:11

Robinson.' 157:11

roles 173:15

roll 56:3 121:24

room 8:20

Roughly 156:24

RSB 7:8

Ruden 8:21 11:13

rule 25:23 26:3 40:24 74:13 82:3 91:11 93:12 98:14 131:9 136:10 171:1 174:23

rulebook 80:14,20 82:10,20 132:24 134:17

rules 7:18 10:6 12:16 63:8,16,21 69:22,24 70:21 71:7 74:8 76:8 80:24 81:15 87:4 97:14 98:19 105:15 121:16 123:9 126:23 130:19 132:2,4 133:18,23 134:10 135:9 145:7 169:9 172:25 175:4,18

run 31:20 119:3



running 122:10 129:2

_____

S

safe 85:25 95:20 122:9
159:4,10 161:12 163:11

safer 166:24

safety 30:12 31:19
32:21 34:21 46:20
50:14,23 51:14 55:1,14,
24 57:3,13 61:3,6,10
62:11 68:6 74:21,23
75:13 79:13,24 80:13,
20,21 82:20 84:1 85:16
86:6,11,19 90:13 91:5
92:14 93:16 94:23,24
95:18,21 96:3 97:8,25
99:2 102:4,18 108:18
112:5 118:14,21 124:10
125:13,22 126:3 129:23
130:21 132:23,25
133:3,23 134:17,18
135:20 136:2,7,14,21
137:4,15 150:25 155:3
157:13,25 158:15
159:5,11 162:5 163:3
169:9

salaried 138:20,23

sale 77:17 84:20

sales 152:25 154:10

salesman 152:10
153:16,24 154:6

salesmen 153:21

salesperson 155:19

sandwich 136:6,20
137:17

satisfactory 142:5

Savannah 180:3

scale 120:14

scenario 76:25 154:3

scenarios 67:15
153:25

schedule 12:18,24
13:5 14:11 15:5 17:1

scheduling 28:17

Schneider 122:24

Schneider's 124:20

Science 54:19

scope 126:25 127:22
147:4,6,7,8,15 148:1

score 122:9,19 167:22

Scot 6:16

Scott 34:7

screen 55:12 149:2

scroll 164:23

scroll-down 88:23

scrolled 108:8

search 163:21

secondary 152:20

section 75:11 87:24
88:4 94:16,17,19 105:8

secure 21:2

seek 65:18

sees 59:4

sell 77:20 152:14,17

selling 78:12

send 22:13 26:15
179:18

sends 179:14

sense 25:7 56:3

sentence 125:12

separate 21:3 33:8

separately 96:19
131:15 147:13

separation 129:12

September 12:6,7 18:1
26:15

Septon 172:12

series 20:12

serve 30:7

service 51:6 55:22
77:18 152:14,17

serviced 56:1

services 7:6 31:19
32:21 46:20 47:8 55:15,
18,25 56:5

set 30:9 99:7 103:23
126:8

sets 61:9 74:15

share 11:1,4 20:5 27:17

shared 25:8

sharing 11:12 12:20

sheet 177:20

Shelton 33:20

shirt 144:5

short 64:22 101:11
156:10 177:3,9

shortly 17:3

show 6:25 10:14 11:11
13:15,19,24 18:16 19:3
39:23,25 94:25 117:20
123:22 162:23

showing 11:14 89:21
162:25

shown 132:18 166:22

shows 19:12 163:23

side 32:20 33:17 39:12
59:8 143:25 167:24

sign 7:21,23,24 8:1,5
40:14,23 45:22 46:9
106:1 120:7 122:12
160:11,18

signature 40:19

signed 40:11 171:14

signs 119:4 121:24

similar 86:15 97:13,15
100:6 114:22 115:2
125:14,22 145:1 153:14
169:8

simply 28:14 178:3

simultaneously 35:13

single 6:17 44:8 167:11

sir 6:14,23 8:3 10:9,14
11:10,16,18 12:9 13:8,
13,24 14:7,10,14,20

15:2,12,20,22 16:13
17:16 20:17 21:12
22:17 23:12 24:12 26:5
27:20 28:2 32:11 35:3
36:25 38:15 39:2,20
40:22 41:1,22 42:16
43:16 45:11,19 47:11
54:1,4,8,23 55:16 60:25
61:5 62:23 65:10 75:9,
24 76:20 78:17 80:2,7,
10,15 81:15 83:3,9,21
84:22 85:18 87:22 90:2
92:23 94:18 101:23
102:13 104:4,6 111:10
113:2,23 116:3 117:10,
22,24,25 123:5 131:15,
24 132:22 133:1 138:7,
14 140:1 141:14 143:9
144:15 146:11,13
148:21 149:3 150:2,12
151:25 155:23,25
156:16,23 163:4 164:13
166:10 167:2 169:21
170:9,22 171:9,11
172:14 174:1 176:13
178:11,20 179:6

