# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

MICHAEL JACOB CASTLE-FOSTER,   )
                      )
      Plaintiff,         )
                      )
v.                       )        CV419-139
                      )
CINTAS CORPORATION NO. 2, d/b/a  )
Cintas Corporation; CINTAS     )
CORPOARTE SERVICES, INC.,     )
                      )
      Defendants.      )

## <u>ORDER</u>

Before the Court is plaintiff's Motion to Compel Discovery, doc. 125, Motion to Exclude Opinions and Testimony of Robert Barth, doc. 130, and Motion to Exclude Opinions and Testimony of Lane VanIngen, doc. 133. Not to be outdone, defendant has filed a Renewed Motion for an Order Directing Plaintiff to Submit to an Independent Medical Examination, doc. 143, a Motion to Exclude Opinions and Testimony of Plaintiff's Expert Lew Grill, doc. 128, a Motion to Exclude Opinions and Testimony of Plaintiff's Rule 26(A)(2)(C) Experts, doc. 132, a Motion to Exclude Plaintiff's Expert Witness Christopher Stewart, doc. 135, a Motion to Exclude the Opinions of Plaintiff's Retained Expert Gregory O'Shanick, MD, doc. 136, a Motion to Exclude Opinions and Testimony of Plaintiff's

Expert Jenna L. Gardner-Morgan, doc. 137, and a Motion to Exclude Opinions and Testimony of Plaintiff's Expert John D. Bethea, doc. 138.

Additionally, and between the two parties, they have requested a hearing on *every* pending discovery motion. Docs. 126, 131, 134, 156, 162, 164, 168, 170, 173, 177. As an initial matter, the Court is skeptical of the parties' request for a hearing on every single discovery motion that they filed. Setting aside whether the current circumstances make it realistic to hold hearings on routine discovery motions (which even under normal circumstances are rarely accompanied by hearings), the parties have provided absolutely no justification for why hearings are necessary. For example, the Request for Oral Hearing accompanying the Motion for Independent Medical Examination, doc. 156, states merely that the parties request a hearing and that they estimate the time for argument will be 30 minutes. *Id.* There is no suggestion in the record that additional evidence or argument is necessary, or indeed will provide context, color, or clarity. Hearings on the assigned motions are unnecessary. They are, all of them, **DENIED**. Docs. 126, 131, 134, 156, 162, 164,168, 170, 173, 177.

For the following reasons, defendants' Motion for an Independent Medical Examination, doc. 143, is **GRANTED** and defendants are **DIRECTED** to file a supplement detailing the testing their examining physicians will conduct within ten days from the date of this order.[1] Plaintiff's Motion to Compel Discovery Responses and for Sanctions, doc. 125, is **GRANTED IN PART** and **DENIED IN PART** and defendants are **DIRECTED** to produce any relevant documents within ten days from the date of this Order or to certify that they have conducted a reasonable search for said documents.  Defendants' Motion to Exclude Opinions and Testimony of Plaintiff's Rule 26(A)(2)(C) Experts, doc. 132, is **DENIED**. Defendants' Motion to Exclude the Testimony of Lew Grill, doc. 128, is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's Motion to Exclude Opinions and Testimony of Dr. Robert Barth, doc. 130, is **DENIED**.  Plaintiff's Motion to Exclude Opinions and Testimony of Lane VanIngen, doc. 133, is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Exclude Christopher Stewart, doc. 135, is **DENIED** subject to re-deposition.  Defendants' Motion to Exclude Jenna

---

[1] Defendants' previously filed Motion for an Independent Medical Examination, doc. 124 is **DISMISSED AS MOOT**.

3

L. Gardner-Morgan, doc. 137 is **GRANTED**.   Defendants' Motion to Exclude John D. Bethea, doc. 138, is **DENIED**.   Defendants' Motion to Exclude the Opinions of Gregory O'Shanick, doc. 136, is **DISMISSED AS MOOT**.   The parties are further **DIRECTED** to file a single joint notice indicating that they have conferred regarding the deadlines contained within this Order and have agreed on a schedule for completion. Furthermore, because the Court grants in part plaintiff's motion to compel, and requires a supplemental privilege log, and other disclosures, some sanction is warranted.   Accordingly, within ten days from the date of this order, the Court will accept briefing from plaintiff as to the reasonable cost and fees associated with having had to bring the motion to compel.   Doc. 63.   Defendants shall have five days to respond, if they so desire.   In the alternative, plaintiff and defendants may confer and agree upon defendants' reimbursement of plaintiff's reasonable costs of bringing this motion and inform the Court jointly within ten days from the date of this order that all disputes over sanctions have been resolved.

Finally, the Court acknowledges that it is reopening discovery, albeit for limited purposes, and that this might affect certain summary judgment motions currently pending before the Court.   *See, e.g.,* doc. 122.

Accordingly, the parties are **DIRECTED** to notify the Court within fourteen days from the date of this Order whether they anticipate supplementing their motions for summary judgment or whether they will stand on those motions as filed.  Failure to file this notice will result in the Court deeming any supplementation waived.

## BACKGROUND

According to the Complaint, a Cintas employee—Nicholas A. Robinson—was driving a 2015 Ford Transit Van owned by defendant Cintas Corporation No. 2 DBA Cintas Corporation.  Doc. 1 at 5.  Plaintiff Michael Jacob Castle-Foster was driving a 2002 Lexus RX800 and travelling in the southbound lane of Old Augusta Road when he collided with Mr. Robinson who was turning out of Rincon Stillwell Road.  *Id.* at 6.  Plaintiff asserts that Mr. Robinson turned left into his path after failing to observe a stop sign and failing to yield the right of way.  *Id.* at 7.  Plaintiff was airlifted to Memorial Health University Medical Center. *Id.* at 15.  Plaintiff alleges he suffers from a closed head injury, a subarachnoid hemorrhage of the left posterior frontal lobe of the brain, a comminuted and displaced right femur fracture requiring multiple surgical procedures and open reduction and internal fixation, a fractured

rib, facial hematoma, facial lacerations, facial scarring, left knee traumatic arthrotomy, and other serious injury. *Id.* at 14–15. Plaintiff claims no less than $230,958.23 in medical damages, $34,461.52 in lost wages, property damages, as well as mental emotional and physical pain and suffering and anguish. *Id.* at 15-19. Plaintiff has recently asserted that he suffers significant and likely long-lasting mental deficits which he believes are the result of the closed head brain injury which he suffered in the crash. *See generally* doc. 143. The parties have filed a number of discovery motions and challenges to the various experts the parties proffered in this case which has been referred to the undersigned for disposition.

## ANALYSIS

### I.   Independent Medical Examination

Defendants have repeatedly sought the assistance of the Court in securing an independent medical examination (IME) of plaintiff. Doc. 143. They request that the Court order three independent medical examinations to be conducted, respectively, by Dr. Alexander, Dr. Cook, and Dr. Barth. *Id.* at 3. Although defendants prefer to conduct the IME's in person, they acknowledge that the current pandemic makes it likely

that these examinations will occur via telemedicine. *Id.* at 12. Defendants strenuously object to the presence of any third-party representative of plaintiff, should the Court grant the requested IMEs. *Id.* at 12-13.

Federal Rule of Civil Procedure 35 allows a "court where the action is pending [to] order a physical or mental examination by a suitably licensed or certified examiner." "A plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." *Schlagenhauf v. Holder*, 379 U.S. 104, 119 (1964). "Even with the availability of a plaintiffs [sic] medical records, a defendant generally deserves 'the benefit of an examination by a physician whose judgment [that defendant's] counsel knows and respects.' " *Jackson v. Deen*, 2013 WL 2027398 at *5 (S.D. Ga. Apr. 3, 2013) (quoting *Woodard v. Wal-Mart Stores East, LP,* 2010 WL 3455342 at *2 (M.D. Ga. Aug. 26, 2010) (internal citations omitted)). The IME process also eliminates the need for a defendant to provide evidence at cross-examination as "[u]se of their own expert testimony is a 'well-recognized and reasonable way' of . . .

[challenging a plaintiff's claim and testimony], 'and an examination by that expert is necessary to form a meaningful opinion.' " *Massey v. Wal-Mart Stores E., LP,* 2013 WL 396286 at * 1 (M.D. Ga. Jan 31, 2013) (quoting *Bethel v. Dixie Homecrafters, Inc.*, 192 F.R.D. 320, 322 (N.D. Ga. 2000) (internal citations omitted)).

Defendants assert that plaintiff has placed his mental and physical condition in controversy by claiming that he suffered significant trauma as a result of a closed head brain injury.  Doc. 143 at 4.  Plaintiff has offered numerous, non-treating physicians as experts who will testify in support of his claims of permanent physical and neurological damages. *Id.* at 2–3.  Defendants believe that plaintiff intends to rely on these experts, who *were* able to conduct medical exams, not only to "support his catastrophic damage claims but to use them as the primary ground to attack the conclusions of Cintas' own retained experts."  *Id.* at 3. However, defendants argue that some of the injuries plaintiff claims the accident caused can be traced back to pre-existing conditions or do not appear in any medical treatment records after the accident but prior to this litigation.  *Id.* at 5-6.  Considering this, defendants believe it would be highly prejudicial to allow plaintiff to bring forth experts who had

examined plaintiff, but withhold that same opportunity from defendants. *Id.* at 9-11. Bolstering this concern, defendants cite numerous instances where plaintiff has challenged defendants' experts and their opinions specifically because those experts have not examined plaintiff. *Id.*

Plaintiff argues, first, that the defendants failed to seek an order requesting IME's until after "the expiration of the twice-extended fact phase of the discovery period despite representing to the Court . . . that it was contemplating filing th[e] motion." Doc. 155 at 2. Second, he argues that defendants' claims that their experts require an IME are untrue as they have responded to plaintiff's *Daubert* challenges and argued that their experts' testimony meets the *Daubert* requirements. *Id.* at 2-3. Plaintiff disputes that there is significant evidence of pre-existing conditions which could have caused his injuries. *Id.* at 6. In support of this claim, he notes that many lay witnesses noticed changes in plaintiff after his accident. *Id.* at 6–7. In short, plaintiff believes that defendants are ginning up controversy about the effect of the closed head brain injury in an attempt to avoid responsibility for plaintiff's injuries. Plaintiff finally argues that the Court should look, in part, to Georgia law where "courts are reluctant to order personal injury plaintiffs to submit

to defense medical exams when the information sought is available through other means, such as medical records and testimony." *Id.* at 9 (*citing Prevsot v. Taylor*, 186 Ga. App. 368 (1990)).  Plaintiff notes that defendants already have access to voluminous medical records and deposition testimony which should be more than sufficient for their experts to render opinions. *Id.* at 9–12.

Even if an examination were appropriate, Plaintiff raises specific objections to each of the defendants' proffered examiners.  Plaintiff objects to Dr. Barth's examination in part because "testing so soon in succession after the testing [plaintiff's expert] administered could result in an invalid or contested set of results."  Doc. 155 at 11.  He objects to Drs. Alexander and Cook's examination because they have plaintiff's medical expert (Dr. O'Shanick's) report.  *Id.*  Finally, plaintiff objects that the defendants failed to provide enough detail as to the IME's requested, *id.* at 12–13, and that the IME's would cause unnecessary delay, *id.* at 13-14.  If, however, the Court sees fit to grant the request for an IME, plaintiff requests that the IME's be virtual and recorded as plaintiff contests the objectivity of defendants' experts. *Id.* at 15–16.