sit 81:25

situation 70:9 121:12

situations 86:24 95:9
137:20,22 167:19

size 71:3 79:7 132:5
157:16 164:22 166:23

sizes 81:8

skill 30:9

skipped 166:18

slow 14:17

slower 40:1

small 134:1

smaller 51:19 56:18
69:23 98:19 115:1
123:15 131:18

Smith 48:7,9,12,14
49:10,18 50:4,11 51:11
52:2,10,18 53:4 57:11,
19,20 108:20 109:1,12
110:1 111:5 112:24
114:10,20 116:18 117:1
119:12,16,21 120:2,10



153:9 159:20 162:11,16
176:15

SMS  121:7 162:21
163:3,22 164:8 165:2
166:25

Sofianos  37:7

solely  55:19

solidify  36:16

solo  59:19

solve  169:15,18

sophisticated  117:18
153:13,15

sore  107:18

sort  37:11 67:25 105:13
122:11 164:10 165:4

sorts  61:20

sound  45:2,3 67:22

sounds  11:10 89:11
156:23 179:10

source  59:1 163:23

sources  58:11

South  180:5,11

Southern  28:23

space  119:21 161:13
162:4,10,18

speak  43:19 49:25
59:13,17 87:11 92:20
93:19 98:22 112:10
151:12 156:25 163:15
170:5 173:1

speaking  32:2 75:22
83:21 95:11,24 98:11
100:12 120:1 145:24
161:1

speaks  126:11 131:14

special  57:2

specific  29:9 63:3
82:11 108:14 110:7,13
111:5,23 112:2 117:6
137:19 147:20 153:4
160:22 170:5 171:24

specifically  13:12

17:21 28:5 43:11,13,18
47:24 75:22 78:6 89:4
95:10 96:7,19 98:22
108:3 117:3 153:1
173:10 176:8

specifics  92:20 162:14

speed  11:12 13:17
121:25 161:5

speeding  122:10
128:18,21 130:24
163:13 180:17

spelled  6:17

spend  71:22 168:16

spent  37:18 138:10
144:20

Spiva  8:23

split  70:23

spoken  59:20 176:25

spreadsheet  18:14
24:22,24 25:23 177:20

Sprinter  89:5

spun  31:23

staff  13:2 17:11 19:1
20:2,7 39:14 43:20

stage  123:19

Stalvey  37:4,5

stand  113:12

standalone  56:4

standard  14:13 29:19
49:4 52:11,14,19 53:5,
9,16,20 56:12,20 99:8
108:23 109:1,13 111:24
112:19 113:4 114:2,15
115:6,14,15,22 116:4,7,
9,23 119:3 120:22
125:4,25 126:16 127:6
137:25 159:14 160:3
161:25 166:3 167:18

standard-type  115:21

standards  61:9 84:6
93:1 95:12,13 113:18,
19 115:2 122:22 131:21
144:25 145:5 146:4,7,
17 147:11,12 150:17

151:14 157:9 158:23
159:3 160:12 161:12

stands  109:23 139:21

start  11:14 73:25 74:16

starting  125:12 150:23

state  6:14 47:14 61:11
70:25 71:12 81:13
107:20 109:5 123:9
132:3,15 147:15

state's  134:10

state-based  62:7

stated  80:17

statement  89:20
102:21 113:12 120:16
161:17

states  63:7,16 82:14
154:22

steering  57:24

Steve  33:13 34:24,25

Stewart  155:18

Stewart's  45:17

stick  107:17

stipulation  105:5

stones  99:1

stop  27:17 45:22 46:9,
13 106:1 119:3 120:7
121:24 137:5 145:18
160:10,18

stopped  63:24

stopping  106:1 120:7
160:18 161:4

stops  136:6,19 137:16

storage  48:5

straight  148:5

strategy  159:4

Stratton  34:7

street  119:14

stringent  94:22 95:19

stronger  79:17

stuck  107:23

stuff  48:5 78:13 154:2
163:14

subchapter  76:8 94:20
96:10

subject  33:15 45:16
62:4 70:3,20 74:10,20
79:9,12,23 80:1 83:25
96:17 111:16 116:24
121:20 123:8 126:5
136:20 139:12 148:6
152:7 159:12 167:25