Contrary to plaintiff's position, defendants did not unduly delay their request.  Though Rule 35 does not set a hard deadline for filing a motion for an IME, "by its terms [the Rule] necessarily generates an expert report" and thus must "be timed in compliance with the deadlines prescribed by the Court."  *Roberson v. Church*, 2009 WL 4348692 at * 1 (M.D. Fla. Nov. 24, 2009).  In other words, a party seeking an IME must comply with Rule 26(a)(2), which governs the disclosure of witnesses "retained or specially employed to provide expert testimony in the case." *Id.*  "Because the expert witness discovery rules are designed to allow both sides . . . to prepare their cases adequately and to prevent surprise, [cit.], compliance with the requirements of Rule 26 is not merely aspirational."  *Cooper v. S. Co.,* 390 F.3d 695, 728 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006); *see* Fed. R. Civ. P. 26(a)(2)(A)(applying its disclosure requirement to "any witness [a party] may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.").  While plaintiff gripes that the request for an IME came late in this proceeding, it still came before the deadline for defendants' expert witness reports.  *See* doc. 62 (extending expert discovery to June 15, 2020) and doc. 78 (initial motion

for IME filed on April 6, 2020).  In fact, defendants filed their motion on the date the Court set.  Doc. 72 (directing the filing of all fact-discovery motions by April 6, 2020).  Plaintiff may complain about the delay, but that delay is insufficient cause the Court  to deny an IME.

Turning next to the substance of the request, plaintiff has placed his physical and mental circumstances at issue by asserting significant injuries related to closed head brain trauma.  Nor can plaintiff eat his cake and have it too.  He cannot simultaneously argue that defendants' expert testimony is both complete from review of the medical records *and* argue that those experts' testimony should be stricken because they have not examined plaintiff.  *See* doc. 143 at 10 (reciting the following questions plaintiff's counsel asked Dr. Alexander: (1) "You didn't do any of that for Dr. O'Shanick, who's actually a medical doctor and actually examined and tested the patient versus Dr. Barth who's a psychologist and never met the client, right?", (2) "And you don't have any information on an exam because you reached your conclusions without actually conducting an exam, right?", and (3) "Do you think that those people hired by the defense are better for you to rely on than the people that actually examined the patient?"); *id.* at 10–11 (reciting the following

question plaintiff's counsel asked Dr. Barth: "Doctor, wouldn't you agree that there is a probable impact of limited information on reliability and validity in your opinions in light of the fact that you did not examine [the Plaintiff]?"); *id.* at 143 (reciting the following questions plaintiff's counsel asked Dr. Cook: (1) "Are you going to be diagnosing my client with anything in light of the fact that you didn't examine him?", (2) "You are not currently going to rule out any condition in the patient that you haven't examined in this case?", (3) "And do you have an opinion on somebody that you've not ever examined, who's never been your patient[?]", and (4) "Can you agree that Dr. O'Shanick has more information than you do because he actually examined the patient?").

Moreover, it is clear from the record that there is more than a modicum of inconsistency between plaintiff's purported allegations of injuries, the medical records his treating physicians provided, and the medical information the various experts who examined him provided. Considering this, defendants are well within their rights to request an IME to address these inconsistencies, provide their experts with the necessary information they require, and obtain what plaintiff has already obtained for himself: an independent evaluation of plaintiff.

13

However, the appropriate terms of how the IME is to be conducted are more difficult to establish.  Defendants provided limited detail as to the scope of the examinations they expect the experts to conduct and Rule 35 requires more.  Accordingly, defendants are **DIRECTED** no more than **ten days** from the date of this Order to detail the testing their examining physicians will conduct in compliance with Rule 35.

While the Court will not prevent plaintiff from responding to this notice, plaintiff should be aware that—so long as the proper detail in accordance with Rule 35 is provided—the Court will not restrict the testing even where duplicative of tests performed by plaintiff's own examiners. *See, e.g., Funez v. Wal-Mart Stores E., LP*, 2013 WL 123566, at * 7 (N.D. Ga. Jan 9, 2013) (finding IME's necessary even when other records are available because there are few substitutes for personal examination).  Moreover, the Court will not restrict testing simply because it *might* provide information contradicting what plaintiff's experts provided.

Likewise, the Court does not find good cause to require either attorney presence or a recording of the examination.  Plaintiff argues that such presence will protect plaintiff from bias or misrepresentation on the

part of the examiner.  However, such an imposition into the IME would be unnecessary, improper and risk invalidating the procedure itself.  *See Calderon v. Reederei Claus-Peter Offen GmbH & Co.*, 258 F.R.D 523, 529-30 (S.D. Fla. 2009) (collecting cases regarding presence of third parties); *see also Kropf v. Celebrity Cruises, Inc.*, 2014 WL 6682533, at *3 (S.D. Fla. Nov. 25, 2014); *Mantel v. Carnival Corp.*, 2009 WL 3247225, at *1 (S.D. Fla. Oct. 9, 2009) ("There is substantial case law within the Federal Courts that expressly excludes third parties and any recording devices from a Rule 35 physical or mental examination.")(citations omitted). However, to avoid further delaying this fractious case any longer than necessary, the examinations will be conducted via telemedicine.

Upon receipt and approval by the Court of the more detailed proposals for the examinations, discussed above, defendants and plaintiff are **DIRECTED** to confer within fourteen days to reach mutually agreeable dates for the conduct of these examinations.  The examinations will be completed no later than March 25, 2021.  The Court will not allow any extensions absent extraordinary and unforeseeable circumstances. If either party delays sufficiently to prevent the completion of the examinations within this deadline, they will be sanctioned pursuant to

Rule 37(b).  Because the Court determines defendants shall have their IMEs, it need not reach their proposal to exclude references to Drs. O'Shanick and Macchiooci's reports or testimony.   Doc. 143 at 14. Likewise, the Court **DISMISSES AS MOOT** defendants' Motion to Exclude the Opinions of Plaintiff's Retained Expert, Gregory O'Shanick, doc. 136, as this motion was filed as an alternative to the renewed motion for independent medical examination in the event the Court denied the IME request.

## II.   Motion to Compel

Plaintiff filed a Motion to Compel Discovery Responses and for Sanctions.  Doc. 125.  He brings a litany of complaints against defendants related to various discovery issues.  Plaintiff objects first to defendants' failure to produce discoverable documents including an accident file, privilege log and training videos.  Second, plaintiff believes that conflicts in witness statements indicate that Cintas may be withholding further discoverable documents.   Third, plaintiff notes that Cintas' expert witnesses have not provided all correspondence, notes, and other file materials, or provided a privilege log.   Finally, plaintiff objects to

defendant's failure to designate a corporate representative and attempt to retroactively designate that witness instead.

A. <u>Accident File</u>

Plaintiff first objects that Cintas has not turned over an accident file generated immediately after the accident and ostensibly prepared by Cintas' legal department. Doc. 125-1 at 3–5. Plaintiff believes this report may contain evidence of drug or alcohol testing conducted on defendants' employee immediately after the accident and that it is discoverable. Defendants do not contest that the accident file exists. Doc. 147 at 9. Instead, they argue that Cintas' legal department handled any accident file and that the legal department would have retained outside counsel (it is unclear to the Court whether the "outside counsel" referenced is defense counsel). *Id.* at 4, 9. Defendants claim that because attorneys created the accident file (albeit in the regular course of business), it is protected, non-discoverable work-product. *Id.* at 9.

"The attorney work-product privilege traces its roots to the recognition by the Supreme Court . . . that 'it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel.' " *Cox v. Adm'r U.S. Steel & Carnegie*,

17 F.3d 1386, 1421 (11th Cir. 1994) (*quoting Hickman v. Taylor*, 329, U.S. 495, 510-11 (1947)).   Federal law determines the scope of the work-product doctrine (even in a diversity case).   *See United Coal Companies v. Powell Constr. Co.*, 839 F.2d 958, 966 (3d Cir. 1988).   However, the party claiming the privilege bears the burden of establishing that the privilege applies.   *See Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1189 (11th Cir. 2013).

"Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."   Fed. R. Civ. P. 26(b)(3)(A).  However, it is not the presence of an attorney which dictates whether a document is protected work product, but rather whether that document has been "prepared in anticipation of litigation."   It is well-settled that something is prepared in anticipation of litigation when:

> the document can fairly be said to have been prepared or obtained because of the prospect of litigation.   But the converse of this is that even though litigation is already in prospect, there is no work-product [protection] for documents prepared in the regular course of business rather than for purposes of litigation.

8 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, §
2024 (2d ed. 1994); *see also Regions Fin. Corp. & Subsidiaries v. United
States*, 2008 WL 2139008, at * 18 (N.D. Ala. May 8, 2008) ("[T]he court
concludes that the Eleventh Circuit would align itself with the majority
of the other courts of appeal and adopt the 'because of litigation' test.").

Indeed, "the Eleventh Circuit adheres to the standard that
litigation need not be imminent 'as long as the *primary motivating
purpose* behind the creation of the document was to aid in possible future
litigation.' " *Pate v. Winn-Dixie Stores, Inc.*, 2014 WL 5460629, * 2 (S.D.
Ga. Oct. 7, 2014) (*quoting United States v. Davis,* 636 F.2d 1028, 1040
(5th Cir. Feb. 12, 1981); *citing Bridgewater v. Carnival Corp.*, 286 F.R.D.
636, 641 (S.D. Fla. 2011) ("This 'primary motivating purpose' language
has been cited innumerable times by courts within this Circuit, and
appears to be the standard followed in this Circuit.")).   "Generally, a
document will be deemed to have been prepared 'in anticipation of
litigation' when the 'document can fairly be said to have been prepared
or obtained because of the prospect of litigation . . . and not in the regular
course of business.' " *Abdallah v. Coca-Cola Co.*, 2000 WL 33249254, at
* 4 (N.D. Ga. Jan. 25, 2000) (*citing Carver v. Allstate Ins. Co.*, 94 F.R.D.

131, 134 (S.D. Ga. 1982)). "A party must anticipate litigation *at the time* the documents were drafted for these protections to apply. Materials or documents drafted in the ordinary course of business are not protected. Ordinarily, therefore, one must focus on when the document was created, and why it was created." *Kallas v. Carnival Corp.*, 2008 WL 2222152, *3 (S.D. Fla. May 27, 2008) (quotes and cites omitted); *accord Fulton DeKalb Hosp. Authority v. Miller & Billips*, 667 S.E.2d 455 (Ga. Ct. App. 2008) (no work product protection for hospital authority's legal department investigation, since it commenced it not in response to any claim or threat of litigation, but because it received several anonymous complaints, and those complaints contained pleas for help rather than references to litigation).

Defendants have asserted the privilege, but they have insufficiently supported it (at least for the first five days after the accident). They argue that the documents should be considered privileged *solely* because the Cintas Legal Department handled them and that this department has its own attorney-client and work product privilege somehow independent of this litigation. Doc. 147 at 9. Defendants assert that this procedure whereby the legal department acquired control over the investigation

occurred because the accident qualified as a "Tier 1 Accident," where an ambulance was called. *Id.* at 8–9. However, defendants do not explain why a Tier 1 accident *necessarily* implicates further litigation or why they believed litigation was forthcoming.