subjectivity  49:6
153:22

Subpart  111:18

subsequent  22:16
128:19

Subway  136:7

suffice  6:22

sufficient  168:21

sugar  156:6

suggest  119:17 147:10
157:12

suggested  57:17
122:21

suggesting  116:11
161:23

suggests  167:5

suitable  37:17 125:6

suits  69:15

summarize  166:19

sun  156:24 167:7

supervisor  141:12

supervisors  176:12

supplement  38:4

support  14:12 23:24

supposed  115:23

surface  107:2

surprise  49:15 57:14
129:18 138:23



swap 11:2

sworn 36:14

symbol 47:3

system 13:17 48:7,9,
12,14 49:10,18 50:4,12
51:11 52:2,11,18 53:4
57:11,20,21 108:20
109:1,12 111:6 112:25
114:10,20 116:19 117:1
119:13,17,21 120:2,10
121:7 123:22 153:9
159:20 162:11,16 163:3
176:15

System's 110:1

―――――――

T

T-I-D-A 60:16

table 68:11

takes 38:18 165:2

talk 10:6 31:18 53:25
76:22 84:23 106:21
108:13 163:5 166:16

talked 102:9 158:13
166:17 168:23,24 171:5

talking 30:22 32:13
36:3 71:23,24 78:4,8
90:24 91:10 94:15
103:17 107:4 124:25
146:3 162:3,4 168:17
172:6,8

task 131:19

taught 120:12

taxi 154:21

taxicab 49:9

taxicabs 49:12

TCE 25:14

teach 47:17,20 115:1
118:21 120:2

team 42:5

technical 151:6

technically 18:6 30:18
57:5,6 70:12 71:9 82:6
87:3 129:20 148:20

154:3 175:19

TECHNICIAN 101:7
104:7 177:5

technology 48:21

telling 177:24

tells 93:21

ten 30:1,3 62:16 64:19
67:24 68:10 101:22
155:24 157:3 161:9
165:5

ten-minute 64:8

tend 17:24 30:15 58:10
63:6 68:8 71:4

Tennessee 33:22 34:3,
9,24 38:7

term 53:8 59:17 99:4
108:23 121:15 147:13
148:2

terminology 42:4
91:21 92:10 147:19
154:19

terms 146:13

test 96:17,20 97:3
158:7 162:13

tested 56:14

testified 35:12 67:1,8,
11,21 69:2 101:25
109:10,11,14 114:16
142:25 143:4,17 145:17
149:13,17 174:21
175:25 176:5

testifies 165:16

testify 69:18,20

testifying 102:3

testimony 22:24 25:24
29:25 32:16 34:19
36:15 40:18 41:19 46:1
65:9,14 66:23 67:23
68:15 80:23 98:10
103:16,18 106:4 110:10
116:22 128:24 130:10
141:8 142:20,22 145:2
150:5,11 168:7,13
169:3 175:22 176:21
178:9

testing 47:8 55:17,20
56:7 58:24 96:14

Texas 33:21 69:10,14,
16 70:25 71:14

thing 27:11 44:8 90:8
107:1,13 115:18 139:1
166:21

things 23:23 31:23
38:22 42:11 43:13,15
52:24 61:14 62:6 63:5
70:16 71:13,24 81:12
86:15 94:7,8 106:6
130:9 151:9 166:18,19
168:19 170:4 172:1
179:22

thinks 118:20 161:24

thought 109:5 133:19
138:5 155:18 175:17

thoughts 46:4 72:1
92:3

thousands 49:21

Thrasher 170:20
173:3,4,8,25 174:2
175:14,15,24,25 176:4
178:23

Thrasher's 170:25
173:16 178:20

three-page 14:18

three-year 128:14

threshold 153:22

throwing 98:25 170:21
171:3 179:6,7

thumb 107:18

ticket 105:9

tickets 130:24

TIDA 60:6,16

time 10:22 13:6 15:3,4,
6,8,11 16:20 17:22
18:7,11 19:23 20:1
22:3,4 23:12,20 26:20
37:18 38:18 49:8 54:13
55:9 57:7 60:23 64:9
71:22 73:21 78:6 84:18
90:8 94:10 97:10
105:16 107:18,23