As discussed above, the work-product analysis cares little for whether an attorney is involved, but cares a great deal for why a document was created. Although an ambulance was called to this accident, defendants have failed to provide any argument whatsoever for why this would necessarily mean litigation was forthcoming.[2] And defendants cannot cloak their incident reports from discovery simply because they pass through an attorney's hands. Accordingly, there is no

---

[2] This may be because it would be difficult for them to do so. The category requires that a "Tier 1" report be created whenever an ambulance is called to an accident in which Cintas is involved *for whatever reason*. It does not take a particularly active imagination to come up with scenarios in which an ambulance would be called to the scene of an accident, but where Cintas would have no liability beyond, for example, workers compensation where litigation would be expressly precluded. Moreover, defendants have not provided any argument that Tier 1 accident reports are not created in the regular course of business. The concession that these reports are generated *in every case where an ambulance is called* eliminates any discretion on the part of an attorney. It implies that regardless of whether anyone could reasonably foresee litigation, a report would be created. Thus, the report would have been created in the regular course of business and is not considered work product *regardless of who created it.*

work-product privilege for the incident report, at least insofar as the document stood prior to April 11, 2018.

The analysis changes after April 11, 2018. Defendants note that a spoliation letter was sent on April 11, 2018 (five days after the incident) and that as a result, anything produced by defendants' attorneys after that date should be considered work product since it was clearly in anticipation of litigation. To the extent this letter kicked off this lawsuit, defendants are right. Once the letter was sent, it was clear that a lawsuit was forthcoming. Thus, the Court must split the proverbial baby. Any portion of the Tier 1 incident report which was created prior to the moment Cintas received the spoliation letter is not work product as defendants have failed to show that it was created in anticipation of litigation. Thus, it is discoverable and should be provided to plaintiff within ten days from the date of this Order. However, any portions of the report created thereafter meet the requirement of made in anticipation of litigation and are not discoverable.

B. Court Instructions, Rule 26(f) Report Dispute, and Conflicting Statements.

Plaintiff next argues that the defendants have withheld corporate policies, investigative forms, and documents pertaining to their routine

factual investigation of the accident.  Specifically, plaintiff claims that defendant is withholding the contents of Mr. Robinson's personnel file and the name of the individual in the legal department to whom that file was sent.  Doc. 125-1 at 7–8.  Plaintiff also asserts that defendants have not provided copies of the safety and training videos because they assert the videos are copyrighted.  *Id.* at 8.  Plaintiff also argues that certain conflicting statements witnesses made during depositions suggest that defendants are withholding information regarding worker's compensation and drug testing.  *Id.* at 9–10.  Defendants argue that these documents either do not exist, or (in the case of the training videos) cannot be copied and that they have provided plaintiff's counsel with an opportunity to view these documents at their leisure. Doc. 147 at 16.

Addressing the training video first, defendants provide no citation in support of their factual argument that the training videos cannot be copied, or that legally, copyright would preclude their being turned over to plaintiff's counsel.  Training videos are regularly disclosed in discovery.  *See, e.g., Felicia v. Celebrity Cruises, Inc.*, 2012 WL 12845124 (S.D. Fla. Sept. 21, 2012) (ordering disclosure of training videos).  Absent any support for their assertion that they cannot be copied (because of

copyright or otherwise) defendants cannot continue to withhold these videos.  Defendants must produce these videos within ten days from the date of this Order.

The remainder of this particular dispute boils down to playground bickering between the parties.   Plaintiff swears that further documentation exists, defendant swears that it does not.  Unpalatable though it may be to plaintiff that the Court accepts defendants' word, the Court cannot force a party to disclose a document to which it lacks access, or which does not exist.  *Cf.* Fed. R. Civ. P. 34(a) (permitting the production or inspection of materials "in the responding party's possession, custody, or control").  And plaintiff's assertion that something *must* exist cannot will it into being.  In the absence of any evidence that the defendants are actively withholding documents, the Court cannot do anything more than this: if the documents exist, defendants are **DIRECTED** to produce them within ten days from the date of this Order. If they do not exist, defendants are **DIRECTED** to certify that they have conducted a reasonable search for said documents and submit such certification to the Court within ten days from the date of this order detailing their search.

24

C. <u>Expert Witness Discovery</u>

Third, plaintiff argues that defendants have failed to produce all correspondence, notes, and other file materials prior to various expert depositions and that defendants have also failed to provide a privilege long for certain expert materials. Doc. 125-1 at 10. Specifically, plaintiff argues that defendants did not provide him with correspondence and file materials as well as emails prior to the depositions of Drs. Provenzale and Barth. *Id.* at 11. Additionally, while some of Dr. Barth's notes were made available before a deposition, he refused to answer questions regarding those notes, and he failed to bring a copy of his file to the deposition because counsel instructed him not to. *Id.* at 12–13. Plaintiff further complains that Dr. Barth refused to answer questions about previous cases he had been involved in during his deposition. *Id.* at 14.

Defendants argue that the Court cannot compel Dr. Barth to answer questions about other cases in which he has served as an expert. Doc. 147. at 18. However, the Court need not reach this dispute yet. Because the Court grants Barth the opportunity to examine plaintiff, presuming of course that defendants provide the proper notice, Barth will provide a supplemental report. If and when that supplemental report is

created, the Court expects that all necessary documents and information will be disclosed. This includes all of the information required by Rule 26 including "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." Fed. R. Civ. P. 26(a)(2)(B)(v).[3]

As to the Rule 26(f) report and whether defendants were required to provide a privilege log containing documents created by their experts, that report states that the parties were required to "provide privilege logs, for any documents for which privilege, confidentiality, or protection are asserted except for materials generated by Plaintiff's counsel or Defendants' counsel." Doc. 21 at 14. This clearly states that the only documents which may be excluded from the privilege log are those which plaintiff's or defendant's counsel generated. That does not, by its plain terms, include documents expert witnesses created. Defendants shall likewise have ten days from the date of this Order to fully and completely update their privilege log.

---

[3] Nothing in this holding should be read by defendants as presenting an opportunity to shield Dr. Barth from properly answering this question by—for example—refusing to allow him to examine plaintiff. If, for whatever reason, defendants determine that they will not provide a subsequent disclosure for Barth, plaintiff may challenge his appearance as an expert.

However, and here the Court will be explicit, there is not a work-product protection for every item an expert creates.  In fact, it is fairly uncontroverted in this circuit that Rule 26 provides "no basis" for shielding the "*theories and mental impressions*" of testifying experts. *Republic of Ecuador*, 741 F.3d at 1195.  In fact, the Eleventh Circuit acknowledges that the rule does not "confer work-product status on the notes of a testifying expert or on a testifying expert's communications with other experts." *Id.* at 1194–95.  Likewise, it is unclear to the Court on what basis defendants felt justified in instructing their expert not to answer questions about prior cases in which he had testified.  There are a host of objections which can be raised during depositions.  However, unless counsel intends to rely on attorney-client privilege, they do not generally come with instructions not to answer.  If defendants believe that they are entitled to give such an instruction to their expert, they must adequately support it.  *See In re Grand Jury Proceedings*, 73 F.R.D. 647, 651 (M.D. Fla. 1977) ("It is the burden of the party raising the attorney-client privilege to establish the critical elements of it.").  Accordingly, should Barth—or indeed any of defendants' experts—refuse to testify on advice of counsel as to their prior work as experts, defendant

27

must suitably justify such restriction to the Court or face the risk that their expert will be struck for failing to comply with *Daubert's* expectations.

### D. Retroactive Designation of Rule 30(b)(6) Witnesses

Plaintiff next complains that defendants failed to provide witnesses for a 30(b)(6) deposition which was noticed on January 17, 2020. Doc. 125-1 at 14. Additionally, he argues that any objection to this notice was waived, as it was not included in any omnibus discovery motion filed on behalf of the defendants. Doc. 157 at 7. In response, defendants objected to the length of the topics as "unduly broad, vague, and . . . abusive in nature." Doc. 147 at 19. Defendants are, however, willing to adopt previous deposition testimony for multiple topics outlined in the notice. *Id.* Moreover, they argue that many of the topics listed in the 30(b)(6) notice address topics "entirely outside the present litigation because they inquire into insurance coverage, address privileged information, internal business policies and procedures, retention policies, [and] emails and IT information." *Id.* at 20. They also argue that a huge number of people involved in this case have been deposed and answered questions similar to those contained on the 30(b)(6) notice. *Id.* at 21-22.

As an initial matter, defendants did not waive their objections to the 30(b)(6) notice.  They did not provide witnesses in response to a deposition notice, so plaintiff sought to compel their attendance in their omnibus motion.  They have responded in opposition as would be expected to a motion to compel.  Given these circumstances, the Court will not consider the objections waived.

Turning next to the question of the witnesses themselves, the Court will not approve defendants' plan to retroactively designate fact witnesses for 30(b)(6) purposes.  The individuals defendants seek to "retroactively designate" were initially noticed as fact witnesses and, at the time their depositions were taken, were not intended to bind the corporate defendants in any way.  As such, both the preparation for those depositions and the questions asked were premised on the individual knowledge of those deponents.  A 30(b)(6) deposition is materially different in that it binds an organization and requires the organization to, through the deponent, "testify about information known or reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6).  Attorneys do not treat these deponents similarly, nor should they be expected to.  Accordingly, defendants must produce a witness in response the 30(b)(6)

notice even if the topics include issues previously discussed in fact witness depositions.

As to the topics themselves, defendants object to topics 4, 5, 6, 7, 8, 9, 27, 28, 30, 33, 34, 35, 36, 37, 40, 53, 54, 55, 59, 68, 69, 70, 72, 73, 75, 76, and 78--86 as overly broad and vague. *See, e.g.,* doc. 147-24. The Court agrees that topics 6, 27, 37, and 75 are overly broad. *See, e.g., id.* at 4 ("All documents produced by Defendants in the above-styled action and all facts and information contained in said documents."). They reference the entirety of discovery in this case without any limitation or reference to specific documentation. In short, it would be impossible to properly prepare a witness because the scope of the topic is so large. If plaintiff wishes to discuss any particular documents, or the process of document retention and selection, they are entitled to reference either single or groups of documents, but it is unreasonable to expect defendants to present a witness for *every document* disclosed in discovery without a more specific identification. The remainder, however, are viable subjects for a 30(b)(6) notice. Notably, many, including topics 4, 5, 6, 27, 28, 53, 54, 55, 68, 69, 70, 72, 73, 81, 83, and 84 have already been discussed in the previous fact witness depositions of Kimone Ferguson and Courtney

Franko.   As they were already considered viable topics for fact depositions, they are not suddenly unduly broad, burdensome, irrelevant, or privileged for a 30(b)(6) depositions.  The remainder likewise touch on topics which are relevant to the dispute at issue.  For example, it is not unreasonable to inquire as to a corporate parties' Answer to the complaint (*see* topic 4) or inquire into any electronic logging devices in a car wreck case (*see* topic 70).  Having reviewed each of the topics, the Court concludes that they are proper topics for a 30(b)(6) deposition.  Nevertheless, this approval in no way grants plaintiff the right to breach the attorney-client privilege nor does it preclude defendants from raising any objections during the deposition which they believe are applicable.  Accordingly, plaintiff's motion to compel discovery is **GRANTED IN PART** and **DENIED IN PART**.  Defendants shall be required to designate and make available for deposition(s) witnesses capable of addressing the authorized topics.