112:14 127:22 131:13
134:24 135:6 137:9
138:10 139:4,12 141:19
142:24 144:14,20
145:6,16 169:17 170:6,
12 171:4,7 178:13,15,
18 180:23

times 28:19 35:3 58:23
59:6 67:3 69:4 70:10
74:10 79:22 84:10,13,
15 121:20 134:23
135:16 148:6 149:6
173:5

tired 157:2,3

today 6:20 7:10 8:22
10:7 11:21 12:12 13:7,
13 17:10 18:24 19:24
20:6 26:23 30:2 31:2,3,
4,6 55:4 58:16 81:25
82:7 106:25 107:2
109:23 166:16 168:23,
24 176:25 178:13
180:23

today's 12:4 17:12
19:2

told 26:13 38:5 178:11

tool 114:24 163:23

top 14:10 18:13 19:11
28:10 37:4 38:10 41:2
43:19 46:19 63:6 70:7
81:23 82:18 88:4 89:17
90:5 104:3,18 121:4
139:2 158:22 164:23,25

topic 119:25 162:2

total 17:14 131:6
162:18 167:23

totally 64:1 91:9 93:3
107:22 135:10 155:17

touched 168:2

town 141:4

track 38:22 123:2

tractor 136:18

tractor-trailer 68:19,
21 69:3,19 84:7 116:2,8
127:4,5,7 130:8 135:21,
24 136:17 137:16



tractor-trailers 71:2
76:2,4 115:23 116:5
123:11 137:5

trade 61:17,20

traffic 105:8 119:18
122:11 128:6,8 160:24
161:1 163:13

trailer 84:8 136:18,19

train 114:10

trainer 48:7,8,9,13
176:15

training 47:22 48:10,16
49:4 50:2 54:25 55:6,10
58:2,6,7,8,11,12 108:14
110:7,13 111:5,17,22
112:3,22 113:4,6
114:22,24 125:18
151:23 152:2,24 153:5,
8 159:13,20 162:16

transcript 8:6 22:10

transport 76:11,15,23
77:2

transportation 31:1,5,
8,15,19 32:13,21,25
46:20,22 47:6 48:17
55:14,24 58:14 60:22
75:15 80:13,20 82:20
132:10,24 134:17
138:25

transported 77:16

transporters 63:18
134:2

transporting 88:25

transposed 122:5

traveling 120:6

treat 94:4

trending 165:6

trial 8:10 15:9 106:22

trickle 23:23

truck 166:8

trucking 32:4,7 48:1,18
60:6,17 61:2,25 62:3,9,
18,21,25 81:6 117:12,
15 122:14 151:1 157:9

true 9:21 49:1 62:3
94:19 114:9 159:19

trumps 151:1

truth 51:17

TSS 31:2,13,14,17,19
32:1 46:19 47:3,5 48:2
55:17

Tuesday 12:7

turned 64:22 101:10
105:16 156:9 171:13
177:8

type 27:12 70:9 76:25
79:2 119:24,25 122:10
140:18 153:3 161:2

types 30:9 114:13

typical 74:11 138:25

typically 7:25 13:1
26:24 74:14 100:15,23
115:16 165:9

———————

U

U-TURN 116:6

U-TURNS 115:24

Uh-huh 103:2

umbridge 92:6 161:16

uncommon 49:2
114:25

undergo 153:12

underlying 18:20
68:12 119:7 152:6
165:25

understand 9:7,13,17
10:9 16:3 26:12 28:6
48:9 68:25 71:21 72:8,
10,11 79:12 84:6 89:10
105:8 110:20 120:9,10
129:3 137:20 141:1,20
144:1 145:11 155:10
157:18 168:1 169:10,
14,16,19 173:3 176:10,
13,14,18

understanding 13:2,4
15:13 41:16 42:25 43:3
46:7 63:3 81:1,5 84:17,

22 102:6 110:3 126:23
132:2 139:5,6 143:9
166:20 169:6,7 175:8

understands 140:5

understood 9:20
29:11 72:12 142:23
172:25

uniform 144:6 160:3
161:6

uniformly 161:3

unilaterally 53:8 72:2

uniquenesses 63:20

university 54:3,5,6,10,
12

unreasonable 131:19
162:20

unsafe 122:19,25
167:21

unsatisfactory 140:14
142:6

unusual 110:5

update 15:3 26:1

updated 19:20 65:13
179:4,17

updating 19:23

UPS 122:24 153:19,24
154:5,12

upstate 180:11

utilized 49:1 52:2

———————

V

Vaguely 118:19

valid 127:25 128:3,4

van 68:22 76:14 77:15
78:9,25 79:2,3,14 80:24
82:1,24 83:12 84:21
89:7,9 118:15,22 133:7
134:14 135:6,7 143:24
144:2 145:9 146:21
152:8,12,15 166:6