## III.   Motion To Exclude Opinions And Testimony Of Plaintiff's Rule 26(A)(2)(C) Experts

Plaintiff disclosed eight treating physicians (Bromberg, Denlinger, Hogan, Snyder, Odom, Stewart, Helmly, and Britt) as experts pursuant to Fed. R. Civ. P. 26(a)(2)(C).  Doc. 132 at 1, 9-18.  However, defendants

argue that the disclosures for those treating physicians are insufficient as they do not set forth any opinions but instead provide either general facts or general topics upon which the expert is expected to testify. *Id.* Moreover, they argue that plaintiff's counsel elicited causation opinions from these physicians during their depositions. *Id.* at 2. Plaintiff, however, argues that the disclosures which he provided were proper because "Defendant was clearly on notice to expect expert medical opinion testimony derived from their treatment of the Plaintiff." Doc. 174 at 8. Plaintiff asserts that he did not expect any of these identified doctors to offer opinions developed outside of their treatment. *Id.* at 7. Plaintiff acknowledges that for each of the witnesses, he stated that the expert-physicians would testify as to the "nature and extent" of plaintiff's injuries and that defendants should have been on notice to expect medical opinion testimony derived from their treatment of the plaintiff. *Id.* Plaintiff complains that defendants—if they had objections to the disclosures that were provided—should have notified the plaintiffs and sought supplementation. *Id.* at 8.

Rule 26(a)(2) requires parties to disclose the identity of their expert witnesses and provide a written report including:

(i)   a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)  the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv)  the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)   a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi)  a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).   Notably, this requirement applies to witnesses "retained or specially employed to provide expert testimony in the case or whose duties as the party's employee regularly involve giving expert testimony." *Id.* However, for those experts where a written report is not required, there is still a disclosure requirement.  Fed. R. Civ. P. 26(a)(2)(C).   Those witnesses must be included on a disclosure which states:

(i)   the subject matter on which the witness is expected to present evidence under Federal Rules of Evidence 702, 703, or 705; and

(ii)  a summary of the facts and opinions to which the witness is expected to testify.

*Id.*

Generally, treating physicians are not required to submit expert reports under Rule 26(a)(2)(B). *See In re Denture Cream Prod. Liab. Litig.*, 2012 WL 5199597, at *4 (S.D. Fla. Oct. 22, 2012), *on reconsideration in part,* 2012 WL 13008163 (S.D. Fla. Nov. 14, 2012) ("When a treating physician testifies regarding opinions 'formed and based upon observations made during the course of treatment,' the treating physician need not produce a Rule 26(a)(2)(B) report." (citation omitted)). However, plaintiff has specifically identified that he intends his treating physicians to provide expert testimony as to causation, and that defendants should have expected such testimony. "[T]reating physicians offering opinions beyond those arising from treatment are experts from whom full Rule 26(A)(2)(B) reports are required." *Id.* at *4 (*citing Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011); *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734–35 (7th Cir. 2010); *Meredith v. Int'l Marine Underwriters*, 2012 WL 3025139, at * 5 (D. Md. July 20, 2012)). The distinction is often dependent on the exact testimony itself. *See Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708, 712 (11th Cir. 2008) ("Although we agree that a treating physician may testify as a lay witness regarding his observations and

decisions during treatment of a patient, once the treating physician expresses an *opinion* unrelated to treatment which is 'based on scientific, technical, or other specialized knowledge,' that witness is offering expert testimony for which the court must perform its essential gatekeeping function as required by *Daubert*.") (per curiam) (emphasis in original); *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (citations omitted)(treating physician's diagnosis of jaw fracture is permissible lay opinion but statement as to cause of fracture was expert opinion); *Rangel v. Anderson*, 202 F. Supp. 3d 1361, 1364 (S.D. Ga. 2016) ("Treating physicians not disclosed as experts are limited to testimony based on personal knowledge and may not testify beyond their treatment of a patient.").

This is not a circumstance where plaintiff failed to provide a disclosure. Indeed, plaintiff provided 26(a)(2)(C) disclosures for the doctors at issue. The question then becomes, whether the disclosures that were provided were sufficient. Defendants argue that they were inadequately notified that the doctors would testify as to causation. Plaintiff argues that the phrase "nature and extent" should have put them on notice. Doc. 174 at 2. Moreover, they contest that none of the

opinions which these doctors will present arise from anything other than the course of treatment which they provided to plaintiff. *Id.* The Court agrees. Nothing preempts a properly disclosed treating physician from testifying on causation so long as they formed that opinion during their course of treatment. *Kondragunta v. Ace Doran Hauling & Rigging Co.*, 2013 WL 1189493, at *3 (N.D. Ga. Mar. 21, 2013). And despite defendants' protestations, there is no indication—at least so far—that the disclosed experts intend to go beyond the course of treatment to provide such testimony. The disclosures which were provided, doc. 132-1, while somewhat vague in their descriptions, certainly provide the required list of opinions and facts upon which those physicians will rely to proffer their opinion testimony. *See Fed. R. Civ. P.* 26(a)(2)(C) (Advisory Committee Notes to 2010 Amendment) (noting that disclosure for non-retained experts "is considerably less extensive than the report required by Rule 26(a)(2)(B)" and "[c]ourts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as responsive to counsel as those who have.").

Even if these disclosures had been inadequate, defendants could not justifiably claim the necessary surprise to exclude them. Plaintiff is right that challenging these disclosures at this juncture smacks of sandbagging. Doc. 174 at 8. If there were any issues with the disclosures, defendants could have raised them with plaintiff, or moved to re-depose far in advance of filing the instant motion. *See id.* at 17; *Kondragunta*, 2013 WL 1189493, at * 8 (no striking of witnesses where defendants "had the ability to complain, and thereby cure this surprise, prior to the expiration of expert discovery, by advising plaintiff that his disclosures did not comply with the rule and by requesting more specific disclosures."). There is no indication that such interaction occurred. As the Northern District, in *Kondragunta* noted, a party cannot lie in wait and thereby hope to deprive a party of their experts particularly when, as here, it appears that any discrepancy was clear to defendants at an early time, yet they chose to do nothing about it. The corollary to all of this is, of course, that plaintiff's experts cannot offer opinion testimony that arises outside of the scope of their treatment. As discussed below, application of the corollary demands a different result in the case of one

37

of plaintiff's physicians, Dr. Denlinger.   Thus, defendant's motion is denied on this basis as to all except Dr. Denlinger.

Dr. Denlinger is different from plaintiff's other physician-witnesses.  Defendant asserts that Dr. Denlinger was a retained expert and that he did not prepare a Rule 26 Report.[4]  Plaintiff does not dispute defendants' claims that he paid Dr. Denlinger to participate in this litigation.  Instead, he argues that Dr. Denlinger was paid for his time when he attended a meeting "arranged by Plaintiff's counsel on one occasion to ask the doctor about [plaintiff's] diagnoses and prognoses in preparation for the first private mediation."  Doc. 174 at 17.  Thus, he contends that, although Dr. Denlinger was paid, he was not "specially employed to provide expert testimony."  Fed. R. Civ. P. 26(a)(2)(B).

Rule 26 does not specifically identify when an expert goes from "not retained" to "retained."   However, as plaintiff paid Dr. Denlinger and then used that paid testimony during proceedings (even if only a mediation), the Court must confess some disquiet as to this arrangement. Money was exchanged between plaintiff's attorney and an expert who—

---

[4] The Court assumes that defendant means a report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) which is substantially more onerous than the disclosure required by Rule 26(a)(2)(C), and which is required by all experts specially retained.

at least in theory—should not have been paid for his testimony. Moreover, that same individual provided assistance to plaintiff in both a private and court-ordered mediation.  But it is—and remains—unclear that any money changed hands for his opinion testimony.  Neither party provided to the Court the standard upon which to judge when an expert goes from unretained to "retained" or "specially employed."  Nor has the Court been able to find support for the proposition that any payment, for whatever purpose *automatically* renders an individual a "retained expert."  Finally, it is unclear that, under the terms of the Rule, Dr. Denlinger has offered any "testimony" in exchange for payment, which would render him a retained expert.

Regardless, it is not the Court's obligation to suss out the legal analysis applicable to this admittedly odd and troubling situation.  S*ee* S.D. Ga. L.R. 7.1(b) ("every motion filed in civil proceedings shall cite to supporting legal authorities").  It was the parties' obligation to fully flesh out their argument.    Instead, (as has become common practice throughout this litigation) they have resorted to pointing out an irregularity and lobbing accusations at each other without providing much context, explanation, or legal argument.  *See United States v.*

*Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). In the absence of supporting authority, the Court will not exclude Dr. Denlinger on this ground alone, *despite* its reservations as to the course plaintiff's counsel took. Accordingly, defendants' motion is **DENIED**.

## IV.  Motions to Exclude Under *Daubert*

The parties have filed numerous motions to exclude each other's expert witnesses and the Court addresses each in turn below. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court concluded that Federal Rule of Evidence 702 "compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific evidence." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*citing Daubert*, 509 U.S. at 589 n.7, 597). The Court later explained that "*Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (*citing* Fed. R. Evid. 702). Incorporating these decisions, amended Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In this Circuit, the courts apply a three-pronged inquiry to determine whether an expert's testimony complies with Rule 702 and *Daubert*. The Court must determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citation omitted). The proponent of the expert opinion bears the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence. *Daubert*, 509 U.S. at 592, n. 10.

For the first prong, "experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status."

*Frazier*, 387 F.3d at 1260–61; *see also* Fed. R. Evid. 702 (a witness may be qualified as an expert by "knowledge, skill, experience, training, or education[.]").  As to the second prong, the reliability "criterion remains a discrete, independent, and important requirement for admissibility." *Frazier*, 387 F.3d at 1261.  The Supreme Court in *Daubert* "set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005) (citation omitted).  These factors or observations inquire into the expert's "theory or technique" and are: "(1) whether it can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *Id*. (citation omitted). "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Frazier*, 387 F.3d at 1262.  "Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the

42

opinion, and how that experience is reliably applied to the facts.' " *Id.* at 1261.  Lastly, expert opinion testimony must assist the trier of fact.  *Id.* at 1262.  "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Id.* (citation omitted).

A.  Motion to Exclude Opinions and Testimony of Plaintiff's Expert Lew Grill

Defendants move to exclude the opinions and testimony of Lew Grill.  Doc. 128.  According to defendants, "Mr. Grill is being offered as a purported trucking industry expert for a single purpose: to contend that some nonexistent and undefined nebulous 'professional driver' standard applies to the conduct of Nick Robinson, the Cintas employee involved in the accident giving rise to this suit, rather than the standard of ordinary care on which the Court will instruct the jury." *Id.* at 1.  Defendants challenge Grill's testimony on multiple grounds arguing that it lacks factual or legal foundations, and that its sole purpose is to confuse the members of the jury.  *Id.*  Defendants also assert that Grill proffers testimony beyond his expertise and that he applies a standard which does not exist.  *Id.* at 7.

Grill proffered the following opinions:

1. Mr. Robinson failed to adhere to industry regulations and standards in at least the following ways:

    a. he failed to keep a proper lookout in order to perceive a hazard;

    b. he failed to safely and reasonably respond to a hazard despite having the time and opportunity to do so;

    c. he failed to drive defensively;

    d. he failed to manage his space, and ultimately encroached on the space of approaching traffic;

    e. he was required to have the necessary knowledge, skills, and safe driving attitude to prevent crashing with other road users.