Vaningen 6:16 7:2,20
9:2 38:2 39:1,19 40:14

46:21 74:14 78:19
101:17 104:14 174:14
177:15 180:23,25

vans 89:5 124:15 173:9

varies 156:18

vary 63:7 81:12

varying 81:7

vast 124:19

vehicle 48:4,24 50:10
51:8,11 52:9 53:21
56:14 61:3,6 68:17
69:3,23 70:20 71:4 74:9
75:15 76:17 77:1 79:2,
5,6 80:2,5,25 81:11,17,
20 82:2,25 83:12,13,16
84:5 85:12,22 88:18,19,
20 89:12,20 91:1,6,13,
17,19,22,25 92:7 93:9,
13 94:11 96:16 98:19,
20 103:11 104:21,22,
23,24,25 105:1,12,14
108:15 110:14,23
111:4,15 113:9 114:6
115:1 119:14 121:2,19
123:15 124:13 125:19
126:5,15,17,24 127:20
128:2,20 129:21
131:18,21 132:6,11,20
133:8 134:4,7,16 135:9
137:10,21 139:21
140:10,14,15,21,24
141:10,16 142:4 144:24
150:6,16,19 151:21,24
152:3 157:15,16 159:8,
11,16 160:7,19 161:7,8
162:1,15 168:8 169:13
176:7

vehicles 49:2,4 50:12,
13,17,25 51:5,12,19,24
52:7 62:12,14 63:14
70:11,12 71:1,6 76:5,11
81:7 83:20,25 84:3
86:2,7,12,20 88:3,7,8,
11,14 89:18 90:14,19
92:15 94:6 96:4 98:2
102:19 105:19 108:17
109:19,21 110:8,15
113:5 114:3,22 116:24
120:4,24 121:15,17
123:3,6,7,10,14,16,17,
23,24 124:17,20 132:17



133:5 136:15 150:8,9
153:22 158:16 163:25
164:5 168:10 176:1

vendor  59:4 135:6

vendors  78:11

verbally  9:22

version  19:21 65:11

versions  158:2

versus  7:5 66:23
123:18 177:18

vetting  16:24

video  64:24 101:8,13
104:8,11 156:12 177:6,
11

videocorder  64:21
101:9 156:8 177:7

VIN  104:22

violate  121:25

violated  130:1

violates  119:7 167:17

violation  128:6,18
130:23

violations  61:13
106:11 127:16,18,19,20
128:9,16,21,22

visit  139:9

visited  139:7

voluntarily  96:18

———————

W

wait  28:8

wanted  78:14 141:10
174:15

warehouse  136:1

warehousers  62:6

watch  156:6

ways  59:9 94:3 125:24

wearing  144:5

week  12:4 13:22 19:22

65:13 178:4 179:12

weigh  105:1

weight  83:19 88:19,20,
21 104:23 164:22

wheelhouse  45:15
93:23

whichever  41:6

widely  48:15

widespread  48:20,21

window  128:14

word  58:22 59:12

word-of-mouth  59:11

work  15:2 16:10 18:11,
21 19:9 27:12 30:12,13,
23,24 31:7 32:9 35:10
50:21 68:8 135:2
146:20

worked  27:3 29:7
54:15 57:7 65:23 66:4,
14 141:3 148:20 152:8

working  31:2 58:15

works  110:10

worksheet  19:8

wrapped  138:3

wreck  135:7 145:16
146:14

write  29:18

written  23:25 28:14
31:13 37:20 44:16
100:18

wrong  12:4 83:7
110:13,19 155:22

wrote  99:17

———————

Y

y'all  26:14 29:23 58:20

Y-E-E-N-D  33:13

year  156:16,18

years  31:25 38:20
49:25 50:5 57:16 62:16
69:6 117:9,13 165:5

Yeend  33:13 34:25

yesterday  14:5,6 107:6

yield  105:25

yielding  160:18 161:4

younger  38:20

———————

Z

Zoom  7:11 9:16 73:2