2. Cintas is responsible for the actions of Mr. Robinson as it relates to the safe operation of their vehicle that Robinson was driving at the time of this collision.

3. According to industry standards, this collision was preventable on the part of Cintas and Mr. Robinson.

4. Mr. Castle-Foster was operating his vehicle in a normal manner when the vehicle intruded upon his path.

    a. Grill understands that Mr. Castle-Foster may have been changing a channel on his radio just prior to the occurrence of this collision.  Such an action is normal.  Mr. Castle-Foster could have been doing any number of normal driving actions that would relate to him not looking at the roadway ahead.  Moreover, a driver would be negligent and remiss if all he did was look forward, including at an intersection where he has a

44

reasonable expectation that a professional driver will not intrude upon his path by failing to yield when he should.

i. Mr. Castle-Foster would have every right to look out his side windows, or his mirrors, or his gauges, or his radio. In fact, there is a cup holder in most vehicles allowing a driver to place a drink. A driver is not expected to pull off to the shoulder of a road to change a radio station. In fact, it is extremely dangerous to do so. A simple glance to change a station or volume on a radio is reasonable and expected.

See doc. 128-2 at 27. Grill has worked in the trucking industry since 1968 as a truck driver, owner operator, truck driver training instructor, truck driver training program director, and as a consultant for motor carriers and truck driving schools. *Id.* at 29. He maintains numerous licenses and certifications both in the United States and in Europe. *Id.* In addition to substantial driving experience, he has also produced numerous training videos and modules for drivers, written books and articles on the subject, and conducts research and analysis on comparative driving cultures. *Id.* at 30. He boasts a variety of other professional qualifications. *See generally,* doc. 128-2. In preparation for rendering his opinions he reviewed:

1. The Deposition Transcript of Courtney L. Franko, with Exhibits;

2. The Deposition Transcript of Kimone Ferguson, with Exhibits;

3. The Deposition Transcript of Michael Jacob Castle Foster, with Exhibits;

4. Plaintiff Vehicle Photos;

5. Defendant Vehicle Photos;

6. Deposition Transcript of Nicholas Anthony Robinson with Exhibits;

7. Castle-Foster Police Report;

8. Accident area location aerial map photo;

9. Accident area site visit, March 25, 2019;

10. Deposition Transcript of Seth Strickland;

11. Treatises as described and listed in Lew Grill Report dated April 25, 2020.

*Id.* at 48.

As an initial matter, having reviewed the report, the deposition and the educational background of Grill, the Court is satisfied that he has the necessary qualifications to opine as he did. As to the other standards, defendants' first, and most pressing, challenge to Grill is that his testimony is unlikely to be helpful—and may instead be exactly the opposite—because he purports to apply a non-applicable standard of care (the Federal Motor Carrier Safety Regulations and Performance

Standard) to defendants' business.  Doc. 128 at 7.  Defendants next assert that the opinions are further improper because they lack support in factual or scientific analysis.  *Id.*  In response, plaintiff argues that Cintas adopted the Federal Motor Carrier Safety Regulations for all of its vehicles, had additional applicable training, and was within the scope of his employment when the accident occurred.  Doc. 171 at 2-6.  Plaintiff notes that Grill has testified to federal motor carrier safety regulations in the past, *id.* at 10, and that Georgia Courts have upheld his opinions.  *See, e.g., PN Exp., Inc. v. Zegel*, 697 S.E.2d 226, 232-33 (Ga. Ct. App. 2010).  Likewise, plaintiff asserts that the proper remedy for any purported legal conclusion testimony is at trial via objections, rather than striking Grill prematurely.  Doc. 171 at 11.  Plaintiff notes that his expert acknowledges that the standard of care is the same for all drivers, but argues that privately established motor standards could be relevant as "illustrative of ordinary negligence under the circumstances."  *Id.* at 13 (*quoting Dogan v. Lawrence*, 2015 WL 7587450 (Ga. State Ct. May 11, 2015)).

Grill's testimony can be broken down into two broad topics.  The first topic deals with the standards applied by Cintas and its drivers.

Unfortunately, many of the issues underpinning the conflict as to these topics are not dependent on the expert's qualifications or examination, but rather on whether he may testify as to questions of fact. Rather than challenging his qualification to provide expert testimony, the parties are using Grill as a proxy for a contest over whether defendants' driver was operating in the course of business and whether Cintas has adopted the Federal Motor Carrier Safety Regulations for its vehicles. Not, however, what the contents of those regulations are, or how they are applied. Neither of these questions are questions which an expert may properly decide as they are inherently fact determinations best left to the province of the jury. Grill is not appropriately designated as an expert to opine on either of these issues. Moreover, even if this was something which could be the subject of expert testimony, Grill is not qualified. Nothing in the information provided indicates that he is qualified to opine on business practices like which procedures companies apply to their drivers, or how they determine when and where an individual is operating in the course of business.

However, should the jury first determine that the FMCSRs apply in this case the jury may find it useful to have some discussion or

explanation as to how truck drivers use and employ these standards. *See, e.g., Duling v. Domino's Pizza, LLC*, 2015 WL 3407602, * 13-14 (N.D. Ga. Jan. 14, 2015) (allowing testimony on commercial motor vehicle industry's standard of care as beyond the knowledge of a layperson). Thus, at this time, the Court will not strike the portions of Grill's opinions which purport to provide this type of opinion. Nevertheless, the Court acknowledges that it may be difficult to tease out the relationship between appropriate and inappropriate testimony at this stage, as much evidence has yet to be presented. Thus, the appropriate remedy for reconciling this issue is fully fleshed out motions *in limine* or objections during trial.

The second set of topics relates to the actual details of the accident. Specifically, in addition to proffering opinions on the application of trucking regulations, Grill opines on certain actions taken during the accident itself. These include opinions like whether or not defendant stopped at the stop sign and whether one or the other of the parties caused the accident. Neither Grill's expertise nor his review of the documents are sufficient to uphold opinions of this sort. As an initial matter, the opinions are those properly reserved for the jury. Moreover,

49

Grill is not an accident reconstructionist. Nothing in either his educational background supports the assertion that he is qualified to testify as to causation in an accident like this. All Grill is doing is reviewing witness testimony and drawing his own conclusion from that testimony divorced from any technical knowledge or expertise. Accordingly, defendants' motion is **GRANTED IN PART AND DENIED IN PART** with leave to renew these objections during trial. Doc. 128. Grill may not testify as to the standard of care applicable in car accidents as this is properly left to the judge and the jury. Neither may Grill opine as to whether Cintas adopted particular standards or whether Cintas' driver was operating in his scope of business as the jury must also decide these issues. Finally, Grill may not testify as to causation. However, Mr. Grill may provide testimony on the federal standards, assuming a foundation is laid supporting the assertion that Cintas' drivers are subject to them, and for context on those standards where applicable.

B. Motion to Exclude Opinions and Testimony of Robert Barth

Plaintiff has filed a motion to strike and exclude the testimony of Dr. Robert Barth. Doc. 130. Plaintiff argues that Barth "has not offered

any opinions in this case specific to the [p]laintiff and would, therefore, not assist the jury in determining any fact at issue." *Id.* at 2. Plaintiff also believes that Barth is biased and untrustworthy and that his opinions are unreliable and irrelevant. *Id.*

Barth was hired to "evaluate [p]laintiff's purported permanent neurological injuries." Doc. 150 at 7. Although his report was quite voluminous, "[g]enerally, his opinions are that [p]laintiff's purported neurocognitive injuries are inconsistent with his diagnoses and recovery in the days following the accident, that other risk factors are present which could potentially be the cause of those purported permanent deficits, and that psychological diagnostic testing is consistent with [p]laintiff malingering." Doc. 150 at 8 (*citing* doc. 130-1). In preparation for rendering these opinions, Barth reviewed a number of records, including medical records, traffic reports, employment records, and police records. Doc. 130-1 at 94–96. He also reviewed several depositions, witness reports, and disclosed some (although plaintiff argues not all of) his prior testimony. *Id.* at 96–98.

Plaintiff asserts that Barth has "carved out a niche as an expert testifier [sic] for defense attorneys and insurance companies, which

accounts for 100 percent of his forensic work." Doc. 130 at 3. Plaintiff argues that Barth's claim that "scientific findings have revealed that presentations of cognitive impairment that are associated with seeking compensation are more severe than the effect of mild traumatic brain injury," and "[s]cientific findings have revealed that seeking compensation is a dominant risk factor for pain becoming chronic," reflect his unreasonable position as an expert who solely renders defense opinions. *Id.* at 4. Likewise, plaintiff points to a lack of "specific studies, epidemiological data, or other 'scientific findings' relied upon to support his opinions." *Id.* Further, plaintiff points to a number of courts which have found Barth to be "dishonest in his role as a testifying expert for the defense." *Id.* at 5. Plaintiff points to at least one case where the court determined that Barth had rendered an opinion prior to examining the plaintiff, rather than drawing on that investigation. *Id.* at 6. Plaintiff also argues that Barth's opinions will be unhelpful, in part because he "offers no opinions about the [p]laintiff specifically." *Id.* at 15. He argues that Barth should not be allowed to testify in place of other experts "who actually have rendered opinions about the [p]laintiff specifically." *Id.* at 16. Reading between the lines, plaintiff appears to contest Barth's

opinions because Barth has not had the opportunity to personally examine plaintiff and catalogue his injuries.

Defendants assert in response that Barth's methods are reliable, and that the Court should not put too much emphasis on "the fact that the expert has developed an expertise principally for the purposes of litigation." Doc. 150 at 14 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 167 F.3d 1311, 1317 n. 5 (9th Cir. 1995)). Defendants also argues that it is unfair to strike Barth prematurely when he has been prevented from examining the plaintiff and using that examination to render opinions. *Id.* at 5.

Review of Barth's deposition and disclosures indicate that he is clearly an expert with a lane for his testimony. Whether that lane is predetermined in this case, however, is far from clear. Barth was not given the opportunity to examine plaintiff, so despite his history as a vociferous defense expert, the Court cannot assume that his bias (if indeed it does exist) extends to *this* case simply because Barth has not had the opportunity to review all the necessary evidence. Because the Court is giving defendants the opportunity to conduct independent medical examinations, *see supra* pp. 6-16, it is not necessary to determine

53

now whether Barth's methodology is unreliable or if his testimony will be unhelpful.   That determination must wait until Barth has had an opportunity to conduct his examination and render his opinions. Accordingly, plaintiff's motion to strike Barth is **DENIED**.   Doc. 130.

C. Motion to Exclude Opinions and Testimony of Lane VanIngen

Plaintiff objects to defendants' proffer of Lane VanIngen as a rebuttal expert to Mr. Lew Grill.   Doc. 133.   VanIngen, unsurprisingly, operates in direct counterpoint to Grill.   And in much the same manner plaintiff raises the same objections as defendants raise to Grill's testimony.   Plaintiff argues that VanIngen "arbitrarily denies that Cintas has adopted the Federal Motor Carrier Safety Regulations (FMCSRs) for all of its motor vehicles in spite of clear evidence to the contrary.   His opinions also ignore that the Cintas driver was working within the course and scope of his employment at the time of the collision."   *Id.* at 1. Plaintiff argues that allowing VanIngen to testify will only confuse and/or mislead the jury and cause prejudice to plaintiff.   Plaintiff, finally, argues that it is indisputable that Cintas adopted the FMCSRs for all of its vehicles and that Cintas' driver was operating in the course of his employment.   To that end, he concludes that VanIngen's first opinion

should be excluded as unreliable and contrary to the facts of the case, and contrary to the law; that his second opinion is misleading and contradictory; that his third opinion is unreliable and contradicted by his testimony; that his fourth opinion is contrary to Cintas' duties; that his fifth opinion is unreliable, contrary to Cintas's admissions, and will only cause confusion; and that his sixth opinion is unreliable. *See generally* doc. 133. Defendant replies that they offer Mr. VanIngen to contest "that some nonexistent and undefined nebulous 'professional driver' standard and 'performance standard' apply to the conduct of Nick Robinson, the Cintas employee involved in the accident giving rise to this suit, rather than the standard of ordinary care on which the Court will instruct the jury." Doc. 149 at 1.

Mr. VanIngen has offered the following "conclusions."

1. Cintas Corporation No. 2, d/b/a Cintas and its employee Nicholas A. Robinson were not subject to the Federal Motor Carrier Safety Regulations (FMCSRs) or the Georgia Department of Public Safety Motor Carrier Safety Regulations on April 6, 2018, the date of the crash that is the basis for this case.

2. Specific training required to operate a motor vehicle on the highway is generally limited to commercial motor vehicles as defined by the FMCSRs.

3. There is no industry standard of care as related to a company's fleet operations of non-commercial motor vehicles beyond proper licensing and a reasonable expectation that drivers will obey applicable laws when operating their assigned vehicle.

4. The decision to hire and entrust Nicholas A. Robinson with the operation of a light duty vehicle by Cintas met the reasonable standard of care for a company entrusting a non-commercial vehicle to an employee.

5. Nicholas A. Robinson was not performing a job-related function for Cintas and was not being compensated for the time he spent driving to his residence when he was involved in the accident on April 6, 2018.

6. The report issued by Lew Grill and his deposition testimony fails to consider the use of the vehicle by Mr. Robinson.  Mr. Grill also blurs the lines regarding the use of commercial motor vehicles and non-commercial motor vehicles by motor carriers.  Additionally, there are regulatory and procedural errors in Mr. Grill's report and testimony.

Doc. 133-5 at 6–15.  In preparation for offering this testimony, VanIngen reviewed the depositions of Courtney Franko, Jason Tranko, Michael Castle-Foster, Nicholas Robinson, Seth Strickland, Kimone Ferguson, Lew Grill, Christopher Stewart, and John Bethea.  *Id.* at 16.  He reviewed the complaint, answers, certain discovery responses, engineering reports, health records, electronic data, Georgia and federal transportation regulations, certain Cintas' policies, the traffic crash report, aerial map

56

photos, the expert witness reports of Christopher Stewart, John Bethea, Lew Grill. *Id.* at 16–17. He also visited the site of the accident. *Id.* at 16. Like Mr. Grill, he has significant experience in transportation. He is the president of Transportation Compliance Experts and provides guidance to transportation industry on safety and compliance matters related to the enforcement of the FMCSRs among other safety services. He was previously a special agent and motor carrier safety specialist with the U.S. Department of Transportation. He has numerous awards and publications, has completed a substantial number of training courses, and maintains two trucking related memberships and licenses. *Id.* at 18–21.

As with Mr. Grill there appears to be little conflict over whether he is a qualified trucking expert. To the extent Mr. VanIngen is proffered solely for the issues that defendants assert, much of the work is already done. The Court has already determined that it would be inappropriate at this juncture to allow Mr. Grill to testify concerning the standard of care applicable in this case, whether Cintas has formally adopted the FMCSRs for their drivers, and whether Mr. Robinson was acting in the course and scope of his employment. Thus, to the extent that defendants

proffer Mr. VanIngen purely as a rebuttal expert on these issues, his opinions are unnecessary.

However, the Court also noted that there is the possibility that Grill's experience and opinions may have a place in this case, to the extent that there is a determination that the FMCSRs apply.  So too does VanIngen's rebuttal testimony in those circumstances.  Therefore, the Court applies the same restrictions to VanIngen as it does to Grill.  The legal questions, like the appropriate standard of care which are best left to the judge, and the fact-based inquiries, like whether Cintas applied higher standards to its fleet and whether Robinson was operating in the course and scope of his employment, are not the purview of experts and neither Grill nor VanIngen may not testify regarding them.  However, depending on whether an adequate foundation is laid, it is possible that expert opinion on trucking standards may be appropriate.  Accordingly, the motion is **GRANTED IN PART** and **DENIED IN PART** with leave for the parties to renew any appropriate motions *in limine* or objections at trial.  Doc. 133.

D. <u>Motion to Exclude Plaintiff's Expert Witness Christopher Stewart</u>

Cintas also requests that the Court exclude the testimony of Christopher Stewart, PE. Doc. 135. Mr. Stewart is an accident reconstructionist who defendants assert failed to identify the methods, formulas, and calculations underlying his opinions. *Id.* at 1. Defendants argue that "it is impossible to determine whether Stewart's expert opinions are the product of reliable principles and methods and whether Stewart has reliably applied the principles and methods to the facts of this case." *Id.* Plaintiff argues that Stewart provided an affidavit explaining the methodologies that he used arriving at his conclusion and that he should not be obligated to turn over proprietary software. Doc. 178 at 2–3.

Stewart offered the following opinions

1. Old Augusta Road, north of the intersection with Rincon Stillwell Road is straight and flat, which provides for good visibility for vehicles stopped at the intersection and waiting to turn left into the northbound lane of Old Augusta Road. Photo 4 is a view of Old Augusta Road facing northbound.

2. The intersection of Rincon Stillwell Road and Old Augusta Road is controlled by a stop sign and stop bar on Rincon Stillwell Road.

59

3. North and southbound traffic on Old Augusta Road does not stop at Rincon Stillwell Road intersection.

4. Vehicles in the left turn lane of Rincon Stillwell Road have an open line of sight greater than 600 feet north.

5. The Lexus has impact damage to the front of the vehicle, the driver side fender and passenger side rear door.

6. The Cintas Ford van had impact damage to the driver side front corner and driver side rear corner.

7. The Lexus impacted the Cintas Ford van at a speed between 40–45 mph.

8. The Cintas Ford van was traveling at a speed of 11 mph at impact.

9. The Cintas Ford van failed to stop at the stop bar prior to entering the path of the Lexus.

10. At 5 seconds before impact; Cintas Ford van was 66 feet from the area of impact traveling at 12 mph and the Lexus was 394 feet from impact traveling 55 mph.

11. At 4 seconds before impact; Cintas Ford van was 51 feet from the area of impact traveling at 8 mph and the Lexus was 313 feet from impact traveling 55mph.

12. At 3 seconds before impact; Cintas Ford van was 42 feet from the area of impact traveling at 6 mph and the Lexus was 233 feet from impact traveling 55 mph.

13. At 2.91 seconds before impact; Cintas Ford van was 41 feet from the area of impact traveling at 6 mph and the Lexus was 225 feet from impact traveling 55 mph. Lexus begins perception of Cintas Ford van.

14.   At 2 seconds before impact; Cintas Ford van was 32 feet from the area of impact traveling at 7 mph and the Lexus was 152 feet from impact traveling 55 mph.

15.   At 1 seconds before impact; Cintas Ford van was 19 feet from the area of impact traveling at 12 mph and the Lexus was 71 feet from impact traveling 55 mph.

16.   At 0.91 seconds before impact; Cintas Ford van was 17 feet from the area of impact traveling at 12 mph and the Lexus was 64 feet from impact traveling 55 mph.  Lexus applies brakes before impact.

17.   At impact; Cintas Ford van was traveling at 11mph and the Lexus traveling 41 mph.

18.   The Cintas Ford van and Lexus came to rest.

19.   The Lexus had less than 3 seconds to perceive and react to the Cintas Ford van.

20.   The Lexus would require approximately 305 feet to perceive, react and stop.

21.   When the Cintas Ford van crossed the stop bar, the Lexus did not have enough time or distance to avoid impacting the Ford.

Doc. 135-3 at 7–9.  Mr. Stewart is a licensed professional engineer and specializes in "product failure analysis and the reconstruction of traffic accidents involving trucks, buses, automobiles, motorcycles, bicycles, and pedestrians." *Id.* at 66.  He maintains numerous licenses, certifications, and professional affiliations related to this specialization. *Id.* at 66–67. In preparation for rendering his opinions, he reviewed the crash site;

crash report; data recorder from the van; several photographs; medical illustrations; medical records; pleadings; the report of J.D. Bethea; and the deposition transcripts of Michael Castle-Foster, Nicholas Robinson, Betty Robinson, and Seth Strickland.  *Id.*at 5.

Defendants assert that Stewart's opinions are unreliable because they rely on proprietary calculations which were not made available prior to the deposition or during cross examination.  Doc. 135 at 9.  Defendants further complain that "without revealing the calculations or formulas underpinning the Monte Carlo Analysis, the critical aspects of Stewart's report and testimony are left without a sufficient foundation nor can the Court or Cintas' experts test the reliability of any of Stewart's conclusions."  *Id.* at 12–13.  Plaintiff argues that while the exact mathematical analysis Stewart's software conducted is unavailable, the "Conservation of Momentum equations and the Monte Carlo analyses formulae are widely available formulae, and he provided in his report and file materials all the data he utilized to input into the analyses."  Doc. 178 at 2.  Specifically, plaintiff points to a lately proffered affidavit which he asserts rectifies the errors.  *See d*oc. 178-2.  (Unsurprisingly, defendants feel that this lately proffered affidavit does nothing more than

reveal the deficiencies inherent in Stewart's report and challenges it on the grounds of its lateness.)   Finally, and perhaps most importantly, plaintiffs point to defendants' expert Dr. Dunn, who apparently also used proprietary software to produce millions of calculations similar to Stewart's and also failed to produce any of the underlying calculations which were used to reach his opinions.  Doc. 178 at 2-3.

As with each of the preceding experts, there is no real challenge to his qualifications.  If this were a typical motion, the Court would next parse through whether the varying assertions regarding the contents of Stewart's assertions are accurate.  Specifically, the Court would have to determine whether, in the absence of "the variables he set, the equation and values used in his Monte Carlo analysis, how random values are chosen within his program, and the pre-braking speed and associated probabilities," his opinions are reliable.  Doc. 182 at 3.  However, this question is one which the Court need not yet answer as two issues must be addressed before reaching the merits of the motion.  First, defendants complain that they will not have the time to depose Stewart with regards to his recently filed curing affidavit.  However, secondly—and most pressing—the Court must express some concern about striking plaintiff's

expert witness on reliability grounds if defendants' witness suffers from the same fatal flaw.

As the parties have repeatedly expressed, this Court serves an essential gatekeeping function designed to prevent unreliable expert witness testimony from misleading the jury.  Generally, the parties bring issues like this to the Court prior to trial.   However, there is no prohibition on the Court raising these issues *sua sponte.  See, e.g., City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 563 (11th Cir. 1998) (affirming, in part, district court's *sua sponte* exclusion of expert testimony); *United States v. Smith*, 621 F. Supp. 2d 1207, 1222 (N.D. Ala. 2009) (noting that the Court may undertake *Daubert* inquiry even in the absence of Government's motion); *see also*, *Miller v. Baker Implement Co.*, 439 F.3d 407, 413 (8th Cir. 2006)("we conclude that it did not abuse its discretion by undertaking a *sua sponte Daubert* analysis"), *Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) ("We have not required that the *Daubert* inquiry take any specific form and have, in fact, upheld a judge's *sua sponte* consideration of the admissibility of expert testimony.") (citation omitted).  Thus, if defendants believe that Mr. Stewart's opinions are unreliable because of his application of a

proprietary formula, then the Court must also question the reliability of defendant's expert, Dr. Dunn, who apparently also uses a proprietary formula which has not been fully explained to the parties.

Despite the Court's concerns about the appropriateness of testimony from either of these witnesses, and perhaps in an effort to save the parties from themselves, the Court will not strike either of these witnesses immediately.  Instead, the defendants shall have thirty days from the date of this Order to re-depose Stewart on any of the issues contained within the newly filed affidavit.  If defendants remain unsatisfied as to the reliability of his testing or any of the opinions he renders, they may file renewed *Daubert* motion no later than fifteen days after the conclusion of the deposition.  However, having raised the specter of unreliability, the Court also opens to the plaintiff this same opportunity.  If plaintiff believes that defendants' expert opinions suffer from the same flaws of which defendants accuse his, he must file a competing *Daubert* motion within the same time period.  There will be no extensions, and neither party should delay in completing the deposition. The current motion is **DENIED**.  Doc. 135.

E. <u>Motion to Exclude Opinions and Testimony of Plaintiff's Expert
   Jenna L. Gardner-Morgan</u>

Defendants also challenge the expert witness report of Jenna L. Gardner-Morgan.  Doc. 137.  Gardner-Morgan performed a Functional Capacity Examination, ("FCE") and provided a Permanent Impairment Rating ("PIR").  *Id.* at 1; doc. 137-1 at 16-43.  Defendants assert that she lacks sufficient qualifications "to render a valid opinion regarding [p]laintiff's permanent impairment rating, as impairment evaluations must be performed by a licensed physician, and her opinions are merely a recommendation."  Doc. 137 at 1.  Likewise, they challenge the scientific methodology she utilized for her opinions.  *Id.* at 2.

Gardner-Morgan offered the following summary of her results:

> Mr. Castle-Foster's occasional lifting capabilities are at a Heavy physical demand category (PDC).  According to the US Department of Labor guidelines, Heavy work is defined as lifting 50–100 pounds 0–33% of the workday.  However, formal recommendations were made to limit floor to waist lifting to 75 pounds occasionally, waist to overhead lifting to 55 pounds occasionally, two handed carry to 65 pounds occasionally, static push to 132 pounds occasionally, and static pull to 132 pounds occasionally.  His impairment Rating Recommendation included a 14% whole person impairment due to his bilateral lower extremity injuries.

Doc. 137-1 at 6.  Gardner-Morgan is a worker's compensation specialist with a doctorate of physical therapy.  *Id.* at 8. She is a certified

ergonomics assessment specialist and a certified functional capacity evaluator. *Id.* at 10. She has experience in physical therapy and has completed two courses in impairment ratings for American Medical Association (AMA) guides. *Id.* at 10–11. However, plaintiff admits that Gardner-Morgan was not certified to approve Castle-Foster's FCE, and that Dr. Denlinger was required to do so. Doc. 165 at 2. Dr. Denlinger in turn, although "familiar with [Castle-Foster's] pertinent medical records and history at the time he signed the FCE and approved the PIR," "does not perform disability rating determinations himself." *Id.* at 6.

Defendants note that Gardner-Morgan is not a physician and as a result, is unable to provide anything other than a recommendation. Doc. 137 at 7. Likewise, defendants challenge her opinions because they lack a list of documents which she reviewed in preparation for conducting her examinations and furthermore, argue that she is not reliable as plaintiff was recommended to her by his attorney. *Id.* at 6-7. Defendants repeatedly note that review of all prior medical records are necessary to complete a fully valid impairment rating and point to significant discrepancies between Gardner-Morgan's statements and plaintiff's prior medical records. *Id.* at 5–10. Plaintiff argues that Gardner-Morgan's

experience as a physical therapist performing FCE's makes her qualified to recommend PIRs and that Dr. Denlinger was qualified to approve them.  Doc. 16 at 6.

Despite Gardner-Morgan's position as a therapist, she does not have the necessary qualifications to offer the opinions which she purports to render.  As an initial matter, all parties agree that Gardner-Morgan's determinations are only preliminary, and a physician must approve them.  *See, e.g.,* doc. 165 at 1-2 (noting that a physician approves an FCE and PIR although a non-physician performs the examination).  There appears to be no contest then that the only way for Gardner-Morgan's testimony to stand is if Dr. Denlinger's approval is sufficient.  However, that is not the only issue with Gardner-Morgan's opinions.

First, it appears that Gardner-Morgan did not follow AMA guides and first determine whether plaintiff had met maximum medical improvement (MMI) prior to completing her examination.  *See* doc. 137 at 9-10, 17-18 (noting that *AMA Guides, 5th Ed.*, requires a determination of whether the MMI has been reached prior to conducting an impairment rating).  Gardner-Morgan testified that she did not "recall ever seeing any record prior to her assessment that Plaintiff had reached

68

MMI, which she attributed to the fact that [p]laintiff's referral was from a lawyer and not [p]laintiff's physician." *Id.* at 18. Even plaintiff acknowledges that this determination was not made until after Gardner-Morgan had performed her examination. Doc. 165 at 3–4.

Second, it does not appear that she reviewed sufficient medical records in order to remedy this error. According to Gardner-Morgan's testimony, she reviewed only 108 pages of medical records pertaining to Castle-Foster's injuries and surgeries. Doc. 165 at 6. Plaintiff's physical therapy records were deliberately excluded as "standard procedure," to avoid skewing the results. Doc. 165 at 7. However, this conflicts with the *AMA Guides*, which require a review of the entire medical history, including therapy. Doc. 181. Plaintiff attempts to remedy this error by noting that Dr. Denlinger had full access and review to all of plaintiff's medical records. Doc. 165 at 4, 6.

To the extent Dr. Denlinger's support for the assessment is offered in remediation, his testimony falls far short of the mark in providing support for its reliability. As an initial matter, he does not provide disability ratings and is unaware of the methodology required to conduct an examination or make a determination as to impairment ratings under

the applicable guides. Doc. 137 at 16.  Nor is it entirely clear from the parties' filings that the odd hybrid collaboration under which plaintiff appears to be offering his expert witness satisfies the requirements of *Daubert*.  It is simply not clear that witnesses may distribute expertise and examination to create a single composite expert.

Plaintiff asserts that Dr. Denlinger's approval rectifies whatever errors or lack of qualifications Gardner-Morgan may have.  However, Gardner-Morgan has been proffered as an expert standing on her own merit.  And neither party has provided any support for the assertion that one expert's faults can be excused by another's merits.  Nor indeed, does it appear that Gardner-Morgan and Denlinger were disclosed as some kind of hybrid expert witnesses.  Thus, the Court falls back on the burden of proof obligations in *Daubert*.  Plaintiff has proffered Gardner-Morgan as an expert.  Accordingly, it is *plaintiff* who is obliged to support Gardner-Morgan's expertise and her testimony's admissibility. Considering that neither party truly contests that Gardner-Morgan's testimony and opinions stand for much in the absence of Dr. Denligner's ratification, the Court cannot find that that she is qualified.  If she lacks sufficient qualifications to render the opinion individually, she cannot be

proffered as an expert in this circumstance.  Indeed, such testimony is likely to mislead the jury as it will grant to her greater authority than would otherwise be entitled to under the terms of the standards which she acknowledges she was attempting to apply.  Accordingly, defendants motion as to Gardner-Morgan is **GRANTED**.  Doc. 137.

F. <u>Motion to Exclude Opinions and Testimony of Plaintiff's Expert John D. Bethea</u>

Defendants have also filed a motion to exclude plaintiff's expert John D. Bethea.  Doc. 138.  Defendant asserts that Bethea is proffered as an expert solely to "create a dispute of fact as to whether Mr. Robinson stopped at the stop sign at the intersection of Old Augusta Road and Rincon Stillwell Road." *Id.* at 1.  Defendants assert that Bethea does not offer any opinions, but rather provides observations which are unhelpful to the jury and should be excluded pursuant to Rule 702.  *Id.*

Bethea proffered the following opinions:

1. The configuration and location of the damage to the front of the Silver 2002 Lexus RX300 SUV and the front of the left-turning White 2015 Ford CINTAS Transit Van is typical of an offset head-on style collision.

2. The Airbag within the White 2015 Ford CINTAS Transit Van deployed. This deployment locked the pre-crash related data within the White 2015 Ford CINTAS Transit Van Airbag Control Module (ACM).

71

3. The technicians from Collision Specialists Inc. (CSI) imaged the Pre-Crash related data from the Airbag Control Module (ACM) located within the White 2015 Ford Cintas Transit Van.

4. Mr. Nicholas A. Robinson testified in his deposition that he stopped for the stop sign on Rincon Stillwell Rd. at its intersection with Old Augusta Rd.  <u>This testimony is errant in that it is contradicted by the pre-crash data found in the White 2015 Ford CINTAS Transit Van Airbag Control Module (ACM).</u>

5. The operator of the CINTAS Transit VAN *<u>did not stop</u>* at the stop sign located on Rincon Stillwell Rd at its intersection with Old Augusta Road immediately prior to turning left into the path-of-travel of the Lexus SUV operated by Mr. Michael J. Castle-Foster.

Doc. 138-1 at 7–8 (emphasis in original) (citations omitted).   Bethea reviewed the following items in preparation for rendering these opinions:

1. Observation of the imaging procedure of the Airbag Control Module (ACM) Data from the CINTAS Transit Van.

2. Analysis of the Airbag Control Module (ACM) Data from the CINTAS Transit Van.

3. Diagram in Georgia Motor Vehicle Accident Report No.: #C000537971-01.

4. Review of the Deposition and Exhibits of the Operator of the CINTAS Transit Van, Mr. Nickolas A. Robinson.

5. Visual inspection of the site where the Crash at issue occurred

6. Visual inspection of the CINTAS Transit Van

### 7. Visual Inspection of the LEXUS SUV

*Id.* at 6.  Bethea is an accident reconstructionist and is certified by the Accreditation Commission for Traffic Accident Reconstruction.  *Id.* at 12. He has a bachelor of science in engineering, and has completed a number of other accident reconstruction trainings.  *Id.*  He has investigated and analyzed crashes in 26 states and testified in over 80 cases, including in Georgia.  *Id.* at 13.

In response to defendants' assertions that Bethea merely offers observations, plaintiff argues that whether or not Robinson stopped at the stop sign is not the sole reason why Bethea is proffered as an expert. Instead, plaintiff asserts that the data upon which Bethea derived his assertions comes from an Airbag Control Module ("ACM") and that expert testimony is required so that a layperson can understand how to interpret that data.  Doc. 163 at 1–2.  Plaintiffs assert that each of the opinions Bethea proffers are "based upon [his] inspection of the Cintas van and his knowledge and expertise as an accident reconstructionist particularly with respect to the downloading process of ACM data, the integrity of the stored data, and the interpretation of the data."  *Id.* at 7.

There is no question that Bethea is qualified to offer the opinions he provides. Instead, the query revolves around whether the opinions themselves are helpful or necessary. While defendants are correct that the first three opinions are dependent on easily observable information, *i.e.*, it being a head on collision, plaintiff is also correct in that the recovery process and interpretation of the ACM data appears poised for expert testimony. As plaintiff points out, although the damage to the cars *appears* obvious, it is also clear that the "average layperson does not reconfigure crush damage patters of vehicles to determine how the vehicles were positioned upon impact." Doc. 163 at 8. Likewise, Bethea's opinions relating to the deployment of the airbags and the downloading of the data lend themselves to expert testimony as they relate to a procedure of which a lay person would be unaware. It is immaterial that another person *could* testify to this, as defendants contest, as *Daubert* does not require the best witness to testify, merely one who is otherwise qualified.

Bethea's fourth and fifth opinions relate to potential conflicts between the ACM data and the testimony of Cintas' driver. It is true, as defendants note, that part of this testimony calls into question the

veracity of Robinson's claim that he stopped at the stop sign. However, there is a difference between stating that an individual is "lying" and presenting an opinion that the data does not confirm or is inconsistent with the statements a witness makes. In that sense, Bethea merely presents the evidence he derived from the ACM data and notes that it does not line up with Robinson's testimony. It remains up to the jury to decide whether they should credit Robinson's statement or to credit the objective evidence from the ACM data. In that sense, there is no impinging on the jury's role as the sole fact finder in this case.

Having reviewed the information contained in the expert report, the Court acknowledges that it is possible that this testimony *could* cross from expert opinion to fact statements given the right set of circumstances. Accordingly, nothing in this Order should be read as precluding defendants from raising objections to Bethea based on his testimony *at trial*. However, given the information provided at this juncture, it would be inappropriate for the Court to exclude Bethea's otherwise helpful and reliable opinions regarding the ACM data on the basis that those opinions *might* overstep the mark during trial. Accordingly, defendants' motion is **DENIED**. Doc. 138.

## SANCTIONS

Plaintiff has also requested sanctions in his motion to compel. Doc. 125. While those sanctions are warranted, *see infra* pp. 80-82, the Court must dissuade all parties from continuing down the path they are on. Many (although admittedly not all) of the motions which were filed in this case were of dubious merit. For example, plaintiff opposed defendants' motion for an IME arguing that such an examination was unnecessary because plaintiff's experts had already examined plaintiff, that a second examination could result in a contested set of results, but then challenged defendants' medical experts pursuant to *Daubert* because those experts had not examined plaintiff. *See* supra pp. 6-16. The *reason* defendants seek their own examination is because they were not present during the one plaintiff conducted and because plaintiff's medical records (in their opinion) *do not* comport with the information plaintiff's experts provided. Likewise, plaintiff cannot object to defendants' medical experts who reviewed the medical records on the basis that they did not personally examine plaintiff *and also* withhold an examination arguing that medical records are *sufficient* to render an expert opinion.

Defendants, however, are not blameless. Defendants argued that one of plaintiff's experts should be struck, in part, because he used a proprietary technology without fully providing all of the formulas used. However, (and it is notable because this assertion is uncontested) defendants' expert proposes to do the exact same thing. Defendants felt that they either had no need to expose this contradiction or hoped to keep the Court in the dark about it completely. *See supra* pp. 59-65.

As a whole, the parties have repeatedly failed to exhibit the kind of professional consideration for each other that the Court expects, notwithstanding their adversarial posture. As early as March of last year the Court noted that the parties were behaving dismally. Doc. 72 at 1 ("A disproportionate amount of ink and venom have been deployed by the parties in this personal injury case over the question of a 90-day extension to the fact discovery period."). Apparently not getting the hint, the parties then proceeded to request a settlement conference at which it became apparent that there was not only no hope of a settlement, but also that no reasonable attorney could have expected a settlement to

ensue considering the positions taken.[5]   After that unsuccessful and needlessly time-consuming conference, the Court directed the parties to file amended discovery motions.   Doc. 120.   In that Order the Court admonished the parties for wasting the Court's time by filing excessive exhibits.   *Id.* (noting that the topside briefs alone for discovery motions constituted 3,744 pages of argument and exhibits).   Yet again the parties ignored the Court's gentle prodding.   In fact, defendants patently ignored a Court order imposing page limits.   Doc. 139 (show cause noting that "[c]ompliance with the page limit, to say nothing of the express instructions on how to seek excess pages, should have been perfunctory.").   Defendants then filed a motion to withdraw in response to the show-cause order that suggested more than a *de minimis* lack of respect for the Court.   Doc. 142 at 1 (noting that "[p]erhaps the motion to withdraw and the whiff of condescension from its opening sentence, was defendant's attempt to save face in light of its inability to comport itself within the boundaries of this Court's rule.").

---

[5] The Court will not discuss the details of the opening position to safeguard the privacy of the mediation procedure.

In short, this nonsense has caused the Court to waste valuable time refereeing disputes of questionable merit. The parties are neither negotiating with each other in good faith, nor are they comporting themselves with the reasonableness and dignity which the Court expects of its practitioners. The Court cannot fathom how they could in good conscience file many of the arguments (if not entire motions) disposed of in this Order under Fed. R. Civ. P. 11(b). *See id.* ("By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; . . . ). The Court also cannot understand why it was necessary for it to wade into this morass to instruct defendants to turn over discovery items which should have been disclosed nearly a year ago. *See supra* pp. 23-24 (for example, the

training videos).  Instead, the attorneys appear to be interested only in sniping at each other and unnecessarily extending and delaying resolution of this case.

In an effort to move this already tortured case to what will inevitably be a tortured conclusion, the Court has imposed deadlines in this Order which should complete all discovery and pretrial (although not dispositive) motions.  Within ten days from the date of this Order the parties are **DIRECTED** to file a single joint notice indicating that they have conferred with regards to those deadlines and have agreed on a schedule for completion.  Failure to file this notice, for any reason, will result in a recommendation for sanctions and all counsel should be prepared to explain their inability to work together to complete this basic task.

Defendants however, are subject to discovery sanctions regardless. Plaintiff requested sanctions in his motion to compel, and costs are warranted, if for no other reason than defendants have wasted the time and money of plaintiff in failing to turn over videos previously directed disclosed by this Court.  Fed. R. Civ. Pr. 37(b)(2)(C).  Discovery, it must be remembered, is supposed to be self-executing.  *Leakes v. Target Corp.,*

2015 WL 4092450 at *1 n. 1 (S.D. Ga. July 6, 2015); *Bottoms v. Liberty Life Assur. Co. of Boston*, 2011 WL 6181423 at * 4 (D. Colo. Dec. 13, 2011) ("Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through Rule 37, and obligates each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection.") (quotes and cite omitted).  That was not the case here.

"Where a motion to compel is granted, attorney fees and expenses must be awarded to the prevailing party unless there was no good faith effort to resolve the motion, the non-disclosure was substantially justified, or other circumstances make an award of expenses otherwise unjust." *FormFactor, Inc. v. Micro-Probe, Inc.*, 2012 WL 1575093 at *9 (N.D. Cal. May 3, 2012) (citing Fed. R. Civ. P. 37(a)(6)).  "[E]ven an innocent failure [to answer discovery] is subject to sanctions, though the reason for the failure is relevant in determining what sanction, if any, to impose." 8B CHARLES A. WRIGHT ET AL, FEDERAL PRACTICE AND PROCEDURE § 2281 (3d ed. 2010).  Because the Court grants in part plaintiff's motion to compel, and requires a supplemental privilege log,

and other disclosures, some sanction is warranted.[6]  Accordingly, within ten days from the date of this order, the Court will accept briefing from plaintiff as to the reasonable cost and fees associated with having had to bring the motion to compel.  Doc. 125.  Defendants shall have five days to respond, if they so desire.  In the alternative, plaintiff and defendants may confer and agree upon defendants' reimbursement of plaintiff's reasonable costs of bringing this motion and inform the Court jointly within ten days from the date of this order that all disputes over sanctions have been resolved.

## CONCLUSION

For the foregoing reasons, defendants' Motion for an Independent Medical Examination, doc. 143, is **GRANTED** and defendants are **DIRECTED** to file a supplement detailing the testing their examining physicians will conduct within ten days from the date of this order.[7] Plaintiff's Motion to Compel Discovery Responses and for Sanctions, doc. 125, is **GRANTED IN PART** and **DENIED IN PART** and defendants

---

[6] The Court expects that plaintiff's request for reimbursement will be reasonable and narrowly tailored.

[7] Defendants' previously filed Motion for an Independent Medical Examination, doc. 124 is **DISMISSED AS MOOT**.

are **DIRECTED** to produce any relevant documents within ten days from the date of this Order or to certify that they have conducted a reasonable search for said documents.  Defendants' Motion to Exclude Opinions and Testimony of Plaintiff's Rule 26(A)(2)(C) Experts, doc. 132, is **DENIED**.  Defendants' Motion to Exclude the Testimony of Lew Grill, doc. 128, is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's Motion to Exclude Opinions and Testimony of Dr. Robert Barth, doc. 130, is **DENIED**.  Plaintiff's Motion to Exclude Opinions and Testimony of Lane VanIngen, doc. 133, is **GRANTED IN PART** and **DENIED IN PART**.  Defendants' Motion to Exclude Christopher Stewart, doc. 135, is **DENIED** subject to re-deposition.  Defendants' Motion to Exclude Jenna L. Gardner-Morgan, doc. 137 is **GRANTED**.  Defendants' Motion to Exclude John D. Bethea, doc. 138, is **DENIED**.  Defendants' Motion to Exclude the Opinions of Gregory O'Shanick, doc. 136, is **DISMISSED AS MOOT**.  Hearings on the assigned motions are unnecessary.  They are, all of them, **DENIED**.  Docs. 126, 131, 134, 156, 162, 164,168, 170, 173, 177.

The parties are further **DIRECTED** to file a single joint notice indicating that they have conferred with the deadlines contained within

this Order and have agreed on a schedule for completion. Furthermore, because the Court grants in part plaintiff's motion to compel, and requires a supplemental privilege log, and other disclosures, some sanction is warranted. Accordingly, within ten days from the date of this order, the Court will accept briefing from plaintiff as to the reasonable cost and fees associated with having had to bring the motion to compel. Doc. 125. Defendants shall have five days to respond, if they so desire. In the alternative, plaintiff and defendants may confer and agree upon defendants' reimbursement of plaintiff's reasonable costs of bringing this motion and inform the Court jointly within ten days from the date of this order that all disputes over sanctions have been resolved.

Finally, the Court acknowledges that it is reopening discovery, albeit for very limited purposes, and that this might affect certain summary judgment motions currently pending before the Court. *See, e.g.,* doc. 122. Accordingly, the parties are **DIRECTED** to notify the Court within fourteen days from the date of this Order whether they anticipate supplementing their motions for summary judgment or whether they will stand on those motions as filed.

Failure to file this notice will result in the Court deeming any supplementation waived.

      **SO ORDERED,** this <u>16th</u> day of February, 2021.

                                              _____
                                              CHRISTOPHER L. RAY
                                              UNITED STATES MAGISTRATE JUDGE
                                              SOUTHERN DISTRICT OF GEORGIA